1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
                    - - -
3
   GRACE LAWRENCE              : CIVIL ACTION
4                              :
           vs.                 :
5                              :
   TRANS UNION, LLC and        :
6  CITY OF PHILADELPHIA        : NO. 02-CV-4440

7
                    - - -
8            Philadelphia, Pennsylvania
              Tuesday, June 10, 2003
9                   - - -

10

11       Telephone Deposition of WILLIAM

12 STOCKDALE, taken pursuant to notice, at the

13 law offices of FRANCIS & MAILMAN, 100 South

14 Broad Street, 19th Floor, on the above

15 date, beginning at approximately 2:00 p.m.,

16 before Kristen L. Brown, a Certified

17 Shorthand Reporter, Registered Professional

18 Reporter, and Notary Public.

19

20

21
                    - - -
22         KAPLAN, LEAMAN AND WOLFE
         Registered Professional Reporters
23            The Bourse - Suite 970
         111 S. Independence Mall East
24        Philadelphia, Pennsylvania 19106
                 (215) 922-7112
             KAPLAN, LEAMAN AND WOLFE
                 (215) 922-7112

WILLIAM STOCKDALE

20

1  question.

2  Q.         Okay.  I'd like to know whether
3  since you assumed the position of director,
4  to your knowledge, has Trans Union used
5  vendors such as Superior Information
6  Services to gather public records
7  information on an exclusive basis, or does
8  Trans Union also obtain public records
9  information directly from the source
10 without going through the lenders?
11 A.         Since 1994, Trans Union used
12 public record vendors to purchase public
13 records.  Trans Union never went out and
14 collected -- since 1994, has never gone out
15 and collected public records themselves.
16 Q.         Why does Trans Union use vendors
17 such as Superior Information Services?
18            MR. LUCKMAN:  Objection to the
19 form.
20            MR. SOUMLIAS:  Could you tell me
21 what was wrong with the question so I could
22 clarify it?
23            MR. LUCKMAN:  I'm not so much
24 sure it's just the form than with the

KAPLAN, LEAMAN AND WOLFE

(215) 922-7112

WILLIAM STOCKDALE

23

1  A.        Superior competes with other
2  vendors by -- through a comparison, an
3  actual data comparison. And it was
4  determined that Superior actually did a
5  better job in that area than the
6  competition, so Trans Union selected
7  Superior.
8  Q.        Could you please tell me what the
9  data comparisons that you referred to is?
10 A.        Yes. We would actually have --
11 we would actually go to courthouses and
12 have -- pick up judgments or tax liens or
13 bankruptcies, and we would compare the
14 databases of the public record vendor to
15 determine who had the best data.
16 Q.        And what do you mean by the best
17 data?
18 A.        The most accurate, the presence
19 of.
20 Q.        Could you tell me when these data
21 comparison studies were done by Trans
22 Union?
23 A.        We did one in 1994 and we just
24 did one in -- within this year, I can't

1  Q.      Now, you said that Superior
2  scored, if I may use that term, better with
3  respect to accuracy. Is that a true
4  statement; is that an accurate statement?
5  A.      Yes.
6  Q.      And do you know whether, focusing
7  now on the 1994 study, do you know whether
8  Trans Union still maintains records of this
9  data comparison study?
10 A.      No.
11 Q.      Does Trans Union contain records
12 of the 2003 data comparison study?
13 A.      No.
14 Q.      You did not maintain any records
15 of that?
16 A.      No.
17 Q.      What happened to the records?
18 A.      We discard them once we're done
19 with the study.
20 Q.      Was the result of the study that
21 you should continue to use Superior in the
22 Pennsylvania area?
23 A.      Yes.
24 Q.      To your knowledge, again going

WILLIAM STOCKDALE

28

1  back to 1994, was Superior also the most

2  competitive in terms of pricing in addition

3  to being the most accurate?

4  A.        No, they were more expensive.

5  Q.        Would you tell me what the

6  pricing for Superior was, let's say under

7  your most recent contract with them, the

8  one that was executed in August of 1999?

