## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GRACE LAWRENCE** ) | |
| ) | |
| **Plaintiff,** ) | |
| **vs.** ) | |
| ) | **Civil Action No. 02-CV-4440** |
| **TRANS UNION, LLC** ) | |
| ) | |
| **and** ) | |
| ) | |
| **CITY OF PHILADELPHIA** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## PLAINTIFF GRACE LAWRENCE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TRANS UNION, LLC'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Grace Lawrence, through her undersigned counsel, respectfully submits this Memorandum of Law in Opposition to Trans Union, LLC's ("TU") Motion for Summary Judgment. For the numerous reasons stated below, TU's Motion should be denied.

### I.    BACKGROUND

Plaintiff Grace Lawrence instituted the current action against TU to recover for the damages she sustained as a result of TU's unlawful credit reporting practices.[1]   Plaintiff's Complaint asserts violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*, *as amended,* and various laws of the Commonwealth of Pennsylvania.

This case centers around TU's inexcusable conduct in reporting an erroneous and damaging $2951 civil judgment on Ms. Lawrence's credit file from the Philadelphia Municipal Court until July of 2002. TU reported this phantom judgment despite never having seen any court record documenting the existence of such a judgment, and even after having received

---

[1]    Defendant City of Philadelphia was previously dismissed from this matter.

multiple disputes of the judgment from Ms. Lawrence and objective evidence from the Municipal Court demonstrating that the information it was reporting about her was grossly inaccurate. In fact, Ms. Lawrence had won a judgment. Notably, TU does not contend that the judgment was ever owed by Ms. Lawrence. Moreover, even after discovery, TU has yet to identify one single document or record demonstrating the origin or existence of a judgment against Ms. Lawrence. As the FCRA was designed to protect consumers against "the trend toward . . . the establishment of all sorts of computerized data banks [that places a consumer] in great danger of having his…character reduced to impersonal 'blips' and key punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause," this case presents the archetypal credit nightmare demonstrating why this remedial statute exists.[2]

Contrary to TU's contentions, Ms. Lawrence does not advance any time-barred claims. Rather, she challenges TU's conduct in reporting the judgment during the two years prior to the filing of her July 3, 2002 Complaint and failing to investigate her dispute of that judgment in March of 2001. She seeks to recover cognizable damages she sustained within the two year period of time prior to the filing of her Complaint, including, among other things, a credit denial in July of 2001, damage to her credit reputation, and emotional distress, embarrassment and humiliation she suffered during that period as a result of being stigmatized as a bad credit risk. She also seeks punitive damages for TU's reckless conduct during 2000-2002 in reporting the judgment and misrepresenting to her that it had verified the judgment as "accurate" despite never having contacted the Philadelphia Municipal Court and having no court record demonstrating the existence of any such judgment.

---

[2]    *See Dalton v. Capital Associated Industries, Inc.*, 257 F. 3d 409 (4th Cir. 2000) (citing 116 Cong. Rec. 36570).

TU's ironic admissions made in support of its statute of limitations defense that it was actually reporting the judgment about Ms. Lawrence since 1997, and that she had disputed the information at that time, do nothing more than strengthen Ms. Lawrence's timely claims by demonstrating the abundant notice that TU had of the derogatory information within the statutory period. While Ms. Lawrence agrees that her battles with TU unfortunately go back many years, she is not seeking recompense under the FCRA for TU's actions or any damage she suffered prior to July 3, 2000.   Other than providing evidence of TU's notice of the inaccurate information it was reporting, the 1997-2000 transactions have no impact on her claims based upon TU's conduct and damage she suffered within the statutory time frame.  As Chief Judge Giles recently noted when following the Fifth Circuit's ruling in *Hyde v. Hibernia*, 861 F.2d 446 (5th Cir. 1988), each transmission of a disputed credit report in an FCRA action creates a separate and distinct tort to which a separate statute of limitations applies. *Jaramillo v. Experian Information Solutions, Inc.* 155 F. Supp. 2d 356, 359-360 (E.D. Pa. 2001).  As Ms. Lawrence has placed evidence before the Court that TU reported the judgment until July of 2002, and that she suffered damage up through that time, Ms. Lawrence's FCRA claims arising from TU's post-July 2000 conduct are clearly not time-barred.[3]

As a matter of course, TU files for summary judgment,[4] contending that Plaintiff has not adduced sufficient facts during discovery to proceed to trial. TU's motion must be denied given the abundant admissible evidence Ms. Lawrence places before this Court, including deposition

---

[3]       As discussed below, evidence of TU's pre-July 2000 conduct is relevant to Plaintiff's burden of proof on her timely claims, as well as her CPL claim which has a 6 year statute of limitations.  *Philbin v. Trans Union*, 101 F.3d 957, 968, fn. 7 (3rd Cir. 1996).

[4]       It bears mention that in all cases challenging TU's reporting of inaccurate information, it consistently moves for summary judgment on all claims.  *See Crane v. Trans Union*, CA. No. 02-7599 (E.D. Pa.) (TU's summary judgment filed and pending); *Sutton v. Trans Union*, C.A. No. 02-6908 (E.D. Pa.) (TU's summary judgment filed and pending); *Evantash v. Trans Union,* C.A. No. 02-1188 (E.D. Pa.) (TU's summary judgment filed and pending); *Williams v. Trans Union*, C.A. No. 02-2574 (E.D. Pa.) (TU's summary judgment filed, case later settled); *Miller v. Trans Union*, C.A. No. 00-5107 (consolidated as C.A. No. 00-4778) (E.D. Pa.) (summary

testimony of TU's corporate representative Eileen Little, Chase Bank and Ms. Lawrence herself, certified records from the City of Philadelphia and documents Plaintiff sent to and received from TU.  This evidence establishes that: (1) Ms. Lawrence won a judgment in the Philadelphia Municipal Court; (2) TU actually reported that this judgment was entered *against* her from 1997 until July of 2002, right after this case was filed; (3) Ms. Lawrence repeatedly disputed the judgment with TU, including in February 2001; (4) Ms. Lawrence went to the Municipal Court, obtained a copy of the docket demonstrating that there was no judgment against her (but rather was in her favor) and forwarded this document to TU; (5) TU received a copy of the docket from Ms. Lawrence and rejected it; (6) TU has never forwarded the court docket to its vendor, Superior Information Services, because it does not forward documents submitted by a consumer to the company reporting the disputed information as a matter of policy, despite the clear mandate set forth at 15 U.S.C. 1681i(a)(2)(B); (7) TU repeatedly informed Ms. Lawrence that the Philadelphia Records Department and Municipal Court had verified the judgment as accurate; (8) TU has never contacted the Municipal Court or Philadelphia Records Department and does not in fact know whether they were *ever* contacted by anyone in response to Ms. Lawrence's disputes; (9) TU has never seen any document or record demonstrating that Ms. Lawrence ever had a judgment against her by any party in any court; (10) until a few months ago, TU had never even requested Superior Information Services to provide it with a document or record reflecting a judgment against Ms. Lawrence; (11) Ms. Lawrence was denied credit from Chase in July of 2001 as a direct result of the inaccurate judgment TU was reporting; (12) Ms. Lawrence suffered embarrassment, anxiety, emotional distress damage and damage to her credit reputation as a result of TU's misreporting of the judgment up through July of 2002.  From

---

judgment filed, case later settled).

this vast factual record, a reasonable factfinder could certainly find in favor of Plaintiff on all of her claims and requested relief, including punitive damages.

Unlike other circuits, the Third Circuit has specifically addressed the summary judgment standard to be applied in an FCRA case challenging a credit reporting agency's (TU in fact) reporting of inaccurate information after receiving dispute of the information from the consumer. *See Cushman v. Trans Union Corp.*, 115 F. 3d 220, 225 (3d. Cir. 1997); *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d. Cir. 1996) (discussed *infra*).   These cases strongly support the submission of this case to a jury.   Accordingly, TU's Motion for Summary Judgment must be denied.

## II.    **COUNTER-STATEMENT OF FACTS**

### A.    **Ms. Lawrence Wins A Philadelphia Municipal Court Case In 1996**

In 1996, Ms. Lawrence won a small claims lawsuit in the Municipal Court of Philadelphia, and had a judgment entered in her favor in the amount of $2,951.[5] (Lawrence Dep. at 6-7).[6] (*See also* Certified Record of Judgment in Plaintiff's favor, which is attached hereto as Exhibit B).   Despite the fact the Ms. Lawrence prevailed in the action, and that the judgment against Mr. Frommer was withdrawn without prejudice, in 1997 TU, one of the three largest national credit reporting agencies, began reporting this court record as a judgment *against* Ms. Lawrence.   (*See* Lawrence Dep. at 7).   (*See also* Plaintiff's redacted TU credit reports of 7/29/1997, 11/12/97, 1/23/98, 1/25/01, 3/26/01, 6/24/02 showing how the judgment was reported

---

[5]    An individual named Thomas Frommer with whom Ms. Lawrence shared a car initiated the 1996 lawsuit in the Municipal Court of Philadelphia, docket number 11080, against Ms. Lawrence. Ms. Lawrence counterclaimed. Ms. Lawrence prevailed in the action against Mr. Frommer and won a $2,951 judgment on her counterclaim. After a post-judgment settlement with Mr. Frommer, Plaintiff withdrew her judgment against him without prejudice.

[6]    A true and correct copy of the pages from Plaintiff Grace Lawrence's deposition testimony of May 8, 2003, that are cited herein are attached hereto as Exhibit A.

between 1997 and 2002, which are attached collectively hereto as Exhibit C).  Ms. Lawrence had

an otherwise excellent credit history; and this $2,951 judgment was the only derogatory account

or information on her TU credit report.  (*See* Exhibit B).

**B.** **It Must Be A Mistake:  Plaintiff First Learns That TU Is Reporting A Philadelphia Municipal Court Judgment As Recorded Against Her**

Ms. Lawrence first learned about this derogatory judgment being reported against her on

her TU credit report when Sallie Mae and Key Bank denied her application for college loans for

her daughter's education in the late Summer of 1997.  (*See* Lawrence Dep. at 7).  (The denial

letters from Sallie Mae and Key Bank are attached hereto as Exhibit D).  Ms. Lawrence

obviously thought that it must be a mistake and thus wrote a letter to TU in August 1997, asking

it to correct her credit report by removing the judgment.  (Lawrence Dep. at 10-11).

This gross mistake would not be corrected for approximately six years, or until just after

this lawsuit was filed.  Indeed, Ms. Lawrence repeatedly disputed the inaccurate information

with TU on multiple occasions including but not limited to: August of 1997, November 1997,

December 1997 and February 2001.  (*See* Lawrence Dep. at 15, 23); (*see also* TU's Memo. of

Law at 5).  Several times in the 1997-1998 timeframe, TU *deleted* the $2,951 judgment from Ms.

Lawrence's credit report, only to re-insert the same judgment a few weeks later:

> 14 A.    Actually there were so many
> 15 letters back and forth, I can't say if this
> 16 is exactly the one that I do believe I
> 17 received.  They told me it was taken off
> 18 and put back on, I do know that.  When it
> 19 was, I don't remember because there was
> 20 several of these letters that I sent back
> 21 and forth and they said the same thing,
> 22 take it off, put it back on.