9  A.        I don't have the exact number,

10 but it was somewhere around the 40 cent

11 range per record, and their competitor was

12 around the 45 cent range.

13 Q.        Could you please explain what

14 that means.  When you say 40 cents per

15 record, was does that mean?

16 A.        Collectors go to courthouses and

17 collect judgments and tax liens and

18 bankruptcies.  So per tax lien that is

19 collected, whether it's a Status 5 tax lien

20 or a brand new open tax lien, Trans Union

21 would pay a unit price and 40 cents,

22 40-some-plus cents, I think it's 42 cents,

23 for Superior is what we would pay for

24 public record.

WILLIAM STOCKDALE

34

1  contractual terms of how to conduct
2  reinvestigations in connection with public
3  records, were those contractual terms any
4  different in the contract that was in place
5  prior to the August 1999 contract?
6  A.      I don't know.
7  Q.      Do you know whether Trans Union
8  maintains copies of that older contract?
9  A.      I don't know.
10 Q.      Okay. Now, we've mentioned the
11 audits in 1994, the site visit in 1994, and
12 the contracts. Is there anything else that
13 Trans Union did between 1994 and 2000 to
14 assure that Superior was providing accurate
15 information pursuant to your business
16 relationship?
17         MR. LUCKMAN: Object to the
18 form.
19         THE WITNESS: Yes.
20 BY MR. SOUMILAS:
21 Q.      Could you tell me what else Trans
22 Union did?
23 A.      I personally have visited
24 Superior at least three times that I'm

WILLIAM STOCKDALE

35

1  aware of for site visits to make sure that
2  they had credible procedures in collecting
3  public record information.
4  Q.        Other than those three personal
5  site visits, anything else?
6  A.        Yes.  We also trend their
7  information to make sure that the
8  information that affects Trans Union is
9  consistent in the area of quality control
10  checks, as well as the volume that is being
11  set.
12           We have set thresholds, so if any
13  area within the threshold that we have set
14  exceeds five percent high or low, we would
15  set an indicator to tell us that we could
16  verify with the public record vendor what
17  the reason was for the exceeding of the
18  threshold.
19  Q.        Anything else other than trending
20  the information and the three personal
21  visits, in addition to the information that
22  you testified about earlier?
23  A.        I can't think of anything else
24  that we did.

KAPLAN, LEAMAN AND WOLFE

(215) 922-7112

1  in place and show me actual data that they
2  would use to make sure that the collectors
3  were collecting information accurately.
4  Q.      How long a period of time did
5  your 1999 on-site visit last?
6  A.      A day.
7  Q.      Full day?
8  A.      Three quarters of a day; six
9  hours.
10 Q.      What was the result of that
11 visit? In other words, were you satisfied
12 that their procedures were adequate?
13 A.      I don't know of a public record
14 vendor that does a better job than
15 Superior, that's how satisfied I was with
16 their product.
17 Q.      Would you also please elaborate
18 on what you've identified as trend or
19 trending information, specifically when is
20 that done; is it done on an ongoing basis,
21 is it a one time study, what is it?
22 A.      It's an ongoing basis. Every
23 time we receive a transmission from
24 Superior, they electronically transmit data

WILLIAM STOCKDALE

38

1  to us, we run the quality control checks
2  against the trended information that we
3  receive from the previous six runs of
4  data.
5         So, for instance, if we normally
6  receive a hundred judgments that were
7  satisfied, our expectation would be that we
8  should receive around the same amount of
9  judgments because courthouses can only
10 handle a certain amount of cases a week, a
11 month, depending on how the data is
12 provided to us from Superior. And, again,
13 if we succeeded the threshold by five
14 percent, then we're going to question that
15 information.
16 Q.     I'm sorry, you said that you do
17 these every one hundred what? I thought
18 you mentioned a one hundred unit, am I
19 wrong about that?
20 A.     Yes.
21 Q.     What was the reference to a
22 hundred for?
23 A.     It was an example.
24 Q.     Oh, it was an example. You said

1  that the trend information is ongoing. Is
2  it on a daily basis that you would check
3  this?
4  A.	When I say ongoing, and I'm not
5  sure if Superior comes in daily or weekly.
6  I believe they come in weekly, but doesn't
7  matter when they come in. When they come
8  in, we take the information that we receive
9  and we run the current information up
10 against the last six transmissions
11 electronically, transmitted data from
12 Superior. We run that information up
13 against the last six and we check certain
14 criteria.
15 Q.	Let me just make sure I
16 understand that. So if we assume for the
17 sake of this deposition that Superior
18 reports to Trans Union public records data
19 once per week, every time a new weekly
20 report comes in you statistically compare
21 it to the previous six?
22 A.	Correct.
23 Q.	Do you maintain records of these
24 statistical comparisons?