(Lawrence Dep. at 15); (*See also* correspondence from TU to Ms. Lawrence 11/12/97 and 1/23/98 which are attached collectively hereto as Exhibit E). TU continued to report this false judgment on Ms. Lawrence's credit report until after she initiated this action in July 2002.

### C.    TU Refuses to Correct Its Mistake: "No Way Out Of It"

TU criticizes Ms. Lawrence for not continuing to dispute the judgment even after three disputes with TU failed to correct the problem. (*See* TU's Memo. of Law at 1-2). This is both unjustified and unsupported by the facts of record. Consumers have no obligation to continue disputing inaccurate credit information that a credit bureau repeatedly fails to correct. Moreover, in her deposition Ms. Lawrence did, in fact, explain why she simply stopped disputing the judgment with TU for a period of time: "I know these things sat for a long time in a big pile because it seemed like there was no way out of it, no way to get it straightened out." (Lawrence Dep. at 53). Like other consumers whose disputes fall through the cracks of the credit reporting system, Ms. Lawrence simply gave up after TU again and again rebuffed her efforts to clear her credit and good name.

### D.    Ms. Lawrence's 2001 Dispute: TU Again Rejects Plaintiff's Municipal Court Docket And Misleads Plaintiff Into Believing That The Municipal Court Is At Fault

Despite feeling like there was no way out, in February 2001 Ms. Lawrence again wrote a letter to TU, asking it to remove the judgment that was being misreported against her. (Lawrence Dep. at 47).[7] As with her previous disputes, Ms. Lawrence sent to TU, along with her letter, copies of the Municipal Court docket in her case (which Ms. Lawrence referred to as the "disposition"), showing that the judgment was actually in her favor. (Lawrence at 47-48). (A

---

[7]    TU inaccurately states that the February 2001 dispute was "prompted" by counsel and thus treats it with distain. (*See* TU Memo. of Law at 5). TU is wrong in stating that the dispute was prompted by Francis & Mailman, P.C., Plaintiff's counsel. Although it is irrelevant as to why Plaintiff initiated another dispute, Plaintiff did not retain her counsel until 2002.

copy of Plaintiff's February 2001 dispute along with the Municipal Court docket is attached hereto as Exhibit F). Again, TU verified the judgment as accurate despite having no knowledge whatsoever that Ms. Lawrence ever had a judgment against her. (A copy of TU's March 2001 Investigation Results and Credit Report is attached hereto as Exhibit G).

During discovery in this matter, Plaintiff learned that TU apparently dismissed the Municipal Court docket because it was not a "stamped" document. (Little Dep. at 26-27).[8] TU never told Plaintiff at any time during her multiple disputes, however, that it was rejecting her supporting documentation or that she need a "stamped" document. (Little Dep. at 71-72) ("Q . . Did anyone from Trans Union ever call Ms. Lawrence and ask her to supply the stamped court record concerning this judgment? A. No."). Rather, on each occasion it simply sent Ms. Lawrence form letters stating that it had investigated her dispute with the original source (*i.e*, the Municipal Court or Philadelphia County Records) and they had certified and verified the judgment "verified" as "complete" and "accurate." (*See* TU Investigation Results correspondence of 11/12/97, 1/23/98, 3/26/01, attached hereto as Exhibit I). When Plaintiff's counsel asked TU's corporate representative Eileen Little why TU never informed Ms. Lawrence that she needed a stamped court document, Ms. Little simply stated that it was not TU's policy to do so. (Little Dep. at 89). Ms. Little conceded, however, that consumers have no way of finding out that TU does not accept certain documents in support of disputes and that it could be useful to consumers if they knew what documentation TU requires. (*See* Little Dep. at 93-95).

---

[8]     A true and correct copy of the pages from Eileen Little's deposition testimony of May 13, 2003, that are cited herein are attached hereto as Exhibit H. Ms. Little is Manager of Consumer Relations for TU and has overseen investigations of consumer disputes for approximately 10 years.

**E.**   **TU Never Disclosed To Ms. Lawrence Who Was Actually "Verifying" The Accuracy Of The Municipal Court Judgment Against Her**

To make a bad matter worse, TU falsely continued to inform Ms. Lawrence that it had contacted the Philadelphia Municipal Court Records Department and that it had verified that the judgment was entered *against* Ms. Lawrence. In fact, deposition testimony revealed that TU *never* contacted the Municipal Court and that, as of just a few weeks ago, it was not aware whether the vendor from whom it purchased its judgment information, Superior Information Services ("Superior"), ever contacted the Municipal Court.

Page 118

18  Q.     I guess that's what I'm asking.
19  Isn't it true that you don't know whether
20  or not anybody actually contacted the
21  Philadelphia County Courthouse or
22  Philadelphia County Records located at 34
23  South 11th Street in connection with Ms.
24  Lawrence's disputes?

Page 119

1       MR. LUCKMAN:  Object to the form.

2       THE WITNESS:  Correct.

3  BY MR. FRANCIS:
4  Q.      And do you have any information
5  or knowledge as you sit here today that
6  Trans Union was ever contacted by
7  Philadelphia County Records or the
8  municipal court concerning any of Ms.
9  Lawrence's disputes?

10      MR. LUCKMAN:  Object to the form.

11      THE WITNESS:  That the City of
12  Philadelphia contacted Trans Union?

13      MR. FRANCIS:  The Philadelphia

    14 County Records.

    15    THE WITNESS: I'm not aware of
    16 that, no.

    17 BY MR. FRANCIS:
    18 Q.    And in connection with any of Ms.
    19 Lawrence's disputes to Trans Union, did
    20 Trans Union ever inform her of the identity
    21 and/or address of Superior Information
    22 Services?

    23 A.    *No, we did not.*

(Little Dep. at 118-19).

Because TU never told her, Ms. Lawrence never knew about Superior, but rather assumed – as TU stated in its letters – that the Municipal Court had entered the judgment against her. This left Ms. Lawrence running from one Philadelphia City office to the next trying to correct an error that was created and perpetuated by TU. Ms. Lawrence even tried to meet with the Municipal Court judge who decided her case in order to solve this problem, but to no avail:

    Page 24

    20 A.    For one thing I went to the
    21 judge's office, I saw an aide, I wasn't
    22 allowed to see the judge to see if he
    23 couldn't pull up records giving me
    24 something to prove how he ruled in the

    Page 25

    1 case.  I went to numerous different offices
    2 downtown where they shuttled me from one
    3 place to another trying to get more
    4 information about how to clear this up or
    5 get the document that I needed to prove how
    6 the case was ruled on in my favor.  I went
    7 to the prothonotary's office, I've never
    8 seen so many rude people in all my life and
    9 got no satisfaction.

10 Q.        Was this in January?

11 A.        Honestly I have no idea when it
12 was.  I think it was over a period of
13 time.  I don't think I did all these things
14 at once.

                    . . . .

22        THE WITNESS:  You know what, it's
23 hard to recall because I went to more than
24 a few places downtown.  The one day, like I

 Page 51

1 said, I was shuttled from one office to
2 another because nobody knew where I should
3 go. . . .

(Lawrence at 24-25, 50-51).  Thus, without ever being told that TU was rejecting her Municipal

Court docket, and without knowing who TU was actually "verifying" the judgment with, Ms.

Lawrence was left knocking on the wrong doors for years.

F.        TU's "Investigation" Procedures

The precise details of what, if anything, Superior did in investigating Ms. Lawrence's

disputes are not known because Superior has thus far refused to abide by the subpoena served

upon it.[9]   What is known is that TU received all of Ms. Lawrence's disputes, and through its

automated and perfunctory dispute investigation process forwarded them on the Superior for

"verification."   For its investigation services, Superior charges TU approximately $5 per

investigation.  (Stockdale Dep. at 46-47).[10]

---

[9]        Because Superior and TU are business associates, TU has attempted amicably to have Superior produce documents and provide a deposition in this case.  Accordingly, Plaintiff has thus far restrained form filing a contempt motion against Superior for failing to comply with Plaintiff's subpoena.

[10]        A true and correct copy of the pages from William Stockdale's deposition testimony of June 10, 2003, that are cited herein are attached hereto as Exhibit J.

Even though the FCRA places the duty to investigate consumer disputes of allegedly inaccurate information squarely upon credit reporting agencies, TU passes most of its investigation duties of public records data to Superior (at a cost of $5).[11]   Aware of its non-delegable duties, TU initially processes the dispute, and ultimately responds to the consumer (thus appearing to the consumer as if it is the only entity involved in an investigation), but conducts no independent review and exercises almost no oversight functions over Superior for any particular consumer dispute.   Rather, TU simply parrots on the consumer's credit report whatever result Superior reports.  (*See* Little Dep. at 57-59, 69).   In this case, it did so without having any knowledge of whether Superior ever actually contacted the Court or obtained proof of the "judgment" that was being reported against Ms. Lawrence:

> 11 Q.      As you sit here today, do you
> 12 know whether or not at any time since 1997
> 13 Superior Information Services ever
> 14 contacted either the Philadelphia Municipal
> 15 Court, the Philadelphia County Records, or
> 16 the City of Philadelphia concerning Ms.
> 17 Lawrence's disputes?
>
> 18 A.      I don't know that.

(Little Dep. at 121).  Thus, although TU acknowledges that it, and not Superior, is the party that the law charges with investigating disputes, and that it is the party that publishes credit information to third parties, it apparently has no idea as whether the judgment that it was reporting against Ms. Lawrence was accurate:

> 5 Q.      Somewhere along the line Trans
>
> 6 Union got information that Ms. Lawrence
> 7 owed a judgment to a Mr. Frommer and it
> 8 reported that information about her.  Would
> 9 you agree with me on that?

---

[11]     Superior also sells public record information to TU in the first instance for a price of approximately $0.40 per record.  (Stockdale Dep. at 29).

10  A.      Yes.

11  Q.      Have you seen any record at all
12  up until today which shows or represents
13  that Ms. Lawrence actually owed a judgment
14  to Mr. Frommer?

15          MR. LUCKMAN:  Object to the form.

16          THE WITNESS:  No.

17  BY MR. FRANCIS:
18  Q.      Do you have any idea what the
19  vendor that Trans Union used in connection
20  with this dispute or in connection with
21  this judgment, what records the vendor had
22  concerning this court record?

23  A.      No.

24  Q.      As you sit here today, do you

 Page 70

 1  know whether or not Ms. Lawrence ever owed
 2  a judgment to a Thomas Frommer?

 3          MR. LUCKMAN:  Objection.

 4          THE WITNESS:  I don't know if she
 5  ever owed him one.  I know she claims she
 6  won.

 7  BY MR. FRANCIS:

 8  Q.      And as you sit here today, do you
 9  know one way or the other whether or not
10  she won that judgment?

11  A.      No.

12  Q.      Have you ever seen the actual
13  court record relating to this judgment?

14  A.      No.

13

15    Q.    Even up until today?

16    A.    Right.

(Little Dep. at 69-70).

Although TU conducts bulk statistical assessments of the data sold to it by Superior, neither of TU's corporate representatives testified that TU ever spot-checks Superior's investigations or that TU ever reviewed or even spoke with anyone at Superior about its "investigation" of the judgment repeatedly disputed by Ms. Lawrence with TU.