WILLIAM STOCKDALE

40

```
1  A.        Yes.  We archive that
2  information.  I don't know how far back we
3  go, but we do have that information.
4  Q.        To your knowledge, have you ever
5  had a problem, for lack of a better word,
6  with the information that was coming in
7  from Superior on any given week as it
8  compared to the trend?
9  A.        Yes.
10 Q.        You did.  Could you please tell
11 me about that.
12 A.        Certainly.  If the -- they are
13 archived when, and I don't know the exact
14 number, but let's say Superior transmits
15 10,000 records a month, there have been
16 times where they only transmitted 9,000, so
17 we were short a thousand.  So we called up
18 Superior to find out why did we only
19 receive 9,000 judgments.  And they would
20 report back to us the reasons why.
21          Many times it was because the
22 courthouse didn't allow a collector into
23 their courthouse that week because they
24 were remodelling, or they did not get
```

1   access to the data that week or they had a
2   systemic problem and they were backlogged
3   with information so they could not provide
4   it to us.
5   Q.      Do you know how many times that
6   sort of a problem happens over the course
7   of a year?
8   A.      Not very often, less than a
9   percent.
10  Q.      And is it always triggered by
11  having a five percent deviation from the
12  previous six reports?
13  A.      Yes.
14  Q.      Other than this five percent
15  deviation, is there anything else that
16  would alert Trans Union of a potential
17  problem?
18  A.      In our consumer -- the only other
19  check would be in a consumer relations
20  department.  If we started to receive a
21  numerous amount of disputes that were in
22  the area of public record and they all seem
23  to be located in Superior -- in areas that
24  Superior provides that information to us,

WILLIAM STOCKDALE

53

1  Trans Union would then send that dispute
2  over to Superior to have them verify the
3  accuracy of the information.
4  Q.        And it's Superior's job to
5  conduct the investigation?
6  A.        (No response.)
7  Q.        Is it Superior's job to conduct
8  the information?
9  A.        It would be Superior's job to go
10 to the courthouse and verify the public
11 record.
12 Q.        They're required to physically go
13 to the courthouse and verify it?
14 A.        Yes.
15 Q.        And this is the $5 charge that we
16 talked about under the 1999 contract?
17 A.        Yes.
18 Q.        Once they report back to Trans
19 Union, does Trans Union do any other
20 investigation, or does it simply report the
21 result of Superior's investigation?
22           MR. LUCKMAN:  Object to the
23 form.
24 BY MR. SOUMLIAS:

KAPLAN, LEAMAN AND WOLFE

(215) 922-7112

WILLIAM STOCKDALE

67

1  Q.         With respect to Superior, I think
2  you characterized them, if my notes are
3  accurate, that you don't know of a better
4  public records vendor.  Other than this
5  lawsuit, do you know of any other lawsuits
6  in which Trans Union is involved where the
7  allegation is that Superior did not provide
8  accurate public records information?
9  A.         No.
10 Q.         You're moving us along fast.
11            With respect to the relationship
12 between -- the business relationship
13 between Trans Union and Superior, I just
14 want to make sure that I understand just a
15 couple specifics about it.  When Trans
16 Union reports information to third parties
17 such as credit furnishers about a public
18 record showing up for a particular
19 consumer, does Trans Union include in it's
20 credit reports that the information comes
21 from Superior, or does it simply list the
22 public record at issue?
23 A.         It only shows the public record,
24 it does not show who picked the public

KAPLAN, LEAMAN AND WOLFE

(215) 922-7112