TU's Group Manager of Consumer Relations, Eileen Little, has also provided deposition testimony explaining TU's general investigation procedures, which are implicated here.[12]    (See Little Dep. in *Evantash* at 10-14) (describing Ms. Little's position and responsibilities).    Ms. Little has testified that, despite its legal requirement to do so, TU *never* shows a consumer's dispute, or documentation supporting the dispute, to the furnisher of the credit information, in this case Superior:[13]

---

[12]    Eileen Little was deposed on October 9, 2001, in *Jaramillo v. Trans Union, et al.,* (Civ. No. 00-CV-5876 E.D. Pa.), a FCRA case, where she testified about Trans Union's investigative procedures during the past few years (hereinafter cited as "Little Dep. in Jaramillo").    Additionally, Mr. Little was deposed on February 25, 2003, in *Evantash v. Trans Union et al.,* (Civ. No. 02-CV-1188 E.D. Pa.), where she testified about Trans Union's investigative procedures during 2000-2001 (hereinafter cited as "Little Dep. in Evantash"). Ms. Little also gave deposition testimony about TU's general investigation procedures in this case (cited herein as "Little Dep."). All of Ms. Little's deposition transcripts are attached in chronological order as Exhibit H. Ms. Little's testimony in *Jaramillo* and *Evantash* about TU's investigative procedures and policies over the past two years is also cited herein because it is clearly relevant to this action. Since the present TU attorneys defended the *Jaramillo* and *Evantash* depositions, and thus had a full and fair opportunity to develop Ms. Little's testimony, and since the deposition testimony concerns substantially similar issues as those in the present case, the testimony is appropriate for purposes of this motion as it would be at trial. *See* Fed. R. Civ. P.  32(a); *Copeland v. Potroleum Transit Co.*, 32 F.R.D. 445, 447 (E.D.S.C. 1963) (deposition taken for use in another case could be used in instant case where substantially same issues were involved and defendant had adequate opportunity to cross-examine deponent with same motive and interest); *see also Gros v. City of Grand Prairie*, 181 F.3d 613, 619 (5th Cir. 1999) (relying on deposition testimony taken in another case to vacate summary judgment); *Donahey v. Wellman*, 687 F. Supp. 195, 196-97 (W.D. Pa. 1988) (relying on deposition taken in parallel case to grant summary judgment); *see generally Aileen Mills Co. v. Ojay Mills, Inc.*, 192 F. Supp 131 (S.D.N.Y. 1960) (deposition taken in prior action by other plaintiffs against same defendants was part of record where submitted to district court upon motion to quash); *Tobacco & Allied Stocks v. Transamerica Corp.*, 18 F.R.D. 355 (D. Del. 1955) (all depositions, exhibits and pleadings from analogous litigation offered by party, over objection of opponent, were accepted and considered admissible).

[13]    *See* 15 U.S.C. § 1681i(a)(2)(A) (providing that the CRA must forward "all relevant information" to the

> 13  Q.  Does the furnisher ever see the
> 14     Consumer's written dispute?
> 15  A.  No.

(Little Dep. in Jaramillo at 115).

> 17  Q.  If the consumer sends some type of
> 18     documentation along with their dispute, is that
> 19     documentation forwarded to the furnisher?
> 20  A.  No.
> 21  Q.  Ever?
> 22  A.  No.

(Little Dep. in Evantash at 58); (*see also* Little Dep. at 116) (TU does not send documentation provided by consumer to the furnisher). Additionally, Ms. Little has testified that TU never even bothers to call a consumer during the course of an investigation:

> 21  Q.  Are there any instances in which the
> 22     dispute investigator would call the consumer
> 23     to find out more about the dispute?
> 24  A.  No.

(Little Dep. in Jaramillo at 120). In the case at bar, Ms. Little explained that TU unbelievably never even forwarded to Superior the Municipal Court docket provided by Ms. Lawrence to TU and never telephoned Ms. Lawrence to find out more information about her dispute or to tell her that she need a "stamped" court document. (Little Dep. at 63-65, 71-72).

Moreover, Ms. Little has testified that even though it requires consumers in many instances to provide corroborative documentation with their disputes, TU does not require creditor-furnishers, such as Superior, to do the same:

> 18  Q.  If the furnisher disagrees with the
> 19     consumer's dispute, does Trans Union require the
> 20     furnisher provide documentation?
> 21  A.  No. They have to just be able to
> 22     verify the information back . . . .

---

credit furnisher).

(Little Dep. in Evantash at 64). Thus, in this case, even though Ms. Lawrence's documentation was rejected because she did not present TU with a stamped court record, TU placed no such burden on Superior. That is, Superior simply had to send an electronic message to TU that the reporting of the judgment against Ms. Lawrence was accurate. Thus, TU continued to report the judgment against Ms. Lawrence even though no one at TU ever saw any court record concerning a judgment owed by Ms. Lawrence and no one at TU knows whether anyone at Superior ever saw such records. (Little Dep. at 69-70, 120-21).

Finally, Ms. Little has given testimony about the enormous demands that TU places on the clerks who process investigations of consumer disputes. Ms. Little has explained that TU's clerks who handle disputes are high school educated, hourly employees who are paid between $10 and $17 per hour. (Little Dep. in *Evantash* at 51-54). These clerks are required to meet certain quotas including the demand to review, respond to and resolve *10 to 14 consumer disputes per hour*. (Little Dep. at 115-16); (Little Dep. in Evantash at 40-42, 51-54). A dispute constitutes a consumer complaint about as many items of credit information as the consumer claims are being inaccurately reported on his credit report, and generally involves three (3) items of information on average. (*Id.*). Thus, in the routine course of business, and assuming a perfect world with no breaks in the workday, TU's investigation clerks must process approximately 30 – 42 consumer disputes per hour, or must complete an investigation in 1 ½ to 2 minutes. Surprisingly, the employees (called "CDV/ACDV operators) who are charged by TU with inputting the data received from credit furnishers, such as Superior, are not the same clerks who initially receive the consumer's dispute. Moreover, the data entry personnel who receive the responses from the credit furnisher are required to process *85 dispute responses per hour*. (Little Dep. in *Evantash* at 60-61). Mr. Little testified:

Page 60

```
4    Q.    What does the CDV operator do with
5    that information?
6    A.    They input the data returned by the
7    subscriber.
8    Q.    Do they do anything else?
9    A.    No.
10    Q.    Do the CDV operators have access to
11    documents that the consumer might have provided
12    along with his or her dispute?
13    A.    No.
14    Q.    The 10 to 14 disputes an hour
15    standard that you talked about, is that just for
16    the dispute investigators, or does that also
17    apply to the CDV operators?
18    A.    No.  The CDV operators have their
19    own standard.
20    Q.    What is their standard?
21    A.    85 an hour.
```

(Little Dep. in Evantash at 60).

Thus, in processing consumer disputes such as Ms. Lawrence's, TU has procedures in place that would require high school educated, hourly employees to spend no more than 2 – 3 minutes to interpret and characterize the consumer dispute, place it in the appropriate automated format for the credit furnisher, send it out for verification (in this case, to Superior), receive a response and update the consumer's credit report.  The labor cost to TU is approximately $0.30 - 0.50 per consumer complaint.  The cost paid to Superior for its part is $5.  (Stockdale Dep. at 46-47).

Moreover, the "investigation" involves no telephone calls, letters or e-mails, no review of records, or discussion with third parties – and no questions of any type either to the consumer or to the credit furnisher.  Importantly, the Municipal Court docket that Ms. Lawrence repeatedly sent to TU (showing that she actually won her case) was never forwarded by TU to Superior, and was rejected by TU for purposes of investigating Ms. Lawrence's disputes.

G.    **Ms. Lawrence Suffered Harm Within The FCRA Two-Year Statute Of Limitations Due To TU's Misreporting Of The Judgment On Her Credit Report**

Contrary to Defendant's bald contentions, Ms. Lawrence suffered cognizable and compensable damages (within the statute of limitations period) as a result of TU's misreporting of the civil judgment.[14]

For example, Plaintiff was rejected for a Chase credit card on August 2, 2001. (The Chase denial letter of 8/2/01 is attached hereto as Exhibit K). The unequivocal deposition testimony of Chase's corporate representative, Donna Stout, leaves no doubt that the civil judgment being reported by TU on Plaintiff's credit report was the only reason for this credit denial:

Page 13

9  Q.    Okay.  Do you know based upon
10  your review of the documents in this case
11  whether Grace Lawrence applied for a Chase
12  Platinum Master Card in July or August of
13  2001?

14  A.    Yes.  We have it that she applied
15  for a Chase Platinum Master Card and the
16  date that we received it was July 1, 2001.
17  And it was an application that came over
18  the phone.  It was an applied by phone
19  application.

20  Q.    Did Chase approve that
21  application?

22  A.    No.

Page 15

---

[14]    TU stresses to this Court that what it deems to be the most significant damages suffered by Ms. Lawrence lay outside of the two-year statute of limitation under the FCRA. (*See* TU's Memo. of Law at 1-3, 10-13). Although Plaintiff agrees that she has suffered harm at the hands of TU for a long time, the damages that she seeks to recover in this action  under the FCRA clearly lay within the limitations period.

21  Q.      Do you see any lawsuits or
22  judgments or liens against her?

23  A.      I see a judgment.  That's the
24  only thing we have.

Page 16

1  Q.      Would you please show me where
2  you see the judgment on Chase-3, if in fact
3  it's listed there?

4  A.      On page six of that document.

5  Q.      Okay.

6  A.      The second block down it says,
7  public records.

8  Q.      And is that the judgment where
9  the creditor is Thomas Froneer, it looks
10  like?

11  A.      Yes.

12  Q.      And it's a civil judgment.  Could
13  you tell the amount of the judgment against
14  her?

15        MR. CREECH:  Objection to form.

16        THE WITNESS:  The current balance
17  we have here is $2951.

18  BY MR. SOUMILAS:

19  Q.      Was that *the reason* why Chase
20  turned Ms. Lawrence down for this credit
21  card?

22  A.      *Yes.*

(Stout Dep. at 13-16) (emphasis added).[15]

TU makes a great deal out of the fact that the application was marked "withdrawn" after Chase's decision to deny but before the denial letter was actually sent. Ms. Stout's testimony, however, explains what happened:

> 9  BY MR. SOUMILAS:
> 10 Q.      Do you know whether the decision
> 11 to decline Ms. Lawrence's application
> 12 because of the judgment on Trans Union's
> 13 credit report was made before the
> 14 application was withdrawn?
>
> 15      MR. CREECH:  Objection.
>
> 16      THE WITNESS:  Yes, it was made
> 17 before.
>                . . . .
>
>  Page 41
>
> 16 Q.      Do you know whether my client was
> 17 told over the phone by a Chase
> 18 representative that her application had
> 19 been declined and as a result of that she
> 20 chose to withdraw it?
>
> 21 A.      I don't have any type of comment
> 22 stating that they told her it was declined;
> 23 however, I would assume that she knew
> 24 that's why she wanted it withdrawn.

(Stout Dep. at 40-41). Finally, Ms. Stout explained that had Chase never actually denied Ms. Lawrence's credit card application, as TU suggests, it would have never set her the denial letter of August 2, 2001. (Stout Dep. at 50). Thus, Chase denied Ms. Lawrence credit *because* of TU's misreporting of a civil judgment against her, as the August 2, 2001 letter plainly states.

---

[15]    A true and correct copy of the pages from Donna Stout's deposition testimony of May 29, 2003, that are cited herein are attached hereto as Exhibit L.

In addition to the Chase credit card denial, Ms. Lawrence testified that (although she did not receive or keep adverse action letters) other creditors offered her higher interest rates than what a consumer with excellent credit should have gotten.  (*See* Lawrence Dep. at 71-72) (testifying about credit card interest rates between 17% and 21%).  Finally, Ms. Lawrence lost credit opportunities since she was embarrassed to apply for credit, knowing the civil judgment would show up on the TU credit report obtained by any potential creditor.  (*See* Lawrence Dep. at 42).

In addition to the above credit damages, Ms. Lawrence has suffered embarrassment, humiliation, emotional distress, anxiety, frustration and damage to her reputation as a result of TU's publication of the derogatory judgment to third parties such as Chase, Plaintiff's existing creditors and other third parties.  According to TU's own consumer disclosure records, many of Plaintiff's creditors – including, but not limited to, Sears (3/01), Chase (2/01), Cenlar Mortgage (12/00), Universal Bank (11/00 and 10/00), and Strawbridges (9/00) – conducted "account reviews" of Ms. Lawrene's TU credit report during the time that TU was misreporting the judgment.  (*See* TU's consumer disclosures of 3/26/01, attached hereto as Exhibit M) (showing account reviews on next to last page).   Thus, TU's own records show that it disclosed this false and derogatory judgment information to third parties during the statutory time period.

As Ms. Lawrence had no other negative credit history, the judgment constituted a humiliating embarrassment and a solitary stigma on her financial history that caused unwarranted anxiety and frustration.  Ms. Lawrence explained in her deposition how she walked around with the Municipal Court docket (which she calls "the disposition") in her possession for a period of years:

> 1 Q.     When you say you had it with you,
> 2 is it something you kept in your car?

3 A.       No, any time I went to apply for
4 any kind of credit of any kind, car, house,
5 anything that required signatures, I took a
6 copy of it with me.  It was an
7 embarrassment, you know.

8 Q.       Do you remember having to go --
9 when you say it was an embarrassment, what
10 do you mean?

11 A.       What do I mean?  I mean I've had
12 excellent credit all my life and rather
13 than have them say, listen, you can't have
14 this loan, I showed them the document so
15 that they could make up their own mind,
16 meaning the disposition of the trial.

(Lawrence Dep. at 42).  Thus, Ms. Lawrence suffered great humiliation and embarrassment from

falsely being identified for a period of approximately six years as an individual with an unpaid

judgment on her record and having to carry around her Municipal Court docket like an albatross

around her neck.[16]

---

[16] These non-economic damages suffered by Ms. Lawrence are well recognized specifically as compensable under the FCRA.  *See Boris v. Choicepoint Servs., Inc.,*WL 1255891 (W.D. Ky. March 14, 2003) ($100,000 in emotional distress damages verdict upheld as appropriate under FCRA upon defendant credit reporting agency's post-trial motion); *Thomas v. Trans Union*, (D. Or. 2002) ($300,000 in compensatory damages for emotional distress and $5 million for punitive damages, remitted to $1 million); *Johnson v. MBNA* (D. Virginia 2002) (jury award of $90,300 for emotional distress and damage to reputation sustained against credit furnisher MBNA for negligent investigation of consumer's dispute in violation of FCRA section 1681s-2(b); *Jorgenson v. TRW, Inc.*, C.A. No. 96-286 (D. Or. 1998) (jury awarding plaintiff $600,000 for compensatory damages for credit rating damage and emotional distress); *Anderson v. Conwood Co.,* 34 F. Supp. 2d 650 (W.D. Tenn. 1999) ($50,000 in actual damages awarded in absence of testimony other than worry, stress and anxiety); *Milgram v. Advanced Cellular Systems, Inc.*, 1990 WL 116322 (E.D. Pa. 1990) (jury award of $20,000 for credit damage, $20,224 in attorney's fees); *Stevenson v. TRW,* 987 F.2d 288 (5th Cir. 1993) ($30,000 in mental anguish and embarrassment damages, plus $20,700 in attorney's fees); *Collins v. Retail Credit Co.*, 410 F. Supp. 924 (E.D. Mich. 1976) ($21,750 for loss of reputation, embarrassment, in recognition of the "many subtle and indirect adverse effects upon a personal, social and economic life"; $50,000 in punitive damages and $21,000 in attorney's fees); *Bryant v. TRW Inc.*, 689 F.2d 72 (6th Cir. 1982) ($8,000 for embarrassment and humiliation, attorney's fees $13,705); *Jones v. Credit Bureau of Huntington, Inc.*, 399 S.E.2d 694 (W. Va. 1990) (jury award of $4,000 compensatory, $42,500 punitive upheld); *Thompson v. San Antonio Retail Merchants Ass'n,* 682 F.2d 509 (5th Cir. 1982) ($10,000 actual damages for humiliation and mental distress even when no out-of-pocket expenses); *Pinner v. Schmidt,* 617 F. Supp. 342 (E.D. La. 1985) ($25,000 in actual damages for negligent credit violations); *Trans Union Corp. v. Crisp,* 896 S.W.2d 446 (Ark. App. 1995) ($15,000 in actual damages, $25,000 in punitive damages in a case involving reports which did not show that debts had been satisfied); *Thompson (*$10,000 for three credit denials); *Thorton v. Equifax Inc.,* 467 F. Supp. 1008 (E.D. Ark. 1979) ($5,000 compensatory and $250,000 in punitive damages); *Phillips v.*

Finally, Ms. Lawrence has incurred out-of-pocket expenses including, but not limited to, lost time and energy, local or long distance telephone calls, parking, postage, and other related costs.  (*See* Lawrence Dep. at 21-25, 50-51 (various trips to Philadelphia and being shuttled from office to office); 15, 20, 60 (letters and phone calls)).

## III.    ARGUMENT

### A.    Applicable Standard

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will only be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  In other words, summary judgment may only be granted if the movant shows, by admissible evidence, that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party.  *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998); *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, 488 U.S. 870 (1988).

The party opposing the motion for summary judgment is entitled to have his/her allegations taken as true, to receive the benefit of the doubt when his/her assertions conflict with those of the movant and to have inferences from the underlying facts drawn in his/her favor.  *Big Apple, BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992), *cert.*

---

*David McDermott Chevrolet, Inc.*, 1992 WL 67374 (Conn. Super. 1992) ($5,000 for credit rating damage); *see also Dalton v. Capital Assoc. Indus.*, 257 F.3d 409 (4th Cir. 2001) (damages for loss of reputation are available under FCRA); *Guimond v. Trans Union*, 45 F.3d 1329 (9th Cir. 1995) (humiliation and mental distress damages available under FCRA); *Morris v. Credit Bureau of Cincinnati*, 563 F. Supp. 962 (S.D. Ohio 1983) (nervousness, irritation and loss of sleep compensable under FCRA.).  In FCRA cases, such damages do not require expert medical testimony. *See Boris*, 2003 WL 1255891 *5-7; *see also Guimond*, 45 F.3d at 1333.

*denied,* 507 U.S. 912 (1993).  In analyzing the moving party's burden under Rule 56(c), the Third Circuit has stated that "[i]f there is any evidence in the record, from any source, from which a reasonable inference in the respondent's favor may be drawn, the moving party simply cannot obtain a summary judgment, no matter how many affidavits are filed (citations omitted) . . . .  The 'burden' then is insurmountable."  *In re Japanese Electronic Prods. Antitrust Litig.*, 723 F.2d 238, 258 (3d Cir. 1983), *reversed on other grounds*, 475 U.S. 574 (1986); s*ee also Boyle v. County of Allegheny, Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

A court may not, at the summary judgment stage, weigh evidence or make credibility decisions.  These tasks are left to the factfinder.  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir.), *cert. denied*, 510 U.S. 994 (1993).  To raise a genuine issue of material fact, the respondent need not match, item for item each piece of evidence proffered by the movant.  *Big Apple, BMW, Inc.*, 974 F.2d at 1362-63.  As the Third Circuit has explained:

> In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quality of the movant's evidence far outweighs that of its opponent.  It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

*In re Unisys Savings Plan Litigation*, 74 F.3d 420, 433 n. 10 (3d Cir. 1996) (citing *Big Apple, BMW*).  If there are gaps in the pertinent materials submitted by the movant, without explanation, that justifies denial of the motion.  *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir. 1989).   In the case at bar, there exist genuine issues of material fact, and therefore summary judgment is inappropriate.

B.    <u>Background Of The FCRA</u>

A brief discussion of the FCRA and its relevant sections provides helpful background to the nature of Plaintiff's FCRA claims and why TU's Motion should be denied.

As Congress explained in the FCRA itself:

> It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

15 U.S.C. § 1681(b).  *See, e.g., Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d. Cir. 1996). The FCRA was prompted by "congressional concern over abuses in the credit reporting industry."  *Philbin*, 101 F.3d at 962*; see also Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329 (9th Cir. 1995).  Further, it is fashioned so as to protect the credit worthiness and reputation of every consumer.  *Ackerly v. Credit Bureau of Sheridan, Inc.*, 385 F. Supp. 658 (D. Wyo. 1974).  The FCRA was crafted to protect consumers from the transmission of inaccurate information about them.  *Kates v. Croker National Bank*, 776 F.2d 1396, 1397 (9th Cir. 1985). Like the other portions of the Consumer Credit Protection Act of 1968, the FCRA is to be *liberally construed in favor of the consumer.  See Guimond v. Trans Union Credit Info. Co*., 45 F.3d 1329 (9th Cir. 1995) (emphasis added).

Congress enacted the FCRA to protect consumers against "the trend toward . . . the establishment of all sorts of computerized data banks [that places a consumer] in great danger of having his life and character reduced to impersonal 'blips' and key punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable."  *Dalton v. Capital Associated Industries, Inc*., 257 F. 3d 409 (4th Cir. 2000),

(citing 116 Cong. Rec. 36570). As a result, the FCRA imposes "*grave responsibilities*" on credit reporting agencies to ensure the accuracy of the information that they report. *Cushman v. Trans Union Corp*., 115 F. 3d 220, 225 (3d. Cir. 1997) (emphasis added).

The FCRA framework includes statutory provisions governing what information can be contained in the reports (sections 1681a(d), 1681c, 1681s-1), to whom the reports can be disseminated and for what purposes (sections 1681b, 1681e), the duty to reinvestigate (section 1681i), the duties of the report user (sections 1681m, 1681q), the duties of the furnishers of information to the credit reporting agencies (section 1681s-2), and the rights of the consumer, including a statutory cause of action by the consumer for violations of the Act (sections 1681n, 1681o).

The FCRA sections that provide private causes of action for violation of these sections are sections 1681n and 1681o, which state:

> Any person who *willfully* fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer . . . .

15 U.S.C. § 1681n(a) (emphasis added).

> Any person who is *negligent* in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer.

15 U.S.C. § 1681o(a) (emphasis added).[17]

These are the provisions of the FCRA that give consumers the right to bring private

---

[17]    Amendments to the FCRA, which took effect on September 30, 1996, imposed new duties and causes of action against furnishers of credit information. 15 U.S.C. § 1681s-2. Creditors-subscribers have statutorily imposed duties to perform proper investigations once a consumer has disputed the accuracy of any information reported about him/her by the furnisher with a credit reporting agency. Subsection (b) of 1681s-2 provides that if a furnisher has been notified that specific information has been disputed as incomplete or inaccurate, the furnisher must conduct an investigation, and if the information, in fact, turns out to be inaccurate, that information must be deleted and suppressed and cannot continue to be furnished. 15 U.S.C. § 1681s-2(b). If the furnisher determines that information it has reported is inaccurate or incomplete, the furnisher has a duty to report that information and correct its prior reportings to all agencies to whom it subscribes and also to correct its own internal records. 15

causes of action against persons who violate the FCRA. The language in sections 1681n and

1681o provides that any person who violates the FCRA "is liable to that consumer." For both

willful and negligent violations, a consumer is entitled to "any actual damages sustained" and an

award of reasonable attorney's fees. 15 U.S.C. § 1681n and o. For willful violations, a

consumer is also entitled to statutory damages of between $100 and $1000 and "such punitive

damages as the court will allow." 15 U.S.C. § 1681o.

### C.    Plaintiff's Claims Are Timely

Before getting to the heart of Plaintiff's case, it is important to address TU's argument

concerning the statue to limitations, which is nothing more than a diversion. TU vamps on about

the FCRA's 2 year statute of limitations as if this is a contested issue. Indeed, TU spends the

greater part of its brief making the obvious point that the FCRA has a two-year statute of

limitations. (*See* Tu's Memo. of Law at 1-3, 5-8, 10-13).

Plaintiff agrees – the FCRA does have a two-year statute of limitations. Nevertheless,

Plaintiff has come forward with facts that TU reported the judgment through July of 2002, that

she disputed the judgment with TU in February of 2001 and that she has suffered damage in

2000-2002 (e.g. July 2001 Chase credit denial). This evidence supports her timely FCRA claim.

It is of no moment that TU may have also caused Ms. Lawrence damage six years ago.

Likewise, it may be correct that the damage it caused Plaintiff outside of the limitations period is

greater than that which she Ms. Lawrence suffered within the two years preceding the filing of

the Complaint. The fact of the matter, however, is that Ms. Lawrence disputed the judgment

within the limitations period and also continued to suffer damages at the hands of TU *within* the

two years of the filing of this lawsuit period.

The Eastern District of Pennsylvania has already held that the two year FCRA statute of

U.S.C. § 1681s-2(b)(1).

limitations begins to run anew from the date of *each* violation.  *See Jaramillo v. Experian Information Solutions, Inc.*, 155 F. Supp.2d  356, 359-61 (E.D. Pa. 2001) ("each transmission of the same credit report is a separate and distinct tort to which a new statue of limitation applied") (citing *Hyde v. Hibernia*, 861 F.2d 446, 450 (5th Cir. 1988)).  Thus, since Plaintiff has established FCRA violations in 2000, 2001 and 2002, her claims are cognizable and timely.

Furthermore, the *facts* that lay outside of the FCRA's two-year statute of limitations are not irrelevant to this lawsuit.  Although they may not constitute damages under the FCRA, these facts are relevant to show the origins of the civil judgment; when and how Ms. Lawrence learned of the inaccurate reporting of the judgment; the history of disputes and notices that she sent directly to TU; TU's faulty procedures in dealing with a repeated dispute case, such as this one; TU's lack of procedures in retaining records and forwarding relevant records to the furnishers of information; as well as other relevant matters.  The Third Circuit has already held that facts outside of the limitations period may be admitted in an FCRA case, even though damages outside of the limitations period may not be recovered.  *Philbin*, 101 F.3d at 968 n.7 (in FCRA case, consumer could use evidence of incidents that occurred outside of limitations period to satisfy burden of proof on timely claims); *see also Hurley v. Atlantic City Police Dept.,* 174 F.3d 95, 111 (3d Cir. 1999) (evidence of events that occurred well outside of limitations period are admissible in sexual harassment case to satisfy burden for timely claims).  Recognizing this,  this case, TU has not moved to preclude such evidence (the motion in limine deadline set in the Court's most recent scheduling order was May 21, 2003.  (*See* Court's Order Extending Deadlines of March 21, 1003 is attached hereto as Exhibit N).

Finally, the evidence dating back to 1997 is relevant and admissible with respect to Plaintiff's Pennsylvania Consumer Protection Law (CPL) claim, which has a six-year statute of

limitations. *See* 42 Pa. C.S. § 5527(6); *Gabriel v. O'Hera*, 534 A.2d 488 (Pa. Super. 1987). TU argues that the CPL has only a two-year statute of limitations – but cites only to cases where the CPL was applied in the fraud context. Here, Plaintiff is not claiming fraud. Rather, Plaintiff alleges that by reporting false credit information, whether negligently or willfully, TU was engaging in an unfair and deceptive trade practice. Since this is not a fraud claim, the six-year statute of limitations applies. Accordingly, evidence and damages stemming from six years prior to the filing of the July 3, 2003 Complaint should be considered by the factfinder for this claim. *See* 42 Pa. C.S. § 5527(6)

> **D.** **There Is A Genuine Issue of Material Fact That TU Violated The FCRA By Failing To Investigate Ms. Lawrence's Disputes Of Inaccurate Information And By Failing To Use Reasonable Procedures To Assure Maximum Possible Accuracy Of Credit Information It Disseminated About Her**

Through documents and deposition testimony, Ms. Lawrence clearly has demonstrated that a genuine issue of material fact exists as to her claims that TU failed to appropriately investigate her repeated credit disputes and failed to use reasonable procedures to assure the maximum possible accuracy of the information that it reported about her concerning the $2,951 civil judgment. Thus, Plaintiff survives summary judgment on her claims against TU for violation of FCRA sections 1681i and 1681e(b).

> **1.** **A Reasonable Jury Could Find That TU Violated Section 1681i Of The FCRA**

Section 1681i of the FCRA requires credit reporting agencies such as TU to perform an investigation if a consumer disputes any item of information contained in their credit report. 15 U.S.C. 1681i(a)(1)(A).[18] The FCRA provides that consumer reporting agency must review all

---

[18]    The term "investigation" is not defined by the FCRA. Black's Law Dictionary defines the word "investigation" as "to follow up step by step by patient inquiry and observation. To trace and track; to search into; to examine and inquire into with care and accuracy; to find out by careful inquisition; examination; the taking of evidence . . . ." *Black's Law Dictionary* at 740 (5th Ed). Nothing that TU did in this case even remotely resembles

relevant information concerning a dispute sent to it by the consumer, and *forward* all such information to the credit furnisher. *See* 15 U.S.C. 1681i(a)(2)(A)(emphasis added). If after the investigation "an item of the information is found to be <u>inaccurate or incomplete or cannot be verified [as accurate]</u>, the consumer reporting agency <u>shall promptly delete</u> that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation." 15 U.S.C. 1681i(a)(5)(A). The standard is no different if the credit item being disputed is a civil judgment. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 286 (7th Cir. 1994) (failure to inquire as to plaintiff's disputes about state court judgment docket a violation of 1681i); *Betts v. Equifax*, 245 F. Supp.2d 1130, 1135 (W.D. Wash. 2003) (FCRA imposes duty to investigate accuracy of public records and to go beyond face of public record when consumer disputes same).

As stated above, sections 1681n and 1681o of the FCRA impose liability against a credit reporting agency that violates this section. 15 U.S.C. 1681n and 1681o. Section 1681i claims in the overwhelming number of cases present jury questions and are not appropriate for summary judgment. *See Cushman v. Trans Union Corp.*, 115 F. 3d 220, 225 (3d. Cir. 1997); *Henson v. CSC Credit Servs.*, 29 F.3d 280 (7th Cir. 1994).

Following the holdings of several other circuit courts from around the country, the Third Circuit in *Cushman* clarified a credit reporting reporting agency's duties under section 1681i. In *Cushman*, TU argued that section 1681i as a matter of law does not require credit reporting agencies to do more than "confirm the accuracy of the information [that it is reporting] with the original source of the information." *Cushman*, 115 F. 3d at 224. The Third Circuit rejected this interpretation, noting that the duty to investigate "falls squarely" on the credit reporting agencies

---

such an understanding of "investigation."

and the "grave responsibilities" that credit reporting agencies bear to ensure the accuracy of the information that they report. *Id.* at 225. Further, the Third Circuit found that credit reporting agencies cannot simply mimic or "parrot" information from the sources of information in performing section 1681i investigations:

> The FCRA evinces Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear "grave responsibilities," 15 U.S.C. § 1681(a)(4), to ensure the accuracy of that information. The "grave responsibility" imposed by section 1681i(a) <u>must consist of something more than merely parroting information received from other sources</u>. Therefore, a "reinvestigation" that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute.

*Id.* (emphasis added).

In so opining, the Third Circuit simply turned to and followed the rulings of other Circuit Courts from around the country which have also found that a credit reporting agency's mere parroting or mimicking process criticized in *Cushman* falls far short of the type of "investigation" required by section 1681i of the FCRA, and creates a factual issue precluding summary judgment. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 286 (7th Cir. 1994) (failure to inquire as to plaintiff's disputes about state court judgment docket a violation of 1681i); *Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993) (only sending CDV forms to plaintiff's creditors and not calling them constituted a violation of the FCRA); *Pinner v. Schmidt*, 805 F.2d 1258, 1261-62 (5th Cir. 1986) (where plaintiff had personal dispute with manager of credit grantor, contacting manager only was unreasonable); *Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (merely making two calls to plaintiff's creditors insufficient investigation); *see also Curtis v. Trans Union*, Nos. 02-C-207, 02-C-208, 2002 WL 31748838 * 5 (N.D. Ill. Dec. 9, 2002) (again rejecting TU's argument that merely reporting what credit furnisher provides is

31

insufficient in context of investigation); *Richardson v. Fleet Bank of Mass.*, 190 F. Supp.2d 81, 88 (D. Mass. 2001) (noting that mere parroting is insufficient and that reasonableness of 1681i investigation usually is question for jury).

In *Cushman*, the Third Circuit reversed summary judgment for TU, finding that a reasonable jury could have found for Cushman based on this evidence. The Court held that whether a credit reporting agency will be liable under section 1681i of the FCRA for failing to properly investigate a consumer's dispute will depend on a number of factual issues, including the efforts taken by the agency, and presents a jury question not appropriate for summary judgment:

> We hold that in order to fulfill its obligation under section 1681i(a) "a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial source of information." (citations omitted) We further hold that "whether the credit reporting agency has a duty to go beyond the original source will depend" on a number of factors. (citation omitted). One of these is "whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable." (citation omitted) A second factor is "the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer." (citation omitted). Whatever considerations exist, it is for "the trier of fact [to] weigh these factors in deciding whether [the defendant] violated the provisions of section 1681i."

*Cushman*, 115 F. 3d at 227 (citation omitted) (emphasis added).

Thus, more often than not, claims brought pursuant to 1681i will not be appropriate for summary judgment as they present factual issues relating to the conduct of the defendant credit reporting agency. This is such a case, and presents more compelling facts than *Cushman*. Plaintiff has produced a plethora of facts that demonstrate that TU violated section 1681i. She has produced evidence that she send multiple disputes to TU challenging the reporting of the

$2,951 judgment.  She has also produced evidence that she actually sent a copy of the docket and TU rejected it.  Any cursory review by a TU employee of the actual court record would have revealed that the judgment was not against her, but actually in her favor.  Further, Plaintiff has produced evidence that TU *never even forwarded the docket* to the very company that it contracted to assist it with disputes, a clear violation of the FCRA.

Even though the FCRA places the duty to investigate consumer dispute on the credit reporting agency, and even though TU received Ms. Lawrence's numerous disputes since 1997, TU still does no know, to this day, whether Ms. Lawrence has a judgment against her or in her favor.  Ms. Little, the head of TU's investigations department in Pennsylvania, testified that TU simply reported what Superior told it to report.  (Little Dep. at 69-70).  Indeed, no one at TU ever went to the Municipal Court or ever saw a copy of the judgment.  (Little Dep. at 120-21).  TU does not even know whether Superior ever went to the Municipal Court or has ever seen a copy of the judgment.  (*Id.*).  TU simply knows that it paid Superior $0.40 for the judgment information and $5 for the investigation.  This head-in-the-sand pass-the-buck attitude could certainly lead a jury to find that TU negligently failed to investigate her dispute.

Moreover, TU's lack of knowledge defense means that it did not fulfill its statutory duty to conduct a proper investigation and discover the true status of the credit information in dispute from the "original source."  *See* 16 C.F.R.  Part 600, § 611(2) (credit bureau must investigate with original source).  TU's blind adherence to information that Superior (a secondary source) allegedly was supplying to it is precisely what the Third Circuit held constitutes an inadequate investigation.  As explained by *Cushman,* a consumer reporting agency's mere parroting of information supplied by a credit furnisher does not fulfill the obligations imposed by 1681i.  *See Cushman*, 115 F. 3d at 225; *see also Curtis v. Trans Union,* Nos. 02-C-207, 02-C-208, 2002 WL

31748838 * 4 (N.D. Ill. Dec. 9, 2002) (finding that even factually correct information may be "inaccurate" for FCRA purposes where such information may be misleading to a party reviewing the consumer's credit report).

Moreover, TU in this case had a very good reason to doubt the reliability of Superior's report that the $2,951 judgment was against Ms. Lawrence. Namely, Ms. Lawrence sent to TU on multiple occasions the Municipal Court docket that showed that she actually won that judgment. Rather than treating the docket sheet as a cause to dig deeper into the issue and investigate, TU simply rejected the document because it was not "stamped," and never even told Ms. Lawrence that it was rejecting it. A reasonable jury could find that TU had reason to doubt the reliability of the information it was reporting and should have conducted and independent and thorough investigation.

Nor is there any cost that TU incurred here that outweighs the harm suffered by Ms. Lawrence. To the contrary, the evidence of record demonstrates that TU's representatives, charged with processing 10 to 14 disputes per hour, spent only a few minutes in dealing with Ms. Lawrence's repeated disputes and never so much as picked up a telephone to call Ms. Lawrence, Superior, the Philadelphia Municipal Court or any other party that could have shed more light on the nature of Plaintiff's dispute. The labor cost to TU was probably not even $2. Additionally, TU passed off its duty to go to the courthouse and investigate the dispute with the original source of the judgment to its vendor, Superior, for a cost of $5 per investigation. The cost to Ms. Lawrence, one the other hand, is significant, including the inability to use and obtain credit, increased cost of credit, in addition to compensable humiliation, embarrassment and frustration.[19]

---

[19]    *See* footnote 16 (emotional distress, damage to reputation, credit denial damages compensable under FCRA).

Accordingly, Plaintiff may proceed to trial with her Section 1681i claims.

### 2. A Reasonable Jury Could Find That TU Violated Section 1681e(b) Of The FCRA

As for Plaintiff's claims for negligent violation of section 1681e(b), Plaintiff has also presented that a genuine issue of material fact exists for many of the same reasons outlined above.

Section 1681e(b) provides:

> Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure <u>maximum possible accuracy</u> of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added). To proceed with a claim for violation of section 1681e(b), a plaintiff need only show that there is a genuine issue of material fact that the defendant issued credit reports about the plaintiff that were inaccurate. *Philbin v. Trans Union Corporation*, 101 F. 3d 957 (3d. Cir. 1996). In *Philbin,* the Third Circuit clarified a plaintiff's burden of proof in 1681e(b) case, and which cases must be submitted to a factfinder.

The Third Circuit held that once a plaintiff has "demonstrated inaccuracies in his credit report, a defendant can only prevail on summary judgment if it can produce evidence that demonstrates as a matter of law that the procedures it followed were reasonable." *Philbin*, 101 F. 3d at 965. The Third Circuit looked to the cases of *Guimond*, *supra,* and *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151 (11th Cir. 1991) and arrived at the conclusion that the mere fact the defendant TRW had issued two credit reports with inaccurate information was "sufficient to permit a jury to infer that TRW did not follow reasonable procedures" in violation of section 1681e(b). *Philbin*, 101 F. 3d at 966; *see also Boris v. Choicepoint Servs., Inc.*, No. A3:01 cv 342, 2003 WL 1255891 *2 (W.D. Ky. March 14, 2003) (noting that section 1681(e)(b)

claims under FCRA typically are also questions for jury).  As a result of this finding, the Third

Circuit reversed the district court's granting of summary judgment on the plaintiff's section

1681e(b) claim.

Here, TU repeatedly issued credit reports about the Plaintiff that contained inaccurate

information.  As discussed in detail above, TU failed to remove the false judgment from Ms.

Lawrence's credit report for almost six years.  Within the two years prior to the filing of

Plaintiff's Complaint, TU's credit report was published to numerous third parties, including

Chase bank and Plaintiff's existing creditors.  These publications of inaccurate credit reports are

sufficient to establish Ms. Lawrence's  section 1681e(b) claim.

Moreover, a reasonable jury could find that TU has not put reasonable procedures in

place to assure maximum possible accuracy in reporting Plaintiff's credit information for several

other reasons.  For example, a reasonable jury could find that TU's policy of not accepting an

unstamped court document is unreasonable.  In that vain, a reasonable jury could find that TU

was, at a minimum, negligent for failing to inform Ms. Lawrence that it was rejecting her

unstamped document.  Had a TU investigator simply called Ms. Lawrence and told her what

kind of document TU specifically required, perhaps years of defamation, anxiety and harm to

Plaintiff's credit could have been avoided.  As TU's Eileen Little testified, however, as a matter

of practice TU simply never calls consumers in connection with their disputes.  (*See* Little Dep.

in Jaramillo at 120).

Additionally, a reasonable jury could find that TU has no proper procedures in place to

deal with a disputes that goes on for years, such as the one in this case.  TU admittedly has no

records of the history of disputes by Ms. Lawrence over the same false credit information dating

back for more than six years.  A reasonable jury could find that in cases of repeated disputes,

such as this one, Defendant should maintain some history of the credit file. TU states that it does not keep documents for significantly longer than the two year FCRA statute of limitations. To Plaintiff's knowledge, there exists no prohibition against keeping documents for a longer period. Even if it does not keep documents, TU certainly could have procedures to simply keep a history of particular consumer disputes on its computer database, so that it can be alerted of a repeated problem when it receives the consumer's next dispute.

Thus, the facts of this case present an issue of fact for the jury as to whether TU's procedures assured maximum possible accuracy in the reporting of Ms. Lawrence's credit information.

### 3.    A Reasonable Jury Could Find That Plaintiff Suffered Damages

Under the FCRA, a plaintiff may recover actual damages and attorneys' fees. 15 U.S.C. § 1681o(a). For proving a willful violation, a plaintiff may also recover statutory damages of up to $1,000 as well as punitive damages. 15 U.S.C. § 1681n(a). Under the FCRA, denial of credit, emotional and mental distress and anguish, damage to credit reputation, humiliation, embarrassment and frustration are specifically compensable. *See Boris v. Choicepoint Servs., Inc.*, No. A 3:01 cv 342, 2003 WL 1255891 (W.D. Ky. March 14, 2003) ($100,000 in emotional distress damages appropriate under FCRA); *Thomas v. Trans Union*, (D. Or. 2002) ($300,000 in compensatory damages for emotional distress and $5 million for punitive damages, remitted to $1 million); *see also Dalton v. capital Assoc. Indus.*, 257 F.3d 409 (4th Cir. 2001) (damages for loss of reputation are available under FCRA); *Guimond v. Trans Union*, 45 F.3d 1329 (9th Cir. 1995) (humiliation and mental distress damages available under FCRA); *Thompson v. San Antonio Retail Merchants Ass'n,* 682 F.2d 509 (5th Cir. 1982) ($10,000 actual damages for humiliation and mental distress even when no out-of-pocket expenses); *Jones v. Credit Bureau of*

*Huntington, Inc.*, 399 S.E.2d 694 (W. Va. 1990) (jury award of $4,000 compensatory $42,500 punitive upheld); *Morris v. Credit Bureau of Cincinnati*, 563 F. Supp. 962 (S.D. Ohio 1983) (nervousness, irritation and loss of sleep compensable under FCRA). Courts generally recognize such damages without the need for expert medical testimony. *See Boris*, 2003 WL 1255891 *5-7; *see also Guimond*, 45 F.3d at 1333.

Here, TU contends, with a proverbial straight face, that Ms. Lawrence has suffered no damage. This contention is false. As demonstrated by documents produced in litigation and in deposition testimony, Ms. Lawrence has cognizable damages in this case. Specifically, Ms. Lawrence was denied a credit card by Chase in July of 2001 solely because of the inaccurate judgment reporting on her TU credit report. This alone would allow Ms. Lawrence to proceed to trial on damages. However, Ms. Lawrence also lost potential credit opportunities, as she was embarrassed to apply for credit because of the judgment. Additionally, Ms. Lawrence suffered non-economic harm in the form of emotional distress and damages to her reputation and dignity. Indeed, Ms. Lawrence had to deal with the humiliation of walking around for years with the "disposition" (*i.e.*, the court docket) of her Philadelphia Municipal Court case, hanging like an albatross around her neck. (*See* Counter-Statement of Facts, Sections II.B & G, *supra*,)

Accordingly, there is more than enough evidence to create a genuine issue of material fact as to whether Ms. Lawrence suffered damages. Accordingly, Plaintiff should be permitted to proceed to trial.

### E.    TU Willfully Violated the FCRA, And Ms. Lawrence Is Therefore Permitted To Proceed To Trial On Her Punitive Damages And Common Law Claims

As far as FCRA cases go, this is one that justifies the submission of punitive damages to the jury. The evidence of record demonstrates that TU recklessly violated the FCRA. As a result, Ms. Lawrence may also proceed with her common law claims for defamation, negligence

and invasion of privacy/false light.[20]

To show "willfulness" under the FCRA (which would justify both punitive damages and allow Plaintiff to proceed with her common law claims), a plaintiff need not show malice, but only that the credit reporting agency "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Cushman*, 115 F. 3d at 227.[21] Such conscious disregard may be found when a credit reporting agency adopts a policy either knowing it to be in "contravention of the rights possessed by consumers under the FCRA or in reckless disregard for whether the policy contravenes those rights." *Cushman*, 115 F. 3d at 227.

Here, Plaintiff has demonstrated a "reckless disregard" for Ms. Lawrence's rights in at least three ways. First, TU flatly ignores the FCRA's requirement of providing the entity furnishing the information "all relevant information" regarding the consumer's dispute, as provided by 15 U.S.C. 1681i(a)(2)(A). Specifically, the FCRA provides:

> Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer . . . the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer.

15 U.S.C. 1681i(a)(2)(A) (emphasis added).

---

[20]     TU does not challenge the merits of Plaintiff's common law claims; it only argues that Ms. Lawrence cannot show willfulness. Moreover, and contrary to TU's contention, Plaintiff has not "abandoned" these common law claims through its "pretrial." (*See* TU's Memo. of Law at 9). Rather, in its Pre-Trial Memorandum, Ms. Lawrence continued to argue that she is bringing this case under the FCRA and "and various other state laws." Plaintiff's Pre-Trial Memorandum at 1. The fact that Plaintiff did not submit jury instructions on all of her state law claims is only a consequence of the limitations placed by this Court on the number of jury instructions that each party may submit, and not an abandonment of her state law claims.

[21]     Although the term "willful" is not defined in the FCRA, case law has held that neither malice nor evil motive need be established for a finding of "willfulness" to be made. *See Stevenson v. TRW, Inc.*, 987 F.2d 288, 294 (5th Cir.1993) (citing *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir.1983)). Many courts have noted that "willful" under the Act is demonstrated by a showing of "knowingly and intentionally committed an act in conscious disregard for the rights of others." *See id.* at 293 (citing *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th

Here, TU did not forward the documentation (the Municipal Court docket) that Ms. Lawrence sent it supporting her dispute to Superior (not even her letters characterizing the inaccuracy). TU's Group Manager of Consumer Relations, Eileen Little (who oversees TU's consumer investigations department), testified that TU never sends the customers dispute or supporting documentation to the credit furnisher:

> 17    Q.    If the consumer sends some type of
> 18        documentation along with their dispute, is that
> 19        documentation forwarded to the furnisher?
> 20    A.    No.
> 21    Q.    Ever?
> 22    A.    No.

(Little Dep. in *Evantash* at 58); (Little Dep. at 116) (same in this case). This conduct constitutes an intentional violation of the law, and, at a minimum, a reckless disregard for the right of consumers. A reasonable jury could certainly find that TU's conscious procedure in not forwarding documentation to credit finishers fails to assure maximum possible accuracy. Had Superior only seen the Municipal Court docket submitted by Ms. Lawrence to TU, the entire misreporting problem could have been solved. At a minimum, Superior could have taken a second look at its initial reporting of the judgment. In failing to forward documentation to Superior, TU intentionally violated the FCRA, and paid no regard to Ms. Lawrence's rights.

Second, TU knowingly misled Plaintiff into believing that it was verifying the accuracy of the $2,951 judgment with the Philadelphia Municipal Court, when in fact TU never contacted the Municipal Court and does not know whether *anyone* ever contacted the Municipal Court on its behalf.[22] TU's head of consumer investigations, Eileen Little, testified as follows:

---

Cir.1986), *cert. denied*, 483 U.S. 1022 (1987)); *Cushman*, 115 F. 3d at 227.

[22]        TU argues that Plaintiff's argument that TU "misidentified the identity of the source of the public record" should be barred because it constitutes a "new claim," not previously asserted by Plaintiff. (*See* TU's Memo. of Law at 12). This argument is absurd. First, Plaintiff's argument is not that TU misidentified the source of the public records. Rather, Plaintiff's argument is that TU misled her into believing that it was actually verifying the

11 Q.      As you sit here today, do you
12 know whether or not at any time since 1997
13 Superior Information Services ever
14 contacted either the Philadelphia Municipal
15 Court, the Philadelphia County Records, or
16 the City of Philadelphia concerning Ms.
17 Lawrence's disputes?

18 A.      I don't know that.

(Little Dep. at 121).   Dispute not knowing what, if anything, Philadelphia Municipal Court

judgment records showed about Ms. Lawrence, TU kept on responding to Ms. Lawrence's

disputes by telling her that the Municipal Court in Philadelphia at "34 South 11th Street" was

reporting the judgment against her.   TU never disclosed to Plaintiff that its information about the

judgment was coming second-hand through Superior.   As a result, Ms. Lawrence did the only

thing that she could do – which was to go the Municipal Court to try to resolve this matter.   As

discussed in detail under Section II.E *supra*, Ms. Lawrence got the run-around from the

Municipal Court and City because, naturally, they did no know what she was talking about:

Page 24

20 A.      For one thing I went to the
21 judge's office, I saw an aide, I wasn't
22 allowed to see the judge to see if he
23 couldn't pull up records giving me
24 something to prove how he ruled in the

Page 25

1 case.  I went to numerous different offices
2 downtown where they shuttled me from one
3 place to another trying to get more
4 information about how to clear this up or

---

judgment with the Municipal Court.  Moreover, this is not a "new claim," or a claim at all.  Plaintiff's claims are the
same as the ones that she asserted in her Complaint on July 3, 2002.  (A true and accurate copy of Plaintiff's
Complaint is attached hereto as Exhibit O).  In paragraphs 26-31 of that Complaint, Plaintiff pled that TU violated
FCRA sections 1681i and 1681(e)(b) in a willful manner.  The argument raised by Plaintiff in support of her
willfulness claim is not a new claim, but rather an argument in support of willfulness based on the evidence of
record.  Accordingly, TU's waiver claim must be rejected.

5 get the document that I needed to prove how
6 the case was ruled on in my favor.  I went
7 to the prothonotary's office, I've never
8 seen so many rude people in all my life and
9 got no satisfaction.

10 Q.      Was this in January?

11 A.      Honestly I have no idea when it
12 was.  I think it was over a period of
13 time.  I don't think I did all these things
15 at once.

                    . . . .

22      THE WITNESS:  You know what, it's
23 hard to recall because I went to more than
25 a few places downtown.  The one day, like I

  Page 51

1 said, I was shuttled from one office to
2 another because nobody knew where I should
3 go. . . .

(Lawrence at 24-25, 50-51).  Thus, without ever being told the truth about who TU was actually

"verifying" the judgment with, Ms. Lawrence was mislead into one dead end after another.  This

type of false disclosure by TU clearly was knowing and willful and shows an utter disregard for

Plaintiff's rights to have a proper investigation into her dispute and to get an honest answer as to

the results of the investigation under FCRA section 1681i.

Finally, TU has acted recklessly in purchasing (for $0.40) and publishing (for a period of

years) a civil judgment that it admittedly knows nothing about.  Although such an entry on a

consumer's credit report can be devastating, TU's head of consumer investigations cavalierly

admits that as of May 2003, TU still does not know one way or the other whether this judgment

was for or against Ms. Lawrence.  (*See* Little Dep. at 69-70, 119-121).  Thus, despite the long

history of disputes as well as the present litigation in this case, TU still does not know that Ms.

Lawrence won her small claims case in 1996 and that the Municipal Court properly entered the judgment in her favor, and not against her. Nevertheless, TU maintains that Ms. Lawrence cannot set forth an FCRA section 1681(e)(b) claim because it employs procedures that assure "maximum possible accuracy" in the reporting of consumer credit information.

These facts establish that TU knowingly and regularly disregard the FCRA's requirements. Thus, Plaintiff may be permitted to proceed with her punitive damages and common law claims at trial.

### E.      Plaintiff's CPL Claim Is Not Preempted By The FCRA

TU's challenge to Ms. Lawrence's CPL claims is its unfounded and unsupportable legal argument that the FCRA somehow preempts this Pennsylvania statutory cause of action. As TU has not challenged the sufficiency of Plaintiff's evidence or factual support for her CPL claims, Plaintiff confines her response to demonstrating that the FCRA does not provide any such preemption of CPL claims. Plaintiff has stated a cause of action against TU for violation of the CPL.

TU misguidedly attacks Ms. Lawrence's CPL claims using two dissimilar, yet equally flawed arguments. TU first argues that the FCRA does not provide Plaintiff with a private cause of action for violation of the CPL, focusing exclusively section 1681s of the FCRA. (TU's Memo. of Law at 22). The availability of Plaintiff's private cause of action, however, is grounded in the CPL and Pennsylvania caselaw, not the FCRA. The FCRA merely provides that a violation of it constitutes an unfair or deceptive act or practice; as discussed below, the CPL and relevant caselaw provide that such a violation provides a remedy.

TU's second argument is that the FCRA preempts Plaintiff's CPL claims. While more pertinent than its first argument, it is equally untenable. The plain reading of the FCRA does not

in any way preempt Ms. Lawrence's CPL claims, and all of the relevant authority and analysis holds otherwise.

### 1.    Violation of The FCRA Constitutes Violation of The CPL

The relevant issue is not whether the FCRA provides for a private cause of action under the CPL, but whether it forbids it on preemption grounds or otherwise.  As Plaintiff demonstrates below, the CPL and supporting Pennsylvania caselaw provide consumers with a cause of action under the CPL for violation of the FCRA.

Contrary to TU's assertions, the fact that there is no Pennsylvania case directly holding that a plaintiff may state a CPL claim in an FCRA case does not justify its contention that this case raises an issue of first impression.  In Pennsylvania, courts have found that a violation of any consumer protection statute presents a claim under the CPL.  The CPL and Unfair and Deceptive Acts and Practices ("UDAP") statutes of the fifty states were modeled after the Federal Trade Commission Act, 15 U.S.C.  §§ 41 *et seq.* and the Lanham Trade-Mark Act, 15 U.S.C. §§ 1051 *et seq.,* and prohibit unfair practices in any trade or commerce.  73 P.S. §§ 201 *et seq.; Commonwealth of Pennsylvania, by Creamer v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812 (Pa. Cmwlth. 1974).  Moreover, credit and banking activities are within the purview of "trade or commerce." *See Pennsylvania Bankers Ass'n. v. Commonwealth*, 58 Pa. Commw. 170, 427 A.2d 730 (1981).  Further, it is well established in Pennsylvania jurisprudence that the violation of any consumer protection statute most often constitutes a *per se* CPL violation. *See, e.g. Gabriel v. O'Hara*, 368 Pa. Super. 383, 534 A.2d 488 (1987) (violation of Unfair Insurance Practices Act, the Motor Vehicle Sales Finance Act and Pennsylvania's usury laws constitute violations of the CPL); *King v. Rubin*, 35 Phila. 571 (Phila. C.P. 1998) (violation of Real Estate Licensing Act is a violation of the CPL); *Deetz v. Nationwide Insurance*

*Company*, 20 D. & C. 3d 499 (Mercer C.P. 1989) (violation of Unfair Insurance Practices Act a violation of CPL); *see also In re Koresko*, 91 B.R. 689 (Bankr. E.D. Pa. 1998) (violation of Motor Vehicle Sales Finance Act found to be a violation of CPL); *In re Russell,* 72 B.R. 855 (Bankr. E.D. Pa. 1987) (same).

This principle is especially true in a situation like the case at bar where the underlying consumer protection statute (*i.e.* FCRA) explicitly states that a violation is deemed to be an unfair trade practice. *See, e.g. McClelland v. Hyundai Motor Company America,* 851 F. Supp. 680 (E.D. Pa. 1994) (violation of Pennsylvania's Lemon Law explicitly states that a violation of it is a CPL violation). Violation of federal consumer credit protection statutes such as the FCRA equally present violations of the CPL, not just violations of state laws. *See Commonwealth ex rel Zimmerman v. Nickel*, 26 Pa. D. & C. 3d 115 (Mercer C.P. 1983) (violation of the Truth in Lending Act, a component of the Consumer Credit Protection Act, 15 U.S.C. § 1601, along with the FCRA, presents a violation of the CPL). The statutes providing the basis for the CPL causes of action in these cases are not anomalies. The FCRA should be treated no differently.

While it has not yet been discussed in Pennsylvania caselaw, the issue of the FCRA's cognoscibility as a consumer protection law that creates a cause of action under a state's CLP has been addressed elsewhere. The Court of Appeal of California, Second Appellate District, has specifically addressed this issue, finding that violation of the FCRA and California's state credit reporting statute presented a violation of its version of the CPL (*i.*e. its version of the FTC UDAP statute). *Cisneros v. U.D. Registry*, 39 Cal. App. 4th 548, 46 Cal. Rptr. 2d 233 (1995), *cert. denied*, 516 U.S. 1074 (1996) (violation of state and federal fair credit reporting statutes is a *per se* violation of California unfair trade practices statute). Not surprisingly, the *Cisneros* court followed the same logic employed by Pennsylvania courts in the above-referenced cases to find

that the defendant's violation of the FCRA and state credit reporting laws amounted to an unlawful business practice.   Although every state UDAP statute varies somewhat, the California statute at issue in *Cisneros* presented no significant difference from the Pennsylvania's CPL as far as its finding that the defendant's violation of the FCRA amounted to a violation of that law.

Here, Ms. Lawrence alleges that TU violated the CPL by negligently and willfully violating sections 1681e(b) and 1681i of the FCRA.  In the FCRA, Congress explicitly provided that a violation of these sections constitutes an unfair practice.  15 U.S.C. § 1681s(a)(1).  With this mandate, and pursuant to Pennsylvania law, there is no question that Plaintiff has stated a cause of action for the CPL.  TU has not raised any challenge to the sufficiency of Plaintiff's evidence or even whether the conduct complained of rises to a CPL violation.  Instead, it argues that section 1681s(a)(1) provides for administrative enforcement only, and that it does not provide a private cause of action.  This is correct, but like the other consumer protection laws forming the basis for Plaintiff's CPL claim in *Gabriel, King, McClellan*, and *Nickel, supra*, the FCRA would not provide for a remedy for another state's law.  The remedy for Plaintiff's CPL claim does not originate in the FCRA, only the declaration that TU's practice is unlawful. Plaintiff's remedy at law comes from the CPL. There is no plausible explanation for why a violation of the FCRA does not also state a claim for violation of the CPL, as do the other consumer protection statutes listed above.

### 2.    The FCRA Does Not Preempt Plaintiff's CPL Claim

Without significant elaboration or analysis, TU argues that section 1681t(b) of the FCRA somehow completely preempts Plainitiff's CPL claim.  This is incorrect.  A plain reading of this section, and a look at the relevant FCRA authority, belie TU's bald contention.

TU cites *Jaramillo v. Experian Information Solutions, Inc.*, 155 F. Supp. 2d 356 (E.D. Pa. 2001) for the proposition that Plaintiff's CPL claims also are preempted by the FCRA. By its own argument, *Jaramillo* provides no support for TU's claim as it involved the actions of a person who furnishes information to a consumer reporting agency, and the specific provision of section 1681t(b)(1)(F), which only applies to furnishers. The liability-conferring section for furnishers is found in section 1681s-2(b) of the FCRA. Further, there is no provision in the FCRA providing that all state causes of action, whether for violation of a UDAP statute such as the CPL or otherwise, are fully preempted. TU then seems to recognize this plain fact, and nevertheless argues that subsections 1681t(b)(1)(B) and (F) provide for preemption of Plaintiff's CPL claims against credit reporting agencies. They do not, and this position is absolutely unfounded.

A plain reading of the FCRA reveals no blanket preemption of UDAP or CPL laws. In fact, section 1681t first provides that it does not preempt <u>any</u> state laws imposing obligations on any person unless those laws are inconsistent with it, and then only to the extent of the inconsistency. *See* 15 U.S.C. § 1681t(a). When the FCRA was amended in 1996, Congress retained this section, but added as an exception to this general rule a specific list of prohibitions that may not be imposed by a state. In pertinent part, the following language became codified as sections 1681t(b)(1)(B) and (F):

> (b) General exceptions
>
> No requirement or prohibition may be imposed under the laws of any State -
>
> (1) with respect to any subject matter regulated under -
>
> . . . .
>
> (B) section 1681i of this title, relating to the time by which a consumer reporting agency must take any action, including the notification to a consumer or other person, in any procedure related

to the disputed accuracy of information in a consumer's file, except that this subparagraph shall not apply to any State law in effect on September 30, 1996;

(F) section 1681c of this title, relating to information contained in consumer reports, except that this subparagraph shall not apply to any State law in effect on September 30, 1996;

15 U.S.C. §1681t(b)(1)(B) and (F).

By its plain language, section 1681t(b)(1)(B) applies only to a state law that imposes a "requirement or prohibition" on the timeframe by which credit reporting agencies must complete investigations of consumer disputes of inaccurate information under section 1681i. Section 1681t(b)(1)(F) applies only to a state law that imposes a "requirement or prohibition" on the types of information that may not be included within a credit report pursuant to section 1681c of the FCRA. Neither of these apply to Plaintiff's CPL claims.

From the outset, the CPL does not impose any obligations or requirements on credit reporting agencies; in fact it does not reference them at all. Without a doubt, it certainly does not impose any requirements relating to the timing of a credit reporting agency's investigations of a consumer's dispute and the information that may not appear in a consumer report. Moreover, the CPL is not a statute regulating credit reporting; it merely makes actionable certain unfair and/or deceptive business practices outlined by the FCRA. It is a general statute proscribing unfair and deceptive practices, a legislative product flowing from the Federal Trade Commission's model law, and precedents established under the FTC Act should be relied upon for interpreting the CPL. *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812 (1974).

Moreover, the premise of Plaintiff's FCRA claim does not even concern these specific matters. Nowhere does Plaintiff allege that TU failed to respond within the thirty (30) day timeframe set forth by section 1681i or that it violated section 1681c. Thus, even if TU could plausibly argue that Plaintiff's CPL claim is implicitly premised upon specific violations of the

FCRA, it would certainly not involve the subject matters set forth by subsections (B) and (F). By its own language, section 1681t(b) preempts only certain subject matter regulated under specifically enumerated sections of the FCRA.

Thus, as the CPL does not address this subject matter, TU seems to be suggesting that section 1681t(b) somehow preempts all state law claims against consumer reporting agencies other than the torts of defamation, negligence and invasion of privacy specifically permitted by section 1681h(e) of the FCRA. This defies contrary authority and the longstanding FCRA fundamental principle that it does not preempt state laws as long as the state law is not inconsistent with the FCRA. *Credit Data of Arizona, Inc. v. State of Arizona*, 602 F.2d 195 (C.A. Ariz. 1979); *see also Hughes v. Fidelity Bank*, 709 F. Supp. 639 (E.D. Pa. 1989). The FCRA is designed only to preempt state statutes on those specific credit reporting matters. Other state statutes would not be preempted. *See, e.g., Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (a general negligent manufacturing claim is outside the category of "requirements" with respect to devises such as pacemakers which gives rise to presumption of more specific state laws); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) (where Congress preempted state law "requirements or prohibitions" based on smoking and health advertising, even some common law remedies were preempted, but claims with respect to express warranties, fraud, misrepresentation and conspiracy were not preempted because they were predicated on a general standard not to deceive, which is not a duty based on "smoking or health").

More specifically, and though it curiously did not reference it, Defendant TU at least is aware of recent authority specifically rejecting the total preemption theory of section 1681t(b). *See Watkins v. Trans Union, LLC*, 118 F. Supp. 2d 1217 (N.D. Ala. 2000). In *Watkins*, the Northern District of Alabama was confronted with a case originally filed in state court which

contained allegations that TU disseminate inaccurate credit information about the plaintiff. The complaint failed to identify any specific causes of action or laws. TU removed the case to federal court. Its same counsel as in the instant case argued that section 1681t(b) provided for complete preemption of plaintiff's cause of action of action. The *Watkins* court specifically rejected this argument, finding that section 1681t(b) provided only "sharply drawn" exceptions to the general rule of section 1681t(a) that only inconsistent state laws are preempted, and holding that the leglislative history of the FCRA specifically provides for concurrent state and federal jurisdiction. *Watkins*, 118 F. Supp. at 1222-23. In so ruling, the *Watkins* noted other cases rejecting TU's argument. *See Saia v. Universal Card Services*, 2000 Dist. LEXIS 9494, 2000 WL 863979 (E.D. La. 2000); *Rule v. Ford Receivables*, 36 F. Supp. 2d 335 (S.D. W. Va. 1999); *Swecker v. Trans Union*, 31 F. Supp. 2d 536 (E.D. Va. 1998).

Accordingly, there is no question that Plaintiff's CPL claim does not specifically regulate a matter left for sole enforcement by the FCRA and that the FCRA does not provide for complete preemption. TU has not provided any authority whatsoever to rebut this or any persuasive analysis in the absence of such authority. As noted above, *Jaramillo* provides no authority because that case only involved the applicability of section 1681t(b)(1)(F), a specific preemption exception broadly removing from state regulation the responsibilities of credit furnishers, not credit reporting agencies like TU. Following the rationale of *Cisneros, supra*, there is no reason why Plaintiff may not proceed with his CPL claim.

Thus, TU's arguments fails, as Ms. Lawrence has stated claims for violation of the CPL.

IV.    **CONCLUSION**

For the reasons stated above, this Court should deny Trans Union, LLC's Motion for

Summary Judgment.

<div style="margin-left:50%">

Respectfully submitted,

**FRANCIS & MAILMAN, P.C.**


BY:    _____
       JAMES A. FRANCIS, ESQUIRE
       MARK D. MAILMAN, ESQUIRE
       JOHN SOUMILAS, ESQUIRE
       Land Title Building, 19th Floor
       100 South Broad Street
       Philadelphia, PA 19110
       (215) 735-8600

</div>

Dated: July 10, 2003