1

1          IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3      - - - - - - - - - - - -

4      GRACE LAWRENCE          :

5           Plaintiff,         :

6              vs.             :

7      TRANS UNION, LLC        :

8      CITY OF PHILADELPHIA  :

9           Defendant.      : C.A. NO:02-CV-4440

10     - - - - - - - - - - - -

11                      -  -  -
                  Friday, October 24, 2003
12                      -  -  -

13              Oral deposition of NANCY CERBUS

14     taken pursuant to notice, held at FRANCIS

15     & MAILMAN, P.C., Land Title Building, 19th

16     Floor, 100 South Broad Street, Suite 1902,

17     Philadelphia, Pennsylvania, commencing at

18     10:46 a.m., before Nicolle J. D'Amico,

19     Court Reporter - Notary Public there being

20     present:

21                      -  -  -

22          KAPLAN, LEAMAN AND WOLFE
          Registered Professional Reporters
23            The Bourse, Suite 970
          111 South Independence Mall East
24        Philadelphia, Pennsylvania 19106
               (215) 922-7112


          KAPLAN, LEAMAN AND WOLFE
               (215) 922-7112

2

```
 1    A P P E A R A N C E S:

 2    THE CONSUMER LAW FIRM OF
      FRANCIS & MAILMAN, P.C.
 3    BY:  JOHN SOUMILAS, ESQUIRE
           Land Title Building, 19th Fl
 4         100 South Broad Street, Suite 1902
           Philadelphia, Pennsylvania 19110
 5         (215) 735-8600
           Representing the Plaintiff
 6

 7
      SATZBERG, TRICHON, KOGAN & WERTHEIMER,
 8    P.C.
      BY:  BRUCE S. LUCKMAN, ESQUIRE
 9         1818 Market Street, 30th Fl
           Philadelphia, Pennsylvania 19103
10         (215) 575-7600
           Representing the Defendant
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

```
 1     I N D E X
 2   WITNESS                          PAGE
 3      NANCY CERBUS
 4     (Witness sworn.)
 5
 6   EXAMINATION BY
 7       MR. SOUMILAS:                 4
 8
 9
10
11            E X H I B I T S
12
13   NUMBER     DESCRIPTION          PAGE
14   Cerbus-1   Subpoena             16
15   Cerbus-2   Declaration          79
16   Cerbus-3   Court Docket Document 149
17
18
19
20
21
22
23
24
```

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

4

NANCY CERBUS

```
1                    -  -  -

2                    It is agreed by and between

3      counsel that reading, signing, sealing,

4      filing, and certification are hereby

5      waived and all objections, except as to

6      the form of the questions, are reserved

7      until the time of trial.)

8                    -  -  -

9                    NANCY CERBUS, having been

10     duly sworn, was examined and testified as

11     follows:

12                   -  -  -

13                   DIRECT EXAMINATION

14                   -  -  -

15     BY MR. SOUMILAS:

16     Q.      Would you state and spell your

17     name for the record, ma'am?

18     A.      Nancy Cerbus.  N-A-N-C-Y,

19     C-E-R-B-U-S.

20     Q.      Who do you work with?

21     A.      Superior Information Services,

22     LLC.

23     Q.      And where is that?

24     A.      It's located in Trenton, New
```

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

5

NANCY CERBUS

1    Jersey.

2    Q.      What is your present title?

3    A.      Vice President.

4    Q.      I'm John Soumilas.  I'm the

5    attorney for Grace Lawrence who has

6    brought a lawsuit against Trans Union, LLC

7    in this case.  And I'm here to take your

8    deposition concerning your knowledge about

9    that case.

10                I understand that you

11   provided a declaration to Trans Union

12   earlier in the litigation, okay?

13   A.      (Witness nods.)

14   Q.      Have you given a deposition

15   before?

16   A.      Yes.

17   Q.      I saw you nodding your head in

18   response to my previous question.  So I'm

19   just going to remind you even though

20   you've been deposed before that you have

21   to give me an oral response because the

22   court reporter is not going to be able to

23   pick up the head nods or gestures, okay?

24   A.      Okay.

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

6

NANCY CERBUS

1    Q.      Let me also remind you that the

2    oath that you just took means that you

3    swear to tell the truth as if you were

4    testifying before a judge and a jury.  Do

5    you understand that?

6    A.      Yes.

7    Q.      I'm going to ask you some

8    questions about what information, if

9    anything, you know concerning

10   Ms. Lawrence's claims in the lawsuit

11   against Trans Union.  If you don't

12   understand any of my questions, tell me

13   and then I'll try to rephrase them as

14   clearly as I can.

15   A.      Okay.

16   Q.      Also as a reminder, please wait

17   until I'm done asking the questions so

18   that the court reporter takes down the

19   full question and I'll wait until you're

20   done with your answer completely before I

21   ask the next question.  Do you understand

22   that?

23   A.      Yes.

24   Q.      If you need a break, let me know.

7

NANCY CERBUS

```
1      My goal is to try to get us out of here

2      before lunch, but certainly if you want a

3      break before then, just let me know, and

4      as long as a question is not pending we'll

5      take one.

6      A.      Okay.

7      Q.      Are you taking any type of

8      medication or any other substance today

9      that might impair your ability to testify

10     truthfully?

11     A.      No.

12     Q.      Is Mr. Luckman your lawyer?

13     A.      No.

14     Q.      Is Mr. Luckman Superior

15     Information Services lawyer?

16     A.      No.

17     Q.      When is the first time you spoke

18     with Mr. Luckman about this case?

19     A.      This year.  Probably in July

20     maybe, or May -- May.

21     Q.      Was it over the phone or was it

22     in person?

23     A.      Phone.

24     Q.      What did you discuss?
```

8

NANCY CERBUS

1    A.      We discussed pulling information

2    for the CDVs that we had done before.

3    Q.      I'm sorry.  You discussed pulling

4    information?

5    A.      Uh-huh, from the courts.

6    Retrieving a copy.

7    Q.      Okay.  Let me just make sure I

8    understand.  Did you discuss going to the

9    courts and getting information or looking

10   through your company's records to get

11   information?

12   A.      Looking through our company's

13   records.

14   Q.      Okay.  And what were you looking

15   for?

16   A.      When we verified these disputes.

17   Q.      You were looking for what

18   precisely about the verifications?

19   A.      Superior's records of performing

20   the service.

21   Q.      Did you find any records that

22   relate to Superior's performing of the

23   service in connection with the disputes?

24   A.      Yes.

9
NANCY CERBUS

1    Q.    What records did you find?

2    A.    The CDVs, when we performed them.

3    Q.    You found the CDVs?

4    A.    Uh-huh, yes.

5    Q.    I'm sorry.  That was a yes?

6    A.    Yes.

7    Q.    How many CDVs did you find?

8    A.    We found two.  The last two that

9    we performed.

10    Q.    Do you know the dates of those?

11    A.    I can pull them.

12    Q.    Do you have them here with you?

13    A.    No.  I have the dates.

14    Q.    Okay.

15    A.    It was November '97 and January

16    1998.

17    Q.    November of 1997 and January

18    1998?

19    A.    Yes.

20    Q.    Did you find any other records

21    concerning CDVs?

22    A.    I'm sorry, that was incorrect.

23    Q.    Okay.

24    A.    It was February 2001 and January

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

10
NANCY CERBUS

1     1998.

2     Q.     Okay.  The reference that you

3     made to November 1997, was that for

4     something else?

5     A.     Yes.

6     Q.     What was that?

7     A.     They're the three months that we

8     were supposed to look for in our records

9     for performing this, these verifications.

10    Q.     So November 1997 was another time

11    period when your records show you were

12    supposed to do an investigation for Trans

13    Union?

14                MR. LUCKMAN:  Objection.

15                THE WITNESS:  No.

16    BY MR. SOUMILAS:

17    Q.     Could you tell me what November

18    1997 is?

19    A.     I wanted to look in those records

20    for the Lawrence verification.

21    Q.     Which records?

22    A.     Our records.

23    Q.     The November 1997 records?

24    A.     Yes.

11

NANCY CERBUS

1    Q.    Why did you go and look at that

2    time frame?

3    A.    Based upon the information from

4    Bruce.

5    Q.    Bruce told you to look for

6    November 1997?

7    A.    Yes.

8    Q.    Did he tell you any other dates?

9    A.    Yes, January '98 and February

10   2001.

11   Q.    Any other dates?

12   A.    Not to my knowledge.

13   Q.    Did you keep notes with your

14   conversations with Mr. Luckman?

15   A.    Yes.

16   Q.    Do you have your notes here?

17   A.    No.

18   Q.    Did you maintain your notes?

19   A.    No.

20   Q.    What were you looking at now when

21   you gave me those dates?

22   A.    Some other notes that I put

23   together.

24   Q.    When did you put those notes

NANCY CERBUS

1    together?

2    A.       July.

3    Q.       Of this year?

4    A.       Yes.

5    Q.       For what purpose?

6    A.       To pull the information from the

7    courts.

8    Q.       So in July of 2003 you took

9    certain notes in connection with pulling

10   information from the courts?

11   A.       Yes.

12   Q.       Could you explain to me what

13   happened in July of 2003 that caused you

14   to do that?

15   A.       Yes.  I had a conversation with

16   Bruce and we wanted to re-pull the

17   documents from Philadelphia to take

18   another look at them.

19   Q.       He asked you to do that?

20   A.       I don't know.  But that would be

21   what I would be doing anyway.

22   Q.       What do you mean by "anyway"?

23   A.       If there is a dispute on any

24   document that Superior would verify, we

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

13

NANCY CERBUS

1    would pull the records anyway.

2    Q.      Okay.  And you took notes in

3    connection with that pulling of the

4    records you said?

5    A.      Yes.

6    Q.      Do you have a copy of those

7    notes?

8    A.      Not with me.

9    Q.      Did you maintain a copy of those

10   notes?

11   A.      I'm sure, yes.

12   Q.      Where would you have maintained

13   them?

14   A.      In my office.

15   Q.      Do you have a file in your office

16   with this particular case, Lawrence?

17   A.      I do.

18   Q.      What else is in that file other

19   than these notes from July 2003?

20   A.      A copy of the document.

21   Q.      I'm sorry?

22   A.      A copy of the document from the

23   courts.

24   Q.      The document from the courts?

14
NANCY CERBUS

1    A.       Uh-huh.

2    Q.       What document are you referring

3    to?

4    A.       The Lawrence case from the

5    courts.

6    Q.       Are you referring to court

7    records?

8    A.       Yes.

9    Q.       That your company retrieved in

10   July 2003?

11   A.       Yes.

12   Q.       Do you have a copy of those

13   records here?

14   A.       Yes.

15   Q.       Could I see them?

16            MR. LUCKMAN:  I'm going to

17   remind Ms. Cerbus that I don't represent

18   her.  I know that they have counsel and

19   she may or may not want to talk to counsel

20   before she turns things over to you.  It's

21   entirely up to her, but she shouldn't --

22            THE WITNESS:  Well, I have

23   my folder.

24   BY MR. SOUMILAS:

15

NANCY CERBUS

1    Q.    You have your whole folder?

2    A.    Uh-huh.

3    Q.    Let me ask you this, Ms. Cerbus:

4    Do you know who Peter McGale is?

5    A.    Yes.

6    Q.    Who is he?

7    A.    He is my colleague.

8    Q.    He works with you?

9    A.    Yes.

10    Q.    What is his title?

11    A.    He is Vice President.

12    Q.    He is also Vice President?

13    A.    Uh-huh.

14    Q.    Have you seen the subpoena that

15    my firm served on your company in this

16    case?

17    A.    Yes.

18    Q.    You have.  I asked you about

19    Mr. McGale because I personally spoke with

20    him to give him notice that he received

21    that subpoena, but have you personally

22    reviewed it?

23    A.    Yes.

24    Q.    To your knowledge, did your

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

16

NANCY CERBUS

1    company ever give us any documents in

2    response to that May 2003 subpoena?

3    A.      I don't know.

4              MR. LUCKMAN:  John, did

5    they send anything over?

6              MR. SOUMILAS:  No.  We

7    never received anything, for the record,

8    from your company.

9    BY MR. SOUMILAS:

10   Q.      Who is John Fiechthaler?

11   A.      He's the supervisor of the

12   mailroom.

13   Q.      Supervisor of the mailroom?

14   A.      Yes.

15   Q.      I want to show you a copy of the

16   subpoena.  Let's mark it.

17              MR. SOUMILAS:  If you

18   would, please, mark this as Cerbus-1.

19                    -  -  -

20              (Whereupon, Exhibit

21   Cerbus-1 was marked for identification.)

22                    -  -  -

23   BY MR. SOUMILAS:

24   Q.      Would you take a look at that

17
NANCY CERBUS

1    document that we've marked as Cerbus-1,

2    ma'am.  And once you've had a chance to

3    review it, let me know.

4                MR. LUCKMAN:  What is the

5    difference between A and B; Exhibit A and

6    Exhibit B?

7                MR. SOUMILAS:  I think

8    Exhibit B is a check for this deposition

9    and A is for documents.

10               MR. LUCKMAN:  Oh, the

11   schedule I got you to produce.

12   BY MR. SOUMILAS:

13   Q.      Have you seen this document

14   before, Ms. Cerbus?

15   A.      Yes.

16   Q.      You have.  This was the subpoena

17   that my firm served on your company?

18   A.      Yes.

19   Q.      Is the 300 Phillips Boulevard,

20   3500, Trenton, New Jersey address the

21   address where your company is located?

22   A.      Yes.

23   Q.      Do you have any other offices?

24   A.      No.

18

NANCY CERBUS

1    Q.      That's where your office is

2    physically located?

3    A.      Yes.

4    Q.      I want to just direct your

5    attention to Exhibit A, what's called

6    Schedule of Documents.  With that exhibit

7    what we lay out there is the documents

8    that we asked you to turn over pursuant to

9    the subpoena.  Will you just read

10   paragraphs 1 through 5 to remind yourself

11   what we asked you for?

12   A.      Okay.

13   Q.      You would agree with me that the

14   first paragraph says,  Any and all records

15   and documents that refer or relate to

16   Grace Lawrence?

17   A.      Yes.

18   Q.      You said you keep in your office

19   a file concerning the Grace Lawrence

20   disputes, right?  I'll represent to you I

21   think that's exactly the type of documents

22   that we were looking for.

23   A.      Uh-huh.

24   Q.      And I want to just place for the

19

NANCY CERBUS

```
 1        record that because we have not received

 2        these documents ahead of time, I don't

 3        know whether I could be fully prepared to

 4        ask you questions about what you know in

 5        this case.  And to the extent that at the

 6        end of the day I feel that I don't know

 7        all the questions to ask you, I'm going to

 8        need to reserve the right to recall you as

 9        a witness so that you can answer questions

10        about documents that I have not yet seen.

11                 MR. LUCKMAN:  John, just so

12        the record is clear, I take it you were

13        aware before today that the documents

14        weren't produced.

15                 MR. SOUMILAS:  Correct.

16                 MR. LUCKMAN:  Was there any

17        efforts made to get the documents before

18        we brought her down here from Trenton?

19                 MR. SOUMILAS:  I think

20        there were several efforts made to get the

21        documents, including phone calls from our

22        firm to Ms. Cerbus directly, to

23        Mr. McGale, as well as e-mails to counsel

24        for Trans Union that kindly coordinated
```

                                    20
                        NANCY CERBUS

 1    this deposition.

 2    BY MR. SOUMILAS:

 3    Q.      Let me just go back to the file

 4    of documents of Ms. Lawrence that you have

 5    in your office.  You said you have notes

 6    from your conversation with Mr. Luckman of

 7    July 2003, that's one thing that you have?

 8    A.      Possibly.

 9    Q.      Possibly or you definitely have

10    them?

11    A.      Possibly.

12    Q.      Do you have the file here with

13    you?

14    A.      No.

15    Q.      You don't have that file here

16    with you?

17                MR. LUCKMAN:  She said that

18    three times.

19                THE WITNESS:  My notes, no.

20    BY MR. SOUMILAS:

21    Q.      Do you have another file here

22    with you?

23    A.      Yes.

24    Q.      I'm sorry, I just want to get

21

NANCY CERBUS

1      that clear because we're talking about two

2      separate files, it seems.

3              Let's go to the file that you

4      do have here with you.  Earlier I saw you

5      consulting some notes when you were

6      answering my questions about the CDVs and

7      apologize if I confused the two files.

8      Let's go to that file first.  What file do

9      you have here with you?

10     A.      I have a file of information that

11     we had pulled from July.

12     Q.      What is in that file?

13     A.      It has an outline of notes, some

14     documents from the court.

15     Q.      Outline of notes.  Notes about

16     what?  Your notes?

17     A.      Yes.

18     Q.      What are your notes about?

19     A.      About this case, what I needed to

20     do for it.

21     Q.      What do you mean by that?

22     A.      That I needed to pull some

23     information from the court.

24     Q.      You also have information that

22

NANCY CERBUS

1    you pulled from the courts?

2    A.    Yes.

3    Q.    Are those court records

4    concerning a judgment on Grace Lawrence?

5    A.    Yes.

6    Q.    And you have those here with you

7    today?

8    A.    Yes.

9    Q.    Anything else in that file that

10   you have here today?

11   A.    I have some procedures --

12   Superior's procedures.

13   Q.    Written procedures that your

14   company follows?

15   A.    Yes.

16   Q.    In connection with what?

17   A.    Performing services.

18   Q.    For Trans Union?

19   A.    Yes.

20   Q.    Is it performing investigation

21   services?

22   A.    Yes.

23   Q.    Such as looking into public

24   records when consumers dispute?

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

23
NANCY CERBUS

1      A.      Yes.

2      Q.      Is that a manual or is it

3      individual procedures?

4      A.      I don't understand.

5      Q.      Fair.  Is it a handbook or a

6      procedures manual or is it individual

7      memos or individual procedures?

8      A.      It's a page from a manual.

9      Q.      A page from a manual.  What is

10     the manual called?

11     A.      Training and guidelines.

12     Q.      Training and guidelines?

13     A.      (Witness nods.)

14     Q.      Is that a yes?

15     A.      Yes.

16     Q.      What does the page refer to?

17     A.      The information that you need to

18     re-look at at the court when performing a

19     CDV.

20     Q.      What else is in your file here

21     today?

22     A.      Audits.

23     Q.      What type of audits?

24     A.      Consumer dispute audits.

24

NANCY CERBUS

1    Q.      Could you tell me what that is?

2    I don't know what that is.

3    A.      It's a process that Superior does

4    that we will randomly select 25 CDVs that

5    someone performed and we'll go back and

6    make sure that the information they

7    provided back to us, the home office, is

8    correct so that we have a pass/fail audit

9    system.

10    Q.      Is that an audit of your

11    employees or your contractors, then?

12    A.      Yes.

13    Q.      How many audits do you have with

14    you?

15    A.      Four.

16    Q.      Which ones do you have?

17              MR. LUCKMAN:  Were they the

18    ones for Palmer?

19              THE WITNESS:  Yes.

20              MR. LUCKMAN:  You have

21    those, John.  They were attached to the

22    declaration in this case.

23    BY MR. SOUMILAS:

24    Q.      I have audits conducted on a

                                        25
                            NANCY CERBUS

1       Mr. Nicholas Palmer?

2       A.      Yes.

3       Q.      Four audits on him?

4       A.      Yes.

5       Q.      What else is in that file?

6       A.      Deposition letter from you.

7       Q.      That's the letter that I sent

8   concerning your deposition today?

9       A.      Yes.

10      Q.      Okay.

11      A.      My declaration that I provided to

12  Trans Union.

13      Q.      Okay.

14      A.      And a fax that I sent to Bruce.

15      Q.      What is the date of the fax?

16      A.      August 7, 2003.

17      Q.      What did you fax to him?

18      A.      The declaration that was signed.

19      Q.      Anything else with you here today

20  that pertains to this case -- let me take

21  it one at a time.  I'll withdraw that

22  question.

23              Anything else in the file

24  that you were just referring to?

                    KAPLAN, LEAMAN AND WOLFE
                        (215) 922-7112

NANCY CERBUS

1    A.     I don't think so.

2    Q.     Anything else that you have here

3    with you today in terms of documents

4    concerning Grace Lawrence or any way

5    relating to the claims that Grace Lawrence

6    has made in this case as you understand

7    them?

8    A.     I don't think so.

9    Q.     Let's go back to the second file

10    that I confused with this file, the file

11    that you have in your office where you

12    said may contain notes from a July 2003

13    conversation with Mr. Luckman.  Let's call

14    that, for the sake of this deposition, the

15    second file or the office file, okay?

16    A.     Uh-huh.

17    Q.     To your knowledge, what type of

18    information do you have in that file?

19    A.     You know, I don't know.

20    Q.     You don't know.  How big a file

21    is it?

22    A.     I don't know.

23    Q.     Is it a three-inch file or a file

24    as thin as the one --

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

27

NANCY CERBUS

1       A.      I don't know.

2       Q.      You don't know?

3       A.      No.

4       Q.      When you said earlier --

5       A.      I have notes all over.

6       Q.      I understand.  I'm just trying to

7   get a sense.  Earlier you said that you

8   may have your notes from a conversation

9   with Mr. Luckman in July 2003 in that

10  file; is that correct?

11      A.      Yes, I did say that.

12      Q.      When is the last time you saw

13  that file?

14      A.      Probably that week.

15      Q.      Which week?

16      A.      That I wrote the notes from that

17  conversation.

18      Q.      Did you review the file in

19  preparation for your deposition today?

20      A.      No.

21      Q.      Based on the last time you

22  remember seeing the file, do you remember

23  whether there were any other documents in

24  the file?

28

NANCY CERBUS

1      A.      I don't remember.

2      Q.      Other than the office file that

3      we just discussed and the file that you

4      have here with you, do you have any other

5      documents either in your office or

6      anywhere else in your company that you

7      know about that refer or relate to Grace

8      Lawrence?

9      A.      We would have the electronic

10     version of the CDV.

11     Q.      Is that on a computer database?

12     A.      Yes.  And I believe that's for

13     the last three years.

14     Q.      Does that mean that you would

15     have the electronic version of the

16     February 2001 CDV?

17     A.      Yes.

18     Q.      You testified earlier that you

19     also have a copy of a January 1998 CDV?

20     A.      Yes.

21     Q.      Where do you have that copy?

22     A.      Same place.

23     Q.      On the computer?

24     A.      Yes.

29

NANCY CERBUS

1      Q.       What is your computer called, or

2      the computer system, I should say?

3      A.       It's called Paradox.

4      Q.       Is it maintained at the Trenton

5      facility?

6      A.       Yes.

7      Q.       You said it goes back three

8      years?

9      A.       Yes.

10     Q.       From today?

11     A.       Yes.

12     Q.       Why would you have the January

13     1998 CDV on that?

14     A.       Because I was able to locate it.

15     Q.       On the computer system?

16     A.       Yes.

17     Q.       How did you locate it?

18     A.       I asked someone to find it for

19     me.

20     Q.       Who did you ask?

21     A.       Matt.

22     Q.       Does Matt have a last name?

23     A.       Rebovich, R-E-B-O-V-I-C-H.

24     Q.       He works for your company?

30

NANCY CERBUS

1    A.    Yes.

2    Q.    What is his title?

3    A.    Manager.

4    Q.    He has access to the Paradox

5    computer system?

6    A.    Yes.

7    Q.    And I take it at your direction

8    he conducted a search of the computer

9    system?

10   A.    Yes.

11   Q.    Was he able to get you a printout

12   of the 1998 CDV?

13   A.    Yes.

14   Q.    Was he able to get you a printout

15   of the 2001 CDV?

16   A.    Yes.

17   Q.    Did he conduct any other searches

18   at your direction concerning CDVs in this

19   case, the Lawrence case?

20   A.    Yes, yes.

21   Q.    Which other one?  Which other

22   dates, I should say?

23   A.    Anything prior to '98.

24   Q.    Okay.  I take it he didn't find

31
NANCY CERBUS

1    anything?

2    A.       That's correct.

3    Q.       Could you please remind me how

4    long you keep these records on your

5    Paradox computer database?

6    A.       We try to keep them for three

7    years.  We might keep them longer, but

8    three years is our recycle time.

9    Q.       What does that mean, three years

10   is the recycle time?

11   A.       Anything older than three years

12   we do not have to maintain.

13   Q.       Is that pursuant to a policy that

14   you have?

15   A.       It's pursuant to Superior policy,

16   yes.

17   Q.       Is it a written policy?

18   A.       Not necessarily.

19   Q.       Do you know whether it's written

20   or oral?

21   A.       I don't.

22   Q.       You know that as a matter of

23   course you maintain documents for three

24   years on your Paradox computer database

32

NANCY CERBUS

1    concerning CDV responses?

2    A.      Yes.

3    Q.      And the manager, Matt Reboninsky

4    (ph) you said?

5    A.      Rebovich.

6    Q.      Rebovich.  I'm not going to make

7    you re-spell it, I know you did already.

8    He would manage to find the CDV from 1998.

9    Do you know how it came that that was

10   still in the system?

11   A.      I don't.

12   Q.      Is he a computer related manager,

13   Matt?

14   A.      Yes.

15   Q.      Would he be the person that knows

16   the full memory of the system?

17   A.      What do you mean?

18   Q.      For example, do you personally

19   know what happens to the information after

20   three years?  Does it get purged?  Does he

21   put it on a CD?  Do you have backup tapes,

22   stuff like that?

23   A.      We usually delete it.

24   Q.      Delete it entirely?

33
NANCY CERBUS

```
1    A.      Yes.

2    Q.      You know that for a fact?

3    A.      Yes.

4    Q.      There is no backup of any sort?

5    A.      Yes, there are backups.

6    Q.      Where are the backups?

7    A.      Off site.

8    Q.      Where physically off site?

9    A.      I don't know.

10   Q.      Do you know what the backup

11   system is called?

12   A.      No.

13   Q.      Do you use another company to do

14   the backup work for you?

15   A.      I don't know.

16   Q.      Would Matt know?

17   A.      No.

18   Q.      Who would know?

19   A.      Whoever is responsible for

20   systems administration.

21   Q.      In your company?

22   A.      Yes.

23   Q.      Who is that?

24   A.      Dan Haigh.
```

34

NANCY CERBUS

1      Q.      Is it H-A-G-U-E?

2      A.      H-A-I-G-H.

3      Q.      What is his title?

4      A.      Director.

5      Q.      The two CDVs that you did find,

6      the 1998 and 2001 CDV, you told me you got

7      a printout of them.  Do you know whether

8      they exist some place in your files, the

9      paper printout?

10     A.      I don't.

11     Q.      Did you give copies of that to

12     Mr. Luckman?

13     A.      I don't know.

14     Q.      Do you know whether you gave

15     copies of those CDVs to anyone at

16     Mr. Luckman's firm, such as Mr. Creech?

17     A.      I don't know.

18     Q.      Do you know who Mr. Creech is?

19     A.      Yes.

20     Q.      Did you give any documents to

21     Trans Union or its counsel?

22     A.      I don't know.

23     Q.      You don't know whether you did?

24     A.      These documents?

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

NANCY CERBUS

1     Q.     Any document?

2     A.     Oh yes, I did.

3     Q.     You did?

4     A.     Uh-huh.

5     Q.     What documents did you give them?

6     A.     I gave them audits.

7     Q.     Are those the same audits for

8     Mr. Palmer that we spoke about earlier?

9     A.     Yes.

10    Q.     Any other audits?

11    A.     No.

12    Q.     What else did you give them?

13    A.     I sent him my declaration.

14    Q.     Okay.  Anything else?

15    A.     I don't know.

16    Q.     Were you the person responsible

17    at Superior for doing -- or I should say

18    overseeing the investigation concerning

19    the Lawrence lawsuit?

20    A.     Yes.

21    Q.     So when Matt Rebovich did this

22    computer search on the Paradox system,

23    that was at your direction?

24    A.     Yes.

36

NANCY CERBUS

1    Q.    If any other information was

2    gathered from the courthouse or any place

3    else that would have been at your

4    direction?

5    A.    Yes.

6    Q.    Sitting here today you don't know

7    whether you ever turned over the CDVs to

8    Trans Union?

9    A.    That's correct.

10    Q.    And you don't know whether you

11    turned over any other documents besides

12    the two things that you told me, the

13    audits for Mr. Palmer and your

14    declaration?

15    A.    I also turned over the CDV

16    verification process, verification

17    standards and a copy of the judgment.

18    Q.    CDV verification standards, is

19    that an internal document of Superior's?

20    A.    Yes.

21          MR. LUCKMAN:  Just to short

22    cut, is that the audit guidelines for

23    verification that you attached to your

24    declaration?

37
                        NANCY CERBUS


1              THE WITNESS:  Yes.

2              MR. LUCKMAN:  I didn't mean

3      to interject.

4              MR. SOUMILAS:  No, that was

5      helpful.

6      BY MR. SOUMILAS:

7      Q.      You turned over, you said, the

8      judgment records?

9      A.      Yes.

10     Q.      Is that the record that you

11     obtained in July of 2003?

12     A.      Yes.

13     Q.      Do you have a copy of that record

14     here today?

15     A.      Yes.

16     Q.      Do you know whether the records

17     that you obtained -- let's back up for one

18     second.

19             Documents turned over to you

20     have audits for Mr. Palmer, your

21     declaration, the CDV verification standard

22     and the judgment information that you

23     received from the court in July 2003.

24     Anything else?

38

NANCY CERBUS

1     A.     Nothing that I can think of at

2     the moment.

3     Q.     Okay.  Let's focus on the

4     judgment record.  Do you know whether the

5     judgment information that you obtained

6     from the court in July 2003 states that

7     Grace Lawrence had a judgment entered

8     against her?

9     A.     Sorry.  What was that again?

10    Q.     I'm wondering if you can tell me

11    if the judgment record that you obtained

12    in July 2003 states that Ms. Lawrence --

13    Grace Lawrence had a judgment entered

14    against her in the amount of $2,951, I'll

15    represent to you?

16    A.     It's kind of vague.  I would

17    probably have to look at the document.

18    Q.     Do you have it here?

19    A.     Yeah, but I expected you to show

20    me exhibits.

21    Q.     I will show you exhibits, but I'm

22    not quite there yet and because we haven't

23    seen this document that you received from

24    the court in July 2003, I want to ask you

NANCY CERBUS

1    questions about that.  Could you tell me

2    if it says that the judgment is against

3    her?

4                    MR. LUCKMAN:  She just

5    answered you.  She said it was kind of

6    vague, she expected you to show her

7    something.  She answered that exact

8    question.

9                    MR. SOUMILAS:  I understand

10   that.  You can still answer my question.

11   I take it that's an objection as to

12   vagueness.

13                   MR. LUCKMAN:  I'm just

14   trying to be helpful.

15                   THE WITNESS:  I'm sorry,

16   what was your question?

17   BY MR. SOUMILAS:

18   Q.       My question is, was the judgment

19   against Ms. Lawrence?

20   A.       I don't know.

21   Q.       Do you have the document here?

22   A.       Yes.

23   Q.       Would you take a look at it?

24   A.       I'm not going to take a look at

40

NANCY CERBUS

1    it, no.

2    Q.    Why not?

3    A.    Because I expected you to show me

4    the exhibits that I needed to go through

5    today.

6    Q.    Ma'am, I don't mean to be

7    difficult.  I will show you some documents

8    that I'd like you to go through, but I

9    served a subpoena as a court officer upon

10   your company, that's an order to turn over

11   documents and to be present for a

12   deposition.  Now, I need to identify what

13   type of documents your company has.  To

14   date, they haven't turned any documents

15   over.

16          I understand that Mr. Luckman

17   said he doesn't represent you and that you

18   may want to consult another lawyer and I'm

19   going to give you the same advice that you

20   may want to consult another lawyer before

21   you turn over any documents to me in

22   response to the subpoena, okay?

23          My position is that the

24   subpoena clearly covers all of the

41

NANCY CERBUS

1      documents that we've discussed thus far.

2      It's a formal request to turn over those

3      documents and you have not.  I'm not going

4      to ask you to turn them over today if you

5      don't want to.

6      A.      Okay.

7      Q.      If you want to consult a lawyer,

8      that's perfectly fine; however, I'm going

9      to ask you questions about them and I'm

10     going to ask you questions about your

11     memory.

12     A.      Okay.  And I responded to that

13     and I stated that I would work with -- I

14     responded to that subpoena and said that I

15     would work with Bruce's firm to provide

16     you these documents.

17     Q.      You responded to me saying that?

18     A.      Yes.

19     Q.      Did you respond in a letter?

20     A.      Yes.

21     Q.      Do you have a copy of that

22     letter?

23     A.      I don't.

24     Q.      Do you know when the letter was

42

NANCY CERBUS

1    sent?

2    A.      It was sent maybe a week after I

3    received that subpoena.

4    Q.      Do you know whether your

5    expectation was that you would give those

6    documents to Mr. Luckman and he would turn

7    them to us?

8    A.      Yes, that was my expectation.

9    Q.      Did you turn the documents over

10   to Mr. Luckman?

11   A.      I turned over --

12   Q.      Actually, let me ask you a

13   clearer question.  You told me what

14   documents you already turned over to

15   Mr. Luckman.  My question is, did

16   Mr. Luckman ask you for any additional

17   documents?

18   A.      Yes.

19   Q.      He did?  What additional

20   documents did he ask you for?

21   A.      He asked me for the original

22   judgment that we received from the City

23   from the tape back in 1996.

24   Q.      So that's separate from the July

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

43

NANCY CERBUS

1      2003 record, because I thought you told me

2      it was the judgment?

3      A.      No, that's when we pulled the

4      files from the court.

5      Q.      So those are the physical paper

6      files?

7      A.      Yes.

8      Q.      What did he ask you for then with

9      respect to this tape?

10     A.      We received the information from

11     the City, directly from the City, the

12     judgment information.  And he wanted to

13     know if I had that information from 1996

14     on our database.

15     Q.      And when you say "tape," that's

16     an electronic tape?

17     A.      Yes.

18     Q.      Is that something that's mailed

19     to your office?

20     A.      Back then it was, yes.

21     Q.      In 1996 it was mailed?

22     A.      Yes.

23     Q.      How do you get it now?

24     A.      We receive it by e-mail, the file

                                              44
                              NANCY CERBUS

1     by e-mail.

2     Q.      Okay.  How often did you receive

3     it back in 1996 by mail?

4     A.      Monthly.

5     Q.      So it was a monthly electronic

6     tape with judgments that you put on your

7     database?

8     A.      Yes.

9     Q.      Was that the same database as the

10    Paradox database that you testified about

11    earlier?

12    A.      No.

13    Q.      What database was that?

14    A.      This is our Superior database.

15    Q.      Does that still exist?

16    A.      Yes.

17    Q.      Do you still place judgment

18    information that you receive from the City

19    of Philadelphia on that Superior database?

20    A.      Yes.

21    Q.      Now you receive it by e-mail?

22    A.      Yes.

23    Q.      Are you able to conduct the

24    searches on the database?

45

NANCY CERBUS

```
 1      A.      Yes.

 2      Q.      Did you conduct a search for the

 3   original information in 1996?

 4      A.      Yes.

 5      Q.      Did you find it?

 6      A.      Yes.

 7      Q.      You did find it?

 8      A.      Yes.

 9      Q.      Did you turn it over to

10   Mr. Luckman?

11      A.      Yes.

12      Q.      You did turn it over to

13   Mr. Luckman.  When was that?

14      A.      Well, this is a search though.

15      Q.      A search is a computer search?

16      A.      Yes.

17      Q.      So it's a result of an inquiry

18   into your computer?

19      A.      Yes.

20      Q.      Could you print out the screen

21   with the results?

22      A.      Yes.

23      Q.      Did you print out the screen?

24      A.      Yes.
```

                                                46
                        NANCY CERBUS

 1     Q.      Did you turn it over to

 2     Mr. Luckman?

 3     A.      I don't know.

 4     Q.      Do you know where that screen

 5     print now is?

 6     A.      No.

 7     Q.      How far back would you go in your

 8     Superior database to do such searches?

 9     A.      Depending on what year, all the

10     information that we've collected in

11     Philadelphia would be back to 1987.

12     Q.      Now, we were talking about

13     additional documents other than the

14     documents that you told me that you turned

15     over to Mr. Luckman that Mr. Luckman asked

16     you for.  The original 1996 report, you

17     said you saw that, but you don't remember

18     turning it over to Mr. Luckman?

19     A.      Well, there's two things.  It's

20     not the original.

21     Q.      Okay.  Explain.

22     A.      It's not from the tape.  It's how

23     we store it in our database.


24     Q.      You said there were two things.


                    KAPLAN, LEAMAN AND WOLFE
                         (215) 922-7112

47

NANCY CERBUS

1    Are those both things?

2    A.    Well, you have the original tape

3    from the City and then you have the

4    records as it appears in our database.

5    Q.    I understand.  Does Superior

6    still have the original tape from the City

7    that they received in 1996?

8    A.    No.

9    Q.    Why not?

10   A.    Because we recycle it.

11   Q.    Meaning you use the same tape for

12   the City to put new information on it?

13   A.    We did, yes.

14   Q.    How often did you recycle?

15   A.    We recycled all the tapes.

16   Q.    How often did you recycle?

17   A.    We recycle each monthly tape a

18   year after we loaded the data.

19   Q.    The data was loaded

20   electronically onto the Superior database?

21   A.    Yes.

22   Q.    And that database still goes back

23   to 1987?

24   A.    Yes.

48

NANCY CERBUS

1     Q.     Who maintains the Superior
2     database at your company?
3     A.     There's many people responsible.
4     Q.     Who is the senior most person
5     responsible for the maintenance of the
6     Superior database?
7     A.     Dan Haigh.
8     Q.     The same Dan Haigh that you
9     mentioned earlier?
10     A.     Yes.
11     Q.     Who did the search for you to try
12     to find the information of the original
13     that you received from the City in 1996?
14     A.     Pat Fister.
15     Q.     Pat Fister?
16     A.     Uh-huh.
17     Q.     Is that a man or a woman?
18     A.     Woman.
19     Q.     When did she do that?
20     A.     I don't know; July.
21     Q.     Of 2003?
22     A.     Yes.
23     Q.     At your direction?
24     A.     Yes.

49

NANCY CERBUS

1    Q.      Do you know what the results

2    were?

3    A.      She was unable to locate it.

4    Q.      Unable to locate it?

5    A.      Yes.

6    Q.      Unable to locate the tape or the

7    information?

8    A.      The information that we would

9    have loaded onto the system.

10   Q.      I'm sorry.  Forgive me if I'm

11   mistaken, but --

12   A.      She would not have the tape.

13   Q.      I understand that because the

14   tape is recycled.  But I thought you

15   testified just a few minutes ago that you

16   actually got a printout of the query

17   re-dating back to 1996?

18   A.      Yes, I have that.

19   Q.      You have that.  Do you have it

20   here in your file here?

21   A.      No.

22   Q.      Do you have it in your file that

23   we call the office file back in your

24   office?

NANCY CERBUS

1    A.       Possibly, but I would be able to

2    print it out.

3    Q.       Again, because the data is there?

4    A.       Yes.

5    Q.       What was the result of the

6    inquiry?

7    A.       I located the case in question.

8    Q.       Okay.  Meaning you located the

9    data that was originally downloaded from

10   the City onto the Superior database back

11   in 1996?

12   A.       Yes.

13   Q.       Was it downloaded in 1996?

14   A.       Yes.

15   Q.       Do you know when in 1996?

16   A.       I don't.

17   Q.       Could you tell me, if you

18   remember, whether that tape said that

19   Grace Lawrence owed a judgment of $2,951?

20   A.       I believe, yes.

21   Q.       You believe it did?

22   A.       (Witness nods.)

23   Q.       And this is according to your

24   inquiry into the Superior database that

51
NANCY CERBUS

1    have copies of the original tape?

2    A.      That's correct.

3    Q.      This is something that

4    Mr. Luckman asked you for you said?

5    A.      He wanted to know if I had the

6    file that we originally received from the

7    court, the raw file.

8    Q.      I'm sorry, the wrong file?

9    A.      Raw R-A --

10   Q.      The raw file, meaning these

11   monthly tapes that you used to receive by

12   mail?

13   A.      Yes.

14   Q.      And you told him what?

15   A.      That eventually we couldn't

16   locate the raw file, but the information

17   that I had in the database, this is what

18   it showed.

19   Q.      So you told him what the

20   information showed?

21   A.      Yes.

22   Q.      Did you ever show him a copy of

23   the printout?

24   A.      I don't know.

52
NANCY CERBUS

1     Q.     You don't know if you ever showed
2     it?
3     A.     (Witness nods.)
4     Q.     But he asked you for it?
5     A.     Yes.
6     Q.     So let's just get this straight.
7     Mr. Luckman asked you for additional
8     information concerning the original tape
9     that Superior received from the City back
10    in 1996.  You don't have that; is that
11    correct?
12                 MR. LUCKMAN:  That may have
13    been a confusing question.
14    BY MR. SOUMILAS:
15    Q.     Is it correct that he asked you
16    for that information?
17    A.     Yes.
18    Q.     Did he also ask you for the
19    information that you have on this Superior
20    database concerning the original
21    reporting?
22    A.     I don't know.
23    Q.     You don't know if he did?
24    A.     (Witness nods.)

53

NANCY CERBUS

1    Q.      Do you remember if you ever had a

2    conversation with him concerning that

3    original reporting?

4    A.      Yes.

5    Q.      When was that?

6    A.      When we were talking on the

7    phone.

8    Q.      When?

9    A.      The same day.

10   Q.      The same day as his original

11   request?

12   A.      Yes.

13   Q.      And was that in the July 2003

14   time frame?

15   A.      Possibly, yes.

16   Q.      What did he tell you?

17   A.      I don't know -- what's your

18   question?

19   Q.      My question is, you said you

20   remember having a conversation with him

21   concerning the information on your

22   database.  I'd like to know what you

23   remember him telling you about that.

24   A.      Oh, I did a search and I said, Oh

54

NANCY CERBUS

1       I found the case and this is what it

2       states, the plaintiff versus the

3       defendant, the filing date, and the dollar

4       amount.

5       Q.      And you conveyed this information

6       to Mr. Luckman?

7       A.      Over the phone, yes.

8       Q.      Did he ask you for that

9       information in the form of a printout or

10      in any other form?

11      A.      I don't know.

12      Q.      Now, you said you were on the

13      phone in speaking with Mr. Luckman about

14      this information?

15      A.      Yes.

16      Q.      Is this information that you

17      would pull up at your desk on your

18      computer screen?

19      A.      Yes.

20      Q.      You go directly into the Superior

21      database and do an inquiry yourself?

22      A.      Yes.

23      Q.      Did you do the inquiry yourself?

24      A.      Yes.

55

NANCY CERBUS

1    Q.    What is involved in doing the

2    inquiry?  What exactly do you need to do?

3    A.    You log in, you select your

4    county, your state and you search the

5    person's name, hit enter.

6    Q.    And do you get information

7    concerning the first time that this

8    information was reported to your company?

9    A.    No.

10    Q.    How do you get to that stage

11    where you could find out how it was

12    originally reported in 1996?

13    A.    I would have to look in the back

14    end of the database.

15    Q.    The back end of the database?

16    A.    Into the data field to look in to

17    see whether this case was entered into our

18    database.

19    Q.    Is that also something that you

20    could do from your computer screen in your

21    office?

22    A.    Yes.

23    Q.    Does it entail simply clicking

24    additional windows?

56

NANCY CERBUS

1    A.    Yes.

2    Q.    How often is data reported -- or

3    I should say, back in the '96 time frame,

4    how often was data reported from the

5    courts in Philadelphia to Superior?

6    A.    Monthly.

7    Q.    So once it was reported for the

8    first month, did it continue to get

9    reported in subsequent months?  In other

10    words, what I want to understand is, do

11    you simply have a notation, I would have

12    reported for the first time some time in

13    '96, or do you have a history of monthly

14    reporting?

15    A.    What they provide to you is in

16    more like an index, so you would receive

17    the entry of the judgment with the dollar

18    amount and the docket date.  And then if

19    the judgment had a disposition at a later

20    date, they would then supply that to you

21    at that point.

22    Q.    But my question is, in your

23    database do you have a monthly history of

24    the reporting?

NANCY CERBUS

1    A.    I don't understand.

2    Q.    You could go back and find on

3    your Superior database when a particular

4    judgment was originally reported from the

5    courts to Superior, correct?

6    A.    Yes.

7    Q.    You also told me that the courts

8    send you a tape every month?

9    A.    Yes.

10    Q.    My question is, does your

11    database have a complete history of the

12    reporting from month to month?

13    A.    Yes.

14    Q.    And this is something that you

15    could also print out?

16    A.    Yes.

17    Q.    Did you review that history in

18    connection with this matter?

19    A.    Yes.

20    Q.    Was this judgment being reported

21    by the City of Philadelphia against

22    Ms. Lawrence every month?

23    A.    I think there is a disconnect.

24    Let's go back.  When you receive the

58

NANCY CERBUS

1    monthly tape, say you receive the tape for

2    July, you only receive the judgment from

3    July.  The next month you'll receive the

4    judgment from August, so you would only

5    receive this judgment once.

6    Q.      That's exactly what I was trying

7    to get at.  So when you get the next

8    monthly tape, it will not re-update the

9    judgment that you got originally; is that

10   what you're telling me?

11   A.      Unless there is a disposition

12   update.

13   Q.      Okay.  So for all intents and

14   purposes you get it once, unless there is

15   a disposition update?

16   A.      Yes, or unless there is a

17   subjudgment to the case.

18   Q.      I'm sorry, a what?

19   A.      A subjudgment to the case.

20   Q.      What is that?

21   A.      Meaning if there's another party

22   to a case with a judgment filed at a later

23   date or a counter claim.

24   Q.      Could you give me an example of

59

NANCY CERBUS

1    that?

2    A.      If Docket No. 123 of 2003 had a

3    judgment filed in January of 2003 for

4    $500, it would be reported in the January

5    information.  Next month there's an

6    additional judgment on that same docket

7    number with a February date, it would then

8    be reported as well.

9    Q.      So it would be a second judgment

10   on another party, for example?

11   A.      That's correct.

12   Q.      Concerning the judgment that you

13   say was against Grace Lawrence, did you

14   receive any updates to the original

15   reporting?

16   A.      No.

17   Q.      Do you know what month in 1996

18   you received the original tape?

19   A.      For this particular one, I don't

20   know the date that we received it.

21   Q.      You're sure it was 1996?

22   A.      I can confirm.  I'm not sure.

23   Q.      And you're sure that it was

24   against her, not in her favor?

NANCY CERBUS

1    A.    Yes.

2    Q.    Okay.  We were talking about

3    additional documents that Mr. Luckman

4    asked you for and we got into all this

5    when you told me that he asked for the

6    original 1996 reporting.  What other

7    documents, if any, did he ask you for?

8    A.    I don't know.  I can't really

9    remember.

10    Q.    Was it your understanding that

11    all of the documents were going to be in

12    response to the subpoena that my office

13    served on your company?

14    A.    Yes.

15    Q.    Was it your understanding that

16    you didn't have any independent obligation

17    to turn those documents over to me?

18            MR. LUCKMAN:  Object to the

19    form.

20            THE WITNESS:   I don't

21    know.

22    BY MR. SOUMILAS:

23    Q.    You don't know whether that was

24    your understanding?

61
NANCY CERBUS

1    A.    Yeah.

2    Q.    I'm just asking you, sitting here

3    today what do you believe?  Do you believe

4    that you had to turn those documents over

5    to me or to Mr. Luckman?

6    A.    I believe based on the letter

7    that I responded to you with that I would

8    work to give Trans Union documents that

9    you needed.

10   Q.    And you gave Trans Union those

11   four documents that we spoke about earlier

12   including the 2003 judgment information?

13   A.    The public record --

14   Q.    The public record?

15   A.    -- retrieval.

16   Q.    Okay.  So is that a public record

17   concerning a judgment on Grace Lawrence?

18   A.    Yes.

19   Q.    That's separate from the tape

20   that you originally got in 1996?

21   A.    Yes.

22   Q.    Do you know whether that public

23   record information also has the judgment

24   against Ms. Lawrence?

62
NANCY CERBUS

1     A.      I don't know.

2     Q.      You don't know that.  Are there

3     any other documents that you were asked to

4     turn over to Trans Union either in

5     connection with the subpoena or for any

6     other reason?

7     A.      I can't remember.

8     Q.      How many conversations have you

9     had with Mr. Luckman since, let's say the

10    beginning of this year?

11    A.      I don't know exactly, but I would

12    say about -- I don't know, five to seven.

13    Q.      Were they in person or over the

14    telephone?

15    A.      Telephone.

16    Q.      When would you place them

17    chronologically?  Do you know when they

18    began?

19    A.      Yes, they began after I received

20    the subpoena.

21    Q.      So roughly May of 2003?

22    A.      Yes.

23    Q.      And you have had five to seven

24    telephone calls with Mr. Luckman since May

                                                  63
                                    NANCY CERBUS


    1        2003?

    2        A.       Yes.

    3        Q.       Okay.

    4        A.       Possibly.

    5        Q.       You told me about what documents

    6        you turned over to Mr. Luckman.  You told

    7        me about other documents or information

    8        that he asked for, okay, in terms of

    9        documents.

   10                 Did he ask for any other

   11        information that's not documentary

   12        information?

   13                 Do you understand my

   14        question?

   15        A.       No.

   16        Q.       I just want to make sure that I'm

   17        covering all my basis.  You told me about

   18        the documents that you turned over to him,

   19        and you also told me that he asked you for

   20        documentation concerning this original

   21        tape back in 1996.  And you're not sure

   22        whether you turned over to him the

   23        printout from your computer.  That all I'm

   24        going to put in the documents count.


                        KAPLAN, LEAMAN AND WOLFE
                              (215) 922-7112

64

NANCY CERBUS

1               I'm asking you now, did he

2      ask you any other information from your

3      memory or from like asking around your

4      company that doesn't relate to documents

5      about this case?

6      A.      I can't think of anything else.

7      Q.      What did you talk about the five

8      to seven times that you spoke?

9      A.      We spoke about pulling this

10     information, Superior procedures, how we

11     would go about reporting this judgment to

12     Trans Union and other credit companies.

13     You know, just these general questions.

14     Q.      Okay.  Did Mr. Luckman ever tell

15     you that Ms. Lawrence's claims of the

16     judgment is not against her?

17     A.      I don't know.

18     Q.      Did Mr. Luckman ever ask you

19     whether you think anyone at Superior made

20     a mistake in reporting the judgment to

21     Trans Union against Ms. Lawrence?

22     A.      I don't know.

23     Q.      You don't know whether he ever

24     asked you whether there was any mistake

65

NANCY CERBUS

1    ever made?

2    A.    Mistake, I don't know.

3    Q.    Did he ask you whether there was

4    anything done intentionally to this

5    reporting?

6    A.    Intentionally?

7    Q.    Yes.

8    A.    What do you mean?

9    Q.    You said "mistake, I don't know."

10   So I'm just trying to follow-up to see if

11   there was something other than a mistake.

12             MR. LUCKMAN:  Object to the

13   form.

14             THE WITNESS:   I don't

15   understand.

16   BY MR. SOUMILAS:

17   Q.    Did Mr. Luckman and you ever

18   speak about whether the information

19   concerning Ms. Lawrence owing a judgment

20   was accurate; that is to say did she

21   really owe that judgment?  Did you ever

22   have discussions about the accuracy of

23   that reporting?

24   A.    Sure, yes.

66

NANCY CERBUS

1    Q.      What did he tell you about that?

2    A.      We spoke about it, and I said,

3    Let me pull the court record so I can

4    then, you know, go through this with you.

5    Q.      So you wanted to pull the court

6    record in July of 2003 and see what was

7    going on?

8    A.      Yes.

9    Q.      Did you first go on your database

10   and find out how you were reporting it?

11   A.      Yes.

12   Q.      Did you first find the CDVs from

13   2001 and 1998?

14   A.      Probably not that day, but in the

15   next couple days.

16   Q.      Was it before going to the court

17   to get the paper record?

18   A.      We probably would have done it

19   all at the same time.

20   Q.      All at the same time, okay.

21           Do you remember any other

22   conversations?  You said there were five

23   to seven total conversations.

24   A.      It would have been the same

67

NANCY CERBUS

1    information.

2    Q.      Now, I think we talked about

3    conversations with Mr. Luckman,

4    information provided to Mr. Luckman,

5    information about which Mr. Luckman

6    acquired that you did not -- you're not

7    sure whether you provided to him, and we

8    talked about your file here, your file in

9    your office and your computer databases.

10   Is there any other information anywhere in

11   your company that may pertain to

12   Ms. Lawrence?  Any other computer database

13   that they have information about or your

14   reporting to Trans Union, any e-mails, any

15   correspondence, any memoranda, to your

16   knowledge?

17   A.      I don't think so.

18   Q.      Are there any other policies or

19   procedures concerning the reporting of

20   judgments other than the ones that you

21   mentioned here today?

22   A.      Superior's?

23   Q.      Superior's policies and

24   procedures?

68

NANCY CERBUS

1       A.      Yes.

2       Q.      There are?

3       A.      Uh-huh.

4       Q.      What are they?

5       A.      We have collection procedures,

6       when to collect judgments, how to collect

7       judgements.

8       Q.      Maybe my question was not clear.

9       I'm just talking about the retrieval of

10      judgment information and the reporting of

11      it to Trans Union or other credit bureaus.

12      I'm not talking about the collections.

13              Your company personally

14      collects judgments?

15      A.      Yes.

16      Q.      I don't care about that for now.

17      What I want to know is other policies that

18      pertain to the reporting of the

19      information to Trans Union or other credit

20      bureaus.

21      A.      Like, what we -- I'm sorry, I

22      don't understand.

23      Q.      Do you have any policies about

24      how you process or how you distribute

69

NANCY CERBUS

1     credit information to credit bureaus other

2     than the documents that we spoke about

3     today?

4     A.     Yes.

5     Q.     Contracts, for example?

6     A.     Yes.

7     Q.     What do you have?

8     A.     We have contracts.

9     Q.     With who?

10    A.     The credit companies.

11    Q.     The credit companies.  Which

12    credit companies?

13    A.     Trans Union, Equifax, Spherion,

14    Dunn & Brad Street.

15    Q.     So the credit reporting

16    companies?

17    A.     Yes.

18    Q.     Any other procedure or policy

19    manuals concerning your business with

20    these companies?

21    A.     Yes.

22    Q.     What other ones?

23    A.     We have criteria -- output

24    criteria to each client.

NANCY CERBUS

1       Q.       Output criteria?

2       A.       Yes.

3       Q.       What is that?

4       A.       Based upon the information that

5    client wishes to receive, we have criteria

6    for each client and a procedure.

7       Q.       Is that to say Trans Union wants

8    information XYZ concerning bankruptcy,

9    whereas another client might want

10   different information?

11      A.       Yes.

12      Q.       Are these your written internal

13   policies?

14      A.       Yes.

15      Q.       Are they in a handbook or what

16   are they called?

17      A.       Yes, it's in a booklet.

18      Q.       What is the booklet called?

19      A.       Output criteria.

20      Q.       Output criteria booklet, okay.

21   Are these policies something you negotiate

22   with the credit reporting companies or do

23   you come up with the policies on your own?

24      A.       They're negotiated.

NANCY CERBUS

1    Q.      They're negotiated.  How about

2    other manuals or booklets or pamphlets

3    concerning your policies on credit

4    reporting or reporting credit information,

5    excuse me.

6    A.      We have training guides.

7    Q.      For who?

8    A.      For our collections.

9    Q.      For your collections people?

10   A.      Uh-huh.

11   Q.      Let's take that off the table

12   again.  Just the retrieval of credit

13   information and how you process it for the

14   credit bureaus, how you sell it to them

15   and so forth.  Anything else in terms of

16   procedures or manuals, memos?

17   A.      I can't think of anything right

18   now.

19   Q.      Okay.

20          MR. LUCKMAN:  Could you

21   tell me when you're at a point for a two

22   minute break?

23          MR. SOUMILAS:  Sure.  Right

24   now is perfect.

72
NANCY CERBUS

1                    -  -  -

2                    (Whereupon a brief recess

3        was taken at 11:52 a.m. and the deposition

4        resumed at 12:00 p.m.)

5                    -  -  -

6        BY MR. SOUMILAS:

7        Q.        Ms. Cerbus, we just took a brief

8        break.  Did you have any conversations

9        regarding your testimony with Mr. Luckman?

10       A.        Yes.

11       Q.        You did?

12       A.        (Witness nods.)

13       Q.        What did you discuss?

14       A.        I told him that I was hoping that

15       it would go a little faster because I have

16       a train to catch.

17       Q.        I'm hoping that it goes faster

18       myself.

19                    MR. LUCKMAN:  I second her

20       motion, by the way.

21       BY MR. SOUMILAS:

22       Q.        I'll try to accommodate you in

23       that respect.  When is your train?

24       A.        2:00.

73

NANCY CERBUS

1    Q.      Did you have any conversation

2    about anything else?

3    A.      Yes.

4    Q.      What else, concerning your

5    testimony; not personally?

6    A.      Not really, no.

7    Q.      Not really.  All right.

8            Up to this point you've

9    identified for me many pieces of

10   information that I will tell you

11   Ms. Lawrence is going to take deposition

12   through our firm are responsive to the

13   subpoena for documents.  Obviously if you

14   don't want to turn over the documents that

15   you have with you today, that's fine,

16   that's your choice.  But based on your

17   testimony about the existence of these

18   documents and my physical view that you

19   have them right here in front of you, we

20   are going to seek assistance from a court

21   with a motion for contempt under the

22   Federal rules of civil procedure to get

23   those documents turned over to us.  And if

24   sanctions are appropriate for such a

74

NANCY CERBUS

1       motion, we would also seek that.  I just

2       want to make that clear to you because

3       this subpoena has been outstanding now for

4       about four months and really the heart of

5       this case is what is the information that

6       you have about this judgment that

7       Ms. Lawrence says was not against her.

8       And you're telling me you have judgment

9       information or information from a court

10      right here with you and you're unwilling

11      to turn it over, then my only recourse is

12      to go to the judge and get a contempt

13      order to turn it over.  Do you understand

14      that?

15                  MR. LUCKMAN:  Just so we're

16      clear, you said that you've seen the

17      documents that are right here.  And that,

18      as far as I can tell, is not accurate.

19      The documents haven't left the folder.

20      She's described them.  No one has seen

21      them.

22                  MR. SOUMILAS:  Let me make

23      that clear for the record.  There are a

24      couple of folders sitting on our table

75
NANCY CERBUS

1    right in front of Ms. Cerbus and I have

2    seen her consulting those folders.  We

3    have not seen those documents and I do not

4    know what precisely she has here with her

5    today or in her office.  Is that fair?

6                    MR. LUCKMAN:  Yes, that's

7    fair.  It may have sounded like you

8    reviewed them but not gotten them kind of

9    thing.

10                    MR. SOUMILAS:  I'm glad we

11   clarified that for the record.  Okay.

12   BY MR. SOUMILAS:

13   Q.      So that's your choice, but let's

14   move onward to other information that I

15   need to ask you in connection with this

16   deposition.

17                    You said you've given

18   deposition testimony before?

19   A.      Yes.

20   Q.      When?

21   A.      A couple years ago.

22   Q.      As in two years ago?

23   A.      I can't remember.

24   Q.      Was it Federal or State court?

76
NANCY CERBUS

1      A.      I can't remember.

2      Q.      Do you know where it was

3      geographically?

4      A.      Yes.

5      Q.      Where?

6      A.      It happened at my office.

7      Q.      The deposition was at your

8      office.  What type of case was it?

9      A.      Civil.

10     Q.      Did it have to do with reporting

11     of judgments or other public record

12     information?

13     A.      Yes.

14     Q.      Do you know who the plaintiff or

15     who the defendant was in that case?

16     A.      I can't recall.

17     Q.      Was your company a party to the

18     case?

19     A.      No.

20     Q.      Do you know if Trans Union was a

21     party to that case?

22     A.      Yes.

23     Q.      Was Mr. Luckman there?

24     A.      Yes.

77
NANCY CERBUS

1    Q.     Do you know what the case

2    involved?  What type of public record was

3    at issue?

4    A.     I can't remember.

5    Q.     Do you know how the case was

6    resolved?

7    A.     No.

8    Q.     Did you testify about your

9    company's relationship as a public records

10   vendor for Trans Union?  Did you give

11   testimony on that subject?

12   A.     Testified?

13   Q.     You said it was a deposition,

14   right?

15   A.     Yes.

16   Q.     And what I mean, at the

17   deposition did you give testimony about

18   your company's relationship as a public

19   records vendor for Trans Union?

20   A.     Yes, I did.

21   Q.     Do you know who the plaintiff's

22   lawyer was who was taking your deposition?

23   A.     I can't recall.

24   Q.     Do you know if that case ever

78

NANCY CERBUS

1    went to court?

2    A.    I can't recall.

3    Q.    Did you give any other

4    depositions?

5    A.    No.

6    Q.    Ever in your life?

7    A.    No.

8    Q.    About any other matter?

9    A.    No.

10    Q.    Did you ever testify in court?

11    A.    No.

12    Q.    About any matter whatsoever?

13    A.    No.

14    Q.    Never as a witness?

15    A.    No.

16    Q.    Were you ever a party to a

17    lawsuit?

18    A.    No.

19    Q.    Is your company a party to a

20    lawsuit?

21    A.    Yes.

22    Q.    I'm sure your company may be a

23    party to multiple lawsuits as a lot of

24    companies are.  Is your company presently

79
NANCY CERBUS

1    as we sit here today a party to any

2    lawsuit involving the reporting of public

3    records information to credit bureaus?

4    A.       Not to my knowledge.

5    Q.       Has your company ever been

6    involved in that type of a lawsuit?

7    A.       Not to my knowledge.

8    Q.       Your title at Superior you told

9    me is Vice President.  Is it Vice

10   President of Data Services?

11   A.       Data Information Services.

12   Q.       Data Information Services.

13                  MR. SOUMILAS:  I'd like to

14   mark as Cerbus-2 the declaration that you

15   provided in this case.

16                       -  -  -

17                  (Whereupon, Exhibit

18   Cerbus-2 was marked for identification.)

19                       -  -  -

20    BY MR. SOUMILAS:

21   Q.       How long have you been Vice

22   President of Data Information Services?

23   A.       Five months.

24   Q.       Five months?

80

NANCY CERBUS

1     A.     Uh-huh.

2     Q.     Since when?

3     A.     May of 2003.

4     Q.     Is there such a position as Vice

5     President of Data Services at your

6     company?

7     A.     No.

8     Q.     Would you just take a look at

9     Cerbus-2 which is the declaration you

10    prepared for Trans Union in this case and

11    take a look at the first numbered

12    paragraph that reads, I am Vice President,

13    Data Services of Superior Information

14    Services, Inc.  Do you see that?

15    A.     Yes.

16    Q.     Is that a mistake?

17    A.     Yes.

18    Q.     Did you review this declaration

19    before you signed it?

20    A.     I did.

21    Q.     Did you type it?

22    A.     I didn't.

23    Q.     Did you input it into a computer?

24    A.     No.

81
NANCY CERBUS

1    Q.      Did Mr. Luckman's firm prepare it

2    for you?

3    A.      Yes.

4    Q.      Did you review it for accuracy

5    before you signed it?

6    A.      Yes.

7    Q.      Is that your signature at the

8    bottom of the third page next to the date

9    August 7, 2003?

10   A.      Yes.

11   Q.      You just didn't catch the fact

12   that your title was wrong?

13   A.      My title is correct.  The

14   services part is incorrect.

15   Q.      So your title is Vice President,

16   Data Information Services, and information

17   is missing from your description of your

18   title here?

19   A.      Yes.

20   Q.      Was that just something that you

21   didn't see?

22   A.      Yes.

23   Q.      How long have you been with

24   Superior?

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

82

NANCY CERBUS

1    A.      Over 11 years.

2    Q.      And what are your

3    responsibilities as Vice President of Data

4    Information Services?

5    A.      I'm responsible for the

6    collection of the information, the

7    services, the output of the data to our

8    clients.

9    Q.      Okay.  What else are you

10   responsible for, if anything?

11   A.      Finances, hiring.  Pretty much

12   general operations, sales.

13   Q.      What did you do before your

14   present title?

15   A.      I was director of Core Data

16   Services.

17   Q.      Director of Core Data?

18   A.      Uh-huh.

19   Q.      How long did you do that?

20   A.      Since April of 1999.

21   Q.      What were your responsibilities

22   in that position?

23   A.      I was responsible for the

24   collection of the information and

83

NANCY CERBUS

1    different services and three business

2    lines.

3    Q.      What do you mean by "business

4    lines"?

5    A.      Different product lines that we

6    have in our business makeup.

7    Q.      What are those product lines?

8    A.      Core Data Services, our list

9    business and corporate services.

10   Q.      What is the difference between

11   each?

12   A.      Our core data is the information

13   that we collect.  The list business is we

14   do like home owners lists, we collect data

15   mortgage information, we have lists like

16   that.  And corporate services is where we

17   incorporate businesses internationally and

18   nationally in all 50 states.

19   Q.      You incorporate them?

20   A.      Yes.

21   Q.      So some company comes to you that

22   wants to start up and they need

23   incorporation papers?

24   A.      Yes.

84

NANCY CERBUS

1       Q.      Does your company employ

2  attorneys?

3       A.      We could, yeah.

4       Q.      Do they?

5       A.      Sure.

6       Q.      In-house attorneys?

7       A.      We don't have any in-house

8  attorneys.

9       Q.      Is there a legal department?

10      A.      No.

11      Q.      When a subpoena goes to your

12  company, who is it referred to?

13      A.      Usually the president.

14      Q.      Do you use outside counsel to be

15  represented?

16      A.      Yes.

17      Q.      Who do you use?

18      A.      Different firms.

19      Q.      Which ones?

20      A.      Fox, Rothschild.

21      Q.      Anybody else?

22      A.      I'm sure, but I just don't know.

23      Q.      Do you know whether you use Fox,

24  Rothschild here in Philadelphia?

85

NANCY CERBUS

1    A.    I don't.

2    Q.    Who is responsible for that?

3    A.    It would be our president.

4    Q.    Who is that?

5    A.    Steven Craig.

6    Q.    Steven Craig.  Could you spell

7    that?

8    A.    C-R-A-I-G.

9    Q.    Prior to your being director of

10   Core Data Services, what did you do for

11   Superior?

12   A.    I was in sales.

13   Q.    Was that your title, sales

14   representative?

15   A.    I was account executive.

16   Q.    Account executive.  And for how

17   long did you do that?

18   A.    A little over a year.

19   Q.    So 1998 to 1999?

20   A.    Yes.

21   Q.    And what did you do as an account

22   executive?

23   A.    I sold our on-line system that we

24   have available and I was responsible for

86

NANCY CERBUS

1     national licensing accounts.

2     Q.      Who did you sell it to?  What

3     type of companies?

4     A.      Licensing to Lexus, Nexus, West

5     Group, law firms.

6     Q.      What did you do prior to that?

7     A.      Prior to that I was part of the

8     data collections group, field collections

9     and I was responsible for the supervision

10    and collection of public records in

11    different states.

12    Q.      What was your title?

13    A.      Supervisor.

14    Q.      Of data collection?

15    A.      Yes.

16    Q.      How long did you do that?

17    A.      Since 1992.

18    Q.      Is that when you joined the

19    company?

20    A.      Yes.

21    Q.      So 1992 to 1998 you were a

22    supervisor?

23    A.      Yes.

24    Q.      What did you do prior to joining

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

87

NANCY CERBUS

1    Superior Information Services?

2    A.      I did criminal background checks

3    for about six years in Philadelphia

4    County.

5    Q.      Did you work for a company doing

6    that or for yourself?

7    A.      Company.

8    Q.      What company?

9    A.      Justifacts Credential

10   Verification Services in Pittsburg.

11   Q.      Justifacts?

12   A.      Uh-huh.

13   Q.      Did you work out of Pittsburg?

14   A.      No.

15   Q.      You worked in Philadelphia?

16   A.      Yes.

17   Q.      Where was your office?

18   A.      I was home based.

19   Q.      I'm sorry?

20   A.      Home based.

21   Q.      You worked out of your home?

22   A.      Yes.

23   Q.      Was your home in Philadelphia at

24   the time or in New Jersey?

88

NANCY CERBUS

1    A.        Philadelphia.

2    Q.        I'm sorry, I presume it's in New

3    Jersey because Superior is now in New

4    Jersey.  Was your home in Philadelphia?

5    A.        Yes.

6    Q.        And you worked out of your home?

7    A.        Yes.

8    Q.        And you did criminal background

9    checks for this company?

10   A.        Yes.

11   Q.        Who was your immediate supervisor

12   at the time?

13   A.        Marsha, and I can't remember.

14   Q.        Was she here in Philadelphia or

15   in Pittsburg?

16   A.        Pittsburg.

17   Q.        Do you remember any superior of

18   yours by a full name, whether immediate or

19   a level above?

20   A.        No.

21   Q.        You don't remember anybody.  Do

22   you remember any co-workers?

23   A.        I didn't have any here.

24   Q.        You didn't have any.  How about

89

NANCY CERBUS

1       before Justifacts -- I'm sorry, did I ask

2       you how long did you work for Justifacts?

3       Six years you told me?  So 1996 roughly to

4       1992?

5       A.       No, like '88 to --

6       Q.       Yeah, I misspoke.  I mean '86 to

7       '92?

8       A.       No, it was like '88 to '94,

9       something like that.

10      Q.       I thought you told me you started

11      working for Superior in 1992?

12      A.       I did.  I worked two jobs.

13      Q.       I understand.  Were you working

14      full-time for Superior back in 1992?

15      A.       Yes.

16      Q.       Were you working full-time for

17      Justifacts?

18      A.       No.

19      Q.       Did you work full-time for

20      Justifacts at any point?

21      A.       No.

22      Q.       Did you have any other position

23      while you were working for Justifacts as a

24      criminal background check?

90

NANCY CERBUS

1    A.    Jobs?

2    Q.    Any other jobs?

3    A.    Yes.

4    Q.    At the same time?

5    A.    Yes.

6    Q.    What other jobs?

7    A.    I worked at a counseling center.

8    Q.    I'm sorry?

9    A.    I worked at a counseling center.

10    Q.    Okay.  Which one?

11    A.    Temple University.

12    Q.    Anything else?

13    A.    I worked in a restaurant.

14    Q.    Which one?

15    A.    Double Decker.

16    Q.    I'm sorry?

17    A.    Double Decker.

18    Q.    Prior to having these jobs and

19    working on a part-time basis for

20    Justifacts, what did you do?

21    A.    Prior?

22    Q.    Yes.

23    A.    I went to college.

24    Q.    Where did you go to college?

91

NANCY CERBUS

1    A.    Temple.

2    Q.    Here in Philadelphia?

3    A.    Yes.

4    Q.    Did you graduate?

5    A.    Yes.

6    Q.    When?

7    A.    I graduated in 1992.

8    Q.    With what type of degree?

9    A.    Bachelor in Business

10   Administration.

11   Q.    Bachelor of Arts in Business

12   Administration?

13   A.    Bachelor of Business

14   Administration.

15   Q.    Do you have any other college

16   education other than your Temple Bachelor

17   of Business Administration degree?

18   A.    No.

19   Q.    Have you taken any courses or any

20   certifications or any training since you

21   graduated from Temple in 1992?

22   A.    Sure.

23   Q.    What?

24   A.    Courses.  I've done a lot of

92

NANCY CERBUS

```
 1    sales courses, Dow Carnegie.  I have

 2    taken --

 3    Q.      I'm sorry, Dow Carnegie you said?

 4    A.      Dow Carnegie.

 5    Q.      Okay.  When was that?

 6    A.      I don't know.  Early '90s.

 7    Q.      Sales courses with Dow Carnegie

 8    in the early '90s.  Anything else?

 9    A.      I've taken financial courses.

10    Q.      Where?

11    A.      The seminars that my company sets

12    up for us.

13    Q.      Your company, Superior?

14    A.      Yes.

15    Q.      When was that?

16    A.      '94.

17    Q.      Anything else?

18    A.      Yeah.  I mean I've taken a lot of

19    courses.

20    Q.      Did you ever take any courses in

21    law or do you have any legal background?

22    A.      I was a legal studies major.

23    Q.      At Temple?

24    A.      At Temple, legal studies and
```

93

NANCY CERBUS

1    finance.

2    Q.    So you had a double major as they

3    say?

4    A.    Yes.

5    Q.    Legal studies and finance?

6    A.    Yes.

7    Q.    And your degree was Bachelor of

8    Business Administration?

9    A.    Yes.

10   Q.    Have you had any legal training

11   beyond your studies at Temple as a legal

12   studies major?

13   A.    We've done -- like the company

14   will go to like the new courses on -- you

15   know, any of the new courses that our law

16   firm will put out for -- whether it's, you

17   know, fair collection practices or

18   privacy.  I mean we attend a lot of

19   seminars on that related to public

20   records.

21   Q.    I'm not sure I understood that.

22   You said our law firm puts out.  Does that

23   mean Fox, Rothschild?

24   A.    Or a law firm in our area.

94

NANCY CERBUS

1    Q.      So if a law firm does a

2    presentation or a seminar, you may attend

3    it as a representative of Superior

4    Information Services?

5    A.      Yes.

6    Q.      You personally?

7    A.      Yes.

8    Q.      Do you know which ones you've

9    attended recently?  By recently I mean the

10   last five years.

11   A.      I did the privacy -- the whole

12   privacy that was in New Jersey and in

13   California.  I attended both of those.

14   Q.      Privacy legal seminar?

15   A.      Uh-huh.

16   Q.      Do you know who gave it?

17   A.      Yes, Daria -- I can't remember.

18   Q.      Daria is the presenter's first

19   name?

20   A.      Yes.

21   Q.      It is a woman?

22   A.      Yes.

23   Q.      Do you know where she works?

24   A.      She works out of California.

95

NANCY CERBUS

1    Q.    And you attended this

2    presentation both in New Jersey and in

3    California?

4    A.    Uh-huh.

5    Q.    Was it a one-day presentation?

6    A.    Yes.

7    Q.    One day each?

8    A.    Yes.

9    Q.    On privacy?

10    A.    Yes.

11    Q.    Anything else in terms of legal

12    training since your Temple days?

13    A.    Not that I can recall.

14    Q.    Your company, Superior

15    Information Services you told me has a

16    single location in Trenton, New Jersey?

17    A.    Yes.

18    Q.    No other outlets or offices

19    anywhere?

20    A.    No.

21    Q.    How many employees does it have?

22    A.    Approximately 115.

23    Q.    All at that Trenton location?

24    A.    No.

96

NANCY CERBUS

1    Q.    Where are employees elsewhere?

2    A.    We collect public records in the

3    mid-Atlantic region, so a lot of our

4    employees that collect the judgment and

5    lien information in the courts are home

6    based.

7    Q.    Okay.  Does the 115 number

8    include independent contractors or is it

9    your employees?

10   A.    Employees.

11   Q.    Do you have any independent

12   contractors?

13   A.    Yes.

14   Q.    How many?

15   A.    We probably use about 80

16   independent contractors.

17   Q.    And are those individuals also

18   based close to the courthouses where you

19   retrieve information from?

20   A.    Yes.

21   Q.    Is Mr. Palmer one such person?

22   A.    Yes.

23   Q.    Is he still working for your

24   company?

97
NANCY CERBUS

1    A.     Yes.

2    Q.     Do you know where he's based?

3    A.     Yes.

4    Q.     Where?

5    A.     Philadelphia.

6    Q.     Does he in effect work out of his

7    home?

8    A.     Yes.

9    Q.     Does he have an independent

10   contractor agreement or contract with your

11   company?

12   A.     Yes.

13   Q.     Where would your company's copy

14   of that contract be?

15   A.     It would be in Trenton.

16   Q.     Your company maintains copies of

17   such agreements?

18   A.     Yes.

19   Q.     Have you spoken with Mr. Palmer

20   in connection with this matter?

21   A.     Yes.

22   Q.     When did you speak with him?

23   A.     I called him after I received the

24   subpoena and the phone calls, and asked

98
NANCY CERBUS

1    him if he could go and retrieve the

2    documents from the court.

3    Q.      Why did you call him?

4    A.      Because I wanted to get the

5    papers to me so I could review them.

6    Q.      Is Mr. Palmer the only individual

7    in Philadelphia that gets documents from

8    the Philadelphia Municipal Court?

9    A.      Yes.

10   Q.      I see.  Did you call him at home?

11   A.      I would imagine that I probably

12   called him on his cell, but I can't

13   remember.

14   Q.      Do you know if he has a separate

15   office or does he do the work out of his

16   home or free-lance?

17   A.      It's free-lance.

18   Q.      So when you communicate with him

19   it's either on his cell or at his home?

20   A.      It's usually on his cell.

21   Q.      Does he also work full-time for

22   another employer?

23   A.      Yes.

24   Q.      And still does?

99

NANCY CERBUS

1      A.      Yes.

2      Q.      Who is that?

3      A.      City of Philadelphia.

4      Q.      Do you know whether the City of

5      Philadelphia knows that he also does

6      independent contractor work for your

7      company?

8      A.      I don't know.

9      Q.      How long has Mr. Palmer worked

10     for your company?

11     A.      He's done work for us since 1998.

12     Q.      As an independent contractor?

13     A.      Yes.

14     Q.      Was there a person who handled

15     the Philadelphia region prior to 1998?

16     A.      Yes.

17     Q.      Who is that?

18     A.      It was Joy Graypin.

19     Q.      I'm sorry?

20     A.      Joy Graypin, G-R-A-Y-P-I-N.

21     Q.      Is Ms. Graypin still affiliated

22     with your company in any way as an

23     employee or an independent contractor?

24     A.      No.

100

NANCY CERBUS

1    Q.    Does she have any other type of

2    relationship with your company?

3    A.    No.

4    Q.    Do you know where she is?

5    A.    No.

6    Q.    Do you have any personnel records

7    concerning Ms. Graypin?

8    A.    Personnel?

9    Q.    Like a personnel file,

10   independent contractor contract, any

11   old --

12   A.    Possibly.

13   Q.    Who would have that in your

14   company?  Who would maintain such records?

15   A.    It would fall under our

16   independent group, so we would look in

17   that file, into that cabinet.

18   Q.    Who has the independent group?

19   A.    Depending on which manager

20   manages that region.

21   Q.    Who would have the area that

22   would encompass Philadelphia?

23   A.    Stephanie Hoover.

24   Q.    Hoover?

101
NANCY CERBUS

1      A.      H-O-O-V-E-R.

2      Q.      And Ms. Hoover works in Trenton?

3      A.      She actually works out of

4      Harrisburg, home based.

5      Q.      You said you spoke with

6      Mr. Palmer.  Was it over the phone?

7      A.      Yes.

8      Q.      What did you tell him?

9      A.      I asked him if he could pull the

10     record for this particular docket that I

11     was providing to him.

12     Q.      Was this in the July 2003 time

13     frame?

14     A.      Or it might have been sooner.

15     Q.      I'm sorry, sooner meaning?

16     A.      Between May and July.

17     Q.      It could have been before you

18     actually got it, right.

19             And did you discuss anything

20     else with him?

21     A.      Yeah.  I would have discussed,

22     you know, the case, what he actually saw

23     from the documents.

24     Q.      Did you tell him why you were

                                        102
                        NANCY CERBUS

1       asking him to retrieve those records, that

2       there was a lawsuit?

3       A.      Yes.

4       Q.      Did he retrieve the records?

5       A.      Yes.

6       Q.      Did he get them to you?

7       A.      Yes.

8       Q.      How did he get them to you?

9       A.      He faxed them over to me.

10      Q.      How many records are there, do

11      you know?  You said it's a fax, so I'm

12      sensing it's not very much documentation?

13      A.      There was the record in Municipal

14      Court and I believe it was appealed to the

15      Court of Common Pleas.

16      Q.      You don't know how many pages?

17      A.      I don't recall.

18      Q.      Do you know where he faxed them

19      from?

20      A.      I don't.

21      Q.      Did he fax them directly to your

22      office?

23      A.      Yes.

24      Q.      Did Mr. Palmer have any

103

NANCY CERBUS

1        recollection about any of the

2        investigations that were conducted in 2001

3        or in 1998 when he started with the

4        company concerning Ms. Lawrence?

5        A.        No.

6        Q.        Did you ask him whether he ever

7        recalled seeing judgment records from the

8        Municipal Court?

9        A.        He does see them.  He sees them.

10       Q.        I'm sorry, my question wasn't

11       clear.  I want to know whether you asked

12       him if he ever recalled seeing judgment

13       records concerning Ms. Lawrence in doing

14       his duties as an independent contractor

15       for Superior.  Did you ask him that?

16       A.        I'm sorry, did I ask him?

17       Q.        Did you ask him if he ever

18       recalled seeing any records over the

19       judgment against Ms. Lawrence?

20       A.        I don't remember.

21       Q.        Do you know sitting here today

22       whether he has any personal recollection

23       of ever having seen such records?

24       A.        I don't.

104
NANCY CERBUS

1    Q.    Did you ever discuss that issue
2    with him?

3    A.    No.

4    Q.    You never specifically remember
5    discussing with him if he has any
6    recollection concerning records concerning
7    Ms. Lawrence?

8    A.    No, I wouldn't have.

9    Q.    You wouldn't have asked him that?

10   A.    No.

11   Q.    You said you told him what the
12   lawsuit was about?

13   A.    That's correct.

14   Q.    Would he have been the person
15   that did the verification for your company
16   in 1998 and 2001?

17   A.    Yes.

18   Q.    But you --

19   A.    I'm sorry, no.

20   Q.    Would he have done it in 2001?

21   A.    Yes.

22   Q.    Would he have done it in 1998?

23   A.    No.

24   Q.    Who would have done it in 1998?

105

NANCY CERBUS

1    A.    Joy.

2    Q.    Did you ask him whether he has

3    any records or any recollection concerning

4    the 2001 verification?

5    A.    No.

6    Q.    You didn't even ask?

7    A.    No.

8    Q.    Okay.  Now, you told me, and

9    correct me if I'm wrong, that he faxed

10   paper records from the court to you around

11   July of 2003?

12   A.    Yes.

13   Q.    And do you remember -- I know you

14   didn't remember earlier, but do you

15   remember now whether those records show

16   that Ms. Lawrence had a judgment against

17   helper or in her favor?

18   A.    I don't recall.

19   Q.    You still don't recall, okay.

20   You said that you're the person

21   responsible for your company in looking

22   into this Lawrence matter in connection

23   with the lawsuit, that you're the person

24   responsible for it?

106
NANCY CERBUS

1    A.    Yes.

2    Q.    And you're the one who kept the

3    file and asked people to retrieve

4    information and so forth?

5    A.    Yes.

6    Q.    And you asked people to look for

7    records within the company to see what was

8    there?

9    A.    Yes.

10   Q.    Such as the CDV records?

11   A.    Yes.

12   Q.    Did you ever since May of 2001

13   when I sent you the subpoena --

14              MR. LUCKMAN:   2003.

15              MR. SOUMILAS:   Yes.   Thank

16   you, I misspoke.

17   BY MR. SOUMILAS:

18   Q.    May 2003 when my firm sent you

19   the subpoena but before July 2003 when you

20   got the records from Mr. Palmer, okay, so

21   I'm looking at that time frame in between,

22   did you locate any paper records within

23   Superior that showed this judgment as

24   being one against Ms. Lawrence?

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

107

NANCY CERBUS

1              MR. LUCKMAN:  Objection.

2              THE WITNESS:   Did I locate

3      records?

4              MR. SOUMILAS:  Yes.

5      BY MR. SOUMILAS:

6      Q.      Well, my question maybe is not

7      very clear.  I take it that at some point

8      in July 2003 you saw some paper records

9      from the courthouse with judgment

10     information concerning Ms. Lawrence?

11     A.      Yes.

12     Q.      And I know you don't remember it

13     precisely what they say, but my question

14     is, prior to July 2003 had you ever seen

15     those records before?  Prior to July 2003

16     had you seen those records?

17     A.      So you're asking me the period

18     between receiving the subpoena?

19     Q.      No.  I'm going a little broader

20     now.  I know you saw paper records

21     concerning the judgment that came to you

22     from the courthouse in July 2003?

23     A.      Uh-huh.

24     Q.      That we agree on?  Yes?

108
NANCY CERBUS

1    A.    Yes.

2    Q.    At any time before July 2003 had

3    you ever seen those court records?

4    A.    Not to my knowledge.

5    Q.    Had you ever seen any court

6    records concerning a judgment against

7    Ms. Lawrence?

8    A.    Not to my knowledge.

9    Q.    Now, in May 2003 I sent you a

10   subpoena and you told me that you took

11   certain steps to gather information about

12   this case?

13   A.    Yes.

14   Q.    And you asked people to retrieve

15   the CDVs and look into your computer

16   system and so forth?

17   A.    Yes.

18   Q.    In that time frame, May 2003

19   through July 2003, did anyone in your

20   employ retrieve any records -- court

21   records regarding a judgment against

22   Ms. Lawrence?

23   A.    Possibly.  I mean I might have

24   asked Nick to retrieve them during that

109
NANCY CERBUS

1    period.

2    Q.    I guess what I'm trying to figure

3    out is, did your company ever see such

4    records before Mr. Palmer got them in July

5    2003?

6    A.    He would have retrieved them for

7    us.

8    Q.    Mr. Palmer?

9    A.    Yes.

10   Q.    And he did so in July 2003?

11   A.    Yes.

12   Q.    But prior to that I understand

13   that there was a two-month period where

14   there was a subpoena outstanding and you

15   were asking people to do some searches for

16   you or you may have done them yourself?

17   A.    Right.

18   Q.    During that time period, did you

19   ever see those records or similar records

20   concerning a judgment from the courthouse?

21   A.    Well, yes, because I started

22   retrieving the information then.

23   Q.    Okay.  What records did you see?

24   A.    We pulled the documents from the

110
NANCY CERBUS

1    court.  We were pulling our internal

2    documents.

3    Q.    I guess that's what I'm trying to

4    get at.  You testified earlier about a

5    tape being reported in 1996.  You don't

6    have the tape, correct?

7    A.    Correct.

8         MR. LUCKMAN:  You're not

9    going to go back over this too much, are

10   you, John?

11        MR. SOUMILAS:  No.

12   BY MR. SOUMILAS:

13   Q.    You also testified about your

14   data system, the Superior database?

15   A.    Yes.

16   Q.    You looked into that, right?

17   A.    Yes.

18   Q.    Is there anything else?  Did you

19   find anything else other than what was in

20   the Superior database?

21   A.    Not that I can recall.

22   Q.    And the Superior database is the

23   information that you had stored on your

24   database that are not court records; am I

NANCY CERBUS

```
 1   correct about that?

 2               MR. LUCKMAN:  Object to the

 3   form.

 4               THE WITNESS:   I don't

 5   understand.

 6   BY MR. SOUMILAS:

 7   Q.      I'm sorry, maybe I'm trying to be

 8   very precise here.  I understand that in

 9   July 2003 Mr. Palmer actually faxed you

10   certain papers, court records from the

11   Municipal Court in Philadelphia concerning

12   a judgment against Ms. Lawrence?

13   A.      Yes.

14   Q.      Okay?

15   A.      Yes.

16   Q.      Were there any such records that

17   you had ever seen in Superior prior to

18   July of 2003?

19   A.      I'm sorry, I don't understand

20   what you're asking.

21               MR. LUCKMAN:  Do you mean

22   did they have any of the Municipal Court

23   hard copy records, copies of the court's

24   records at Superior before Palmer sent
```

112
NANCY CERBUS

1    them?

2                    MR. SOUMILAS:  That's what

3    I mean.

4                    THE WITNESS:   Like any

5    other case?

6    BY MR. SOUMILAS:

7    Q.      No, no.  In Ms. Lawrence's case.

8    Concerning Grace Lawrence.  I want to know

9    whether you had ever seen court records,

10   not your database, but court records

11   concerning Ms. Lawrence?

12   A.      Possibly.  Yeah, I think he faxed

13   them to me maybe in May or June.

14   Q.      Who did?

15   A.      Nick.  And then I asked him for

16   them again in July.

17   Q.      Okay.  So Mr. Palmer originally

18   faxed them to you in May?

19   A.      Yes.

20   Q.      And then faxed them again in

21   July?

22   A.      Yes, because I think he had to --

23   I think it was archived and he had to

24   request the file.

113

NANCY CERBUS

1    Q.        Okay.  Let's take it one at a

2    time.  Why did he fax them to you in May?

3    A.        Because I had requested them.

4    Q.        In response to the subpoena sent

5    by my firm?

6    A.        Yes.


7    Q.        Why did he fax them to you in

8    July?

9    A.        Because I wanted to make sure

10   that we had everything that was in the

11   folder, the case.  He had faxed over

12   the -- he went to the courthouse in May or

13   June or whenever the time period was,

14   initially went there.  The information was

15   archived, he ordered it.  They then

16   proceeded to give him a copy of the

17   judgment screens from the computer system.

18   They print them out, he faxed them over,

19   but that wasn't the copy of the court

20   case, that was just a copy of the computer

21   terminal that the public doesn't have

22   access to.

23   Q.        All right.  So this is in May?

24   A.        Yes.

114

NANCY CERBUS

1    Q.      It's a court computer printout,

2    but it's not the actual court records; is

3    that what you're telling me?

4    A.      That's correct.

5    Q.      And those were faxed to you

6    personally in May?

7    A.      Yes.

8    Q.      And you saw them at some point in

9    May of 2003?

10   A.      Yes.

11   Q.      Did you turn those records over

12   to Mr. Luckman?

13   A.      Yes.

14   Q.      Do you know how many pages they

15   were?

16   A.      I don't recall.

17   Q.      And your understanding was these

18   were computer screen printouts given to

19   Mr. Palmer by the Philadelphia Court?

20   A.      Yes.

21   Q.      And this is off a computer

22   database that the public doesn't have

23   access to?

24   A.      That's correct.

115
NANCY CERBUS

1    Q.    So you need to ask for the

2    information and somebody at the court

3    needs to give it to you?

4    A.    Yes.

5    Q.    Now, in July 2003 you asked for

6    additional information from Mr. Palmer?

7    A.    Yes.

8    Q.    What was that additional

9    information?

10   A.    I needed to see the copies of the

11   case.

12   Q.    So not simply what was on the

13   City's computer, but what was filed, the

14   paper copies with the court?

15   A.    Yes.

16   Q.    And did he go and get that for

17   you?

18   A.    Yes.

19   Q.    And so that was a separate court

20   record, not a computer record, but a

21   file -- something that was filed with the

22   court?

23   A.    Yes.

24   Q.    I understand.  That was something

116
NANCY CERBUS

1      that he also faxed to you?

2      A.      Yes.

3      Q.      And you saw that yourself?

4      A.      Yes.

5      Q.      Did you turn that over to

6      Mr. Luckman at Trans Union?

7      A.      Yes.

8      Q.      Did you turn it over around July

9      2003?

10     A.      On or about, yes.

11     Q.      And did you turn over those court

12     computer printouts in May of 2003?

13     A.      I believe, yes.

14     Q.      Why did you ask Mr. Palmer to go

15     back to the court and look for the actual

16     court records?

17     A.      Because I knew he had ordered the

18     file that was archived, so he needed to go

19     back anyway.  They usually just keep it

20     for him for the next time that he's in,

21     but if you don't follow-up with them -- he

22     just has to keep following up with them to

23     get the information he had requested.

24     Q.      So when you spoke with him

117
NANCY CERBUS

1    originally in May 2003 you asked him for

2    both the computer records and the paper

3    records, everything?

4    A.    Yes.

5    Q.    But he couldn't access the paper

6    records because they were archived?

7    A.    Yes.

8    Q.    And you needed to remind him in

9    July 2003 that you still needed the paper

10   records?

11   A.    Yes.

12   Q.    Does it usually take two months

13   to get the paper records?

14   A.    Not really.  It usually only

15   takes about a week.

16   Q.    About a week.  How often do you

17   know Mr. Palmer was in the courthouse?

18   A.    He goes probably three to four

19   times a week.

20   Q.    Do you know why he hadn't picked

21   them up as of July of 2003?

22   A.    He told me he did and he sent

23   them over.  And I asked him to retrieve

24   them because I wasn't able to locate them.

118
NANCY CERBUS

1    Q.    Why was it in July 2003 that you

2    insisted that you still wanted to see

3    these court records, not simply the

4    computer printouts?

5                MR. LUCKMAN:  Object to the

6    form.

7    BY MR. SOUMILAS:

8    Q.    You can answer the question.

9    A.    I'm sorry, what was it?

10   Q.    The question was, why was it that

11   in July 2003 you told him that you still

12   needed to see those court records, not

13   simply the computer printouts that he gave

14   you in May of 2003?

15   A.    Because I was just following up

16   on pulling all the information together.

17   Q.    Now, I don't intend on going over

18   any territory that I've already gone over,

19   but you've told me a couple times that you

20   don't remember what the records say.  Is

21   that the case for the computer records or

22   the paper records?

23   A.    For both.

24   Q.    You just don't remember what they

119
NANCY CERBUS

1    say?

2    A.        No.

3    Q.        But you know that you saw them in

4    May of 2003, the computer records, and in

5    July of 2003 the court records?

6    A.        Yes.

7    Q.        And you turned them all over to

8    Trans Union?

9    A.        Yes.  I look at a lot of court

10   records all the time.

11   Q.        I understand.  I don't expect you

12   to remember everything off the top of your

13   head.  Although, I would expect to get the

14   documents that I think are entirely

15   responsive to my subpoena that is now

16   outstanding for four months.

17            You said your company reports

18   credit information throughout the

19   mid-Atlantic region?

20   A.        Yes.

21   Q.        And you mentioned that your

22   company also does collection services,

23   correct?

24   A.        No.

120

NANCY CERBUS

1      Q.      No, you didn't.  Then I'm

2      mischaracterizing what I thought I heard.

3      You mentioned something earlier about

4      policies of collection accounts.  Do you

5      remember that?

6      A.      That was probably a course that I

7      took.

8      Q.      Right.  I think you mentioned

9      that, but you also mentioned when I was

10     asking you about policy and procedure

11     manuals that your company has, about

12     policies and procedures on fair debt

13     collection.  Do you remember that

14     testimony?

15     A.      Fair debt collection was a

16     seminar that I attended.

17     Q.      Okay.  Does Superior collect

18     debts on behalf of creditors?

19     A.      No.

20     Q.      Does Superior do any other type

21     of business besides retrieving public

22     records information?

23     A.      Yes, we have a corporate services

24     piece.  We do --

121
NANCY CERBUS

1              MR. LUCKMAN:  She described

2       the three types of businesses they do,

3       John.

4       BY MR. SOUMILAS:

5       Q.      Is the corporate services the

6       incorporating companies?

7       A.      Yes.

8       Q.      I'm sorry, what else?

9       A.      And we do lists.  We have a list

10      business.

11      Q.      Which you also testified about?

12      A.      Yes.

13      Q.      Anything else?

14      A.      We have our on-line piece.

15      Q.      What is the on-line piece?

16      A.      Where we have our database that

17      companies can go on-line and subscribe to.

18      Q.      To retrieve information from you?

19      A.      Yes.

20      Q.      Anything else?

21      A.      I don't think so.

22      Q.      Is your company, Superior

23      Information Services a credit reporting --

24      a consumer reporting agency, excuse me?

122
NANCY CERBUS

1    A.    No, we are not.

2    Q.    Do you consider yourself a

3    furniture of credit information?

4    A.    Yes.

5    Q.    Do you comply with the Fair

6    Credit Reporting Act?

7    A.    We are familiar with the Fair

8    Credit Reporting Act and abide by those

9    paragraphs based on our contracts with our

10   clients.

11   Q.    Do you have a compliance

12   department to comply with the Fair Credit

13   Reporting Act?

14   A.    We don't have a compliance

15   department.

16   Q.    Do you have compliance procedures

17   or compliance manuals?

18   A.    I'm not sure.

19   Q.    How do you comply with the Act as

20   you said you do?

21                MR. LUCKMAN:  Objection.

22   BY MR. SOUMILAS:

23   Q.    What steps do you take to comply

24   with the Act?

123
NANCY CERBUS

1    A.    I would have to refer that to our

2    president who handles that.

3    Q.    Okay.  So you are not really

4    sure.  You are not the person to answer

5    that question; is that what you're telling

6    me?

7    A.    Yeah, I'm not sure.

8    Q.    Take a look at Paragraph 3 of

9    your declaration that was marked as

10   Cerbus-2.

11   A.    Yes.

12   Q.    The third sentence there says,

13   Superior has developed and follows

14   rigorous procedures to comply with the

15   Fair Credit Reporting Act 15, U.S.C.

16   Section 1681 at seq.

17   A.    Uh-huh.

18   Q.    What do you mean by that?

19   A.    That we will follow the

20   procedures to comply with the Fair Credit

21   Reporting Act.

22   Q.    But I thought you just told me

23   you don't know what those procedures are?

24   A.    I don't know what -- you were

124
NANCY CERBUS

1    asking me about compliance and manuals --

2    Q.      What are those rigorous

3    procedures?

4                    MR. LUCKMAN:  You

5    interrupted her, John.  She wasn't

6    finished.

7                    MR. SOUMILAS:  I apologize.

8    BY MR. SOUMILAS:

9    Q.      I'd like for you to expand on

10   what you meant in your declaration about

11   rigorous procedures.

12   A.      The rigorous procedures that we

13   comply with is that we follow the Fair

14   Credit Reporting Act and comply based on

15   the consumer dispute verifications, and

16   that we will report this information

17   accurately and that we will abide by all

18   the time lines that we need to reverify

19   the information.

20   Q.      And are those obligations

21   contractural obligations imposed upon you

22   by the credit reporting agencies?

23   A.      Yes.

24   Q.      Such as Trans Union?

125
NANCY CERBUS

1       A.      Yes.

2       Q.      So when you say in the next line

3       in your declaration, Superior is

4       contracturally obligated to follow

5       rigorous procedures in gathering and

6       verifying credit information, that means

7       that you do follow the procedure that

8       Trans Union tells you to follow?

9       A.      We have service agreements with

10      Trans Union and then that is, again, with

11      the Fair Credit Reporting Act.

12      Q.      I understand that.  And you also

13      have what you told me agreements with

14      Equifax and Spherion?

15      A.      That's correct.

16      Q.      And with respect to Trans Union,

17      are the procedures that you follow the

18      ones that Trans Union contractually

19      obligates you to follow?

20              MR. LUCKMAN:  Object to the

21      form.

22      BY MR. SOUMILAS:

23      Q.      I'm simply trying to flush out,

24      ma'am, what you mean in the last sentence

126
NANCY CERBUS

1    of Paragraph 3 of your declaration when

2    you say you're contractually obligated.

3    I'm trying to understand what that means.

4                    Who contractually obligates

5    you?

6    A.      Our clients.

7    Q.      Such as?

8    A.      Trans Union.

9    Q.      And when you testified earlier

10   that you use the CDV procedures to report

11   information to Trans Union.  Do you

12   remember that?

13   A.      Yes.

14   Q.      With respect to Trans Union, and

15   I don't know about the other credit

16   reporting agencies, but my question is,

17   did Superior come up with this procedure,

18   the CDV procedure or did Trans Union come

19   up with it, to your knowledge?

20                    MR. LUCKMAN:  Didn't she

21   already say it was negotiated?  Didn't we

22   go over this?

23                    MR. SOUMILAS:  No, I don't

24   think she testified specifically as to

127
NANCY CERBUS

1    this.  She said that she had negotiated

2    contracts with the credit bureaus.  I

3    remember that.

4              THE WITNESS:  I'm sorry,

5    what was your question?

6    BY MR. SOUMILAS:

7    Q.      My question is, I know you said

8    that you have contracts that you

9    negotiated with the credit bureau, at

10   least that's what I recall.

11   A.      Yes.

12   Q.      Do you recall testifying about

13   that as well?

14   A.      Yes.

15   Q.      But you also testified that you

16   comply with a Fair Credit Reporting Act by

17   abiding by this CDV procedure?

18   A.      Yes.

19   Q.      Are those the consumer dispute

20   verification procedures?

21   A.      Yes.

22   Q.      What are those procedures?

23   A.      The procedure is that as Superior

24   receives the dispute from Trans Union, we

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

128
NANCY CERBUS

1      must go to the courthouse, verify the

2      information and provide that information

3      back to Trans Union within a specific

4      amount of time.

5      Q.      So it's Trans Union that sends

6      Superior the CDV with the consumer

7      complaints?

8      A.      Yes.

9      Q.      Superior doesn't receive the

10     complaint directly from the consumer?

11     A.      That's correct.

12     Q.      Do you have any direct

13     communication on your files from

14     Grace Lawrence in this case?

15     A.      No.  I mean, we wouldn't.

16     Q.      You wouldn't as a matter of

17     policy?

18     A.      That's correct.

19     Q.      Because the disputes all come

20     through the consumer reporting agency,

21     Trans Union?

22     A.      Yes.

23     Q.      And these forms that you get, are

24     these forms that you created or are they

129

NANCY CERBUS

1    Trans Union forms?

2                   MR. LUCKMAN:  Objection;

3    asked and answered.

4                   MR. SOUMILAS:  I don't

5    think it was asked or answered.

6    BY MR. SOUMILAS:

7    Q.      I want to know the CDV forms, did

8    Superior create those or are those

9    something that Trans Union told you you

10   have to use?

11   A.      They're from Trans Union.

12   Q.      They're Trans Union forms?

13   A.      Yes.

14   Q.      When Trans Union sends you these

15   disputes on the forms, their forms, do

16   they also send you -- let me back step.

17                   How do they send them to you?

18   Is it by e-mail?  Is it by fax?  How do

19   they get to you?

20   A.      We get an import file everyday.

21   Q.      Is that a computer communication?

22   A.      Yes.

23   Q.      So you don't see any paper

24   documents?  The CDV doesn't come to you in

130
NANCY CERBUS

1    paper form?

2    A.       No.

3    Q.       They come to you in electronic

4    form?

5    A.       Yes.

6    Q.       Is that the same thing as an

7    ACDV, an automated consumer dispute

8    verification?

9    A.       Yes.

10   Q.       So when we speak about CDVs and

11   ACDVs you're using the terms

12   interchangeably?

13   A.       Yes.

14   Q.       As part of this relationship that

15   you have with Trans Union, does Trans

16   Union send you paper documentation that

17   may accompany a dispute?

18               MR. LUCKMAN:  Object to the

19   form.

20   BY MR. SOUMILAS:

21   Q.       Do you understand the question,

22   ma'am?

23   A.       Not really.

24   Q.       Separate from the CDV that comes

NANCY CERBUS

1    to you through a computer, does Trans

2    Union send you an envelope or a fax with

3    some paper in it that says this consumer

4    is disputing something and they sent this

5    two-page letter along with it?

6    A.      For most of them, no, but

7    occasionally we do receive them.

8    Q.      Occasionally that does happen?

9    A.      Yes.

10    Q.      When does that happen?

11    A.      It's manual as opposed to an

12    automated.

13    Q.      Manual is fax or mail?

14    A.      Mail usually.

15    Q.      And when it comes by mail, is

16    there a supporting documentation from a

17    consumer that comes to you?

18    A.      Sometimes.

19    Q.      Does it come to you the majority

20    of the times or the minority of the times?

21    A.      Minority, I would say.

22    Q.      Would you say the small minority

23    of the times?

24                MR. LUCKMAN:  Object to the

132

NANCY CERBUS

1    form.

2                    THE WITNESS:  I don't

3    know.

4    BY MR. SOUMILAS:

5    Q.    Do you have any choice in the

6    matter as to whether Trans Union would

7    send you this information?

8                    MR. LUCKMAN:  Object to the

9    form.

10   BY MR. SOUMILAS:

11   Q.    Do you understand my question?

12   A.    No.

13   Q.    Do you demand from Trans Union if

14   a consumer says they've sent us that type

15   of documentation, we want to see it?

16   A.    I don't know, but we do receive

17   what the consumer states.

18   Q.    Is that in the CDV form?

19   A.    Yes.

20   Q.    If the consumer states what they

21   state in a letter, do you get the letter?

22   A.    No.

23   Q.    You just get the CDV?

24   A.    Yes.

133
NANCY CERBUS

1    Q.    And you respond by CDV?

2    A.    Yes.

3    Q.    And your options are you would

4    check verified or you would check some

5    other information?

6                MR. LUCKMAN:  Object to the

7    form.

8    BY MR. SOUMILAS:

9    Q.    How do you respond to the CDV?

10   A.    Well, we retype in all the

11   information.

12   Q.    Every time?

13   A.    Yes.

14   Q.    And all the information is all

15   the information concerning the public

16   record?

17   A.    Yes.

18   Q.    Even if it's the exact same

19   information as the information that you

20   provided originally, you retype it in?

21   A.    Yes.

22   Q.    And you type it in the exact same

23   way?

24   A.    Yes.

134

NANCY CERBUS

1    Q.    And you do this every time?

2    A.    Yes.

3    Q.    And you type it into the computer

4    system?

5    A.    Yes.


6    Q.    What is the computer system you

7    told me that receives the CDVs?

8    A.    It's called Paradox.

9    Q.    And that has records dating back

10    to 1987?

11    A.    That's our Superior database.

12    Q.    Paradox has records for how long?

13    Three years?

14    A.    Usually three years.

15    Q.    Usually three years, that's

16    right, because you said you were able to

17    find the 1998 CDV.

18    A.    Yes.

19    Q.    Does your company get paid from

20    Trans Union for doing this investigation

21    and getting back to them with the CDV?

22    A.    Yes.

23    Q.    How much?

24    A.    $5 per CDV.

135
NANCY CERBUS

1      Q.      Has that always been the case?

2                      MR. LUCKMAN:  I didn't hear

3      that.

4      BY MR. SOUMILAS:

5      Q.      Has that always been the case

6      that it was $5?

7      A.      No.

8      Q.      Is it $5 now?

9      A.      Yes.

10     Q.      When was it different?

11     A.      I don't recall.

12     Q.      Do you know what the difference

13     was?

14     A.      It was $1 difference.

15     Q.      $1 difference.  So it used to be

16     $4?

17     A.      Yes.

18     Q.      At some point in the past?

19     A.      Yes.

20     Q.      Was it before 2000?

21     A.      I don't know.

22     Q.      But now it's $5?

23     A.      Yes.

24     Q.      And I know you submitted to us,

136

NANCY CERBUS

1      I'm not going to mark it for your

2      deposition, but could you take a look at

3      it?  It's a public record process

4      standards document.  You've attached this

5      to your declaration.  Do you remember it?

6      A.      Yes.

7      Q.      Do you see the overview section?

8      A.      Yes.

9      Q.      The second sentence reads,

10     Vendors who verify information for Trans

11     Union will locate the court that houses

12     that information and check the accuracy

13     and completeness thereof.

14     A.      Yes.

15     Q.      What do you understand that to

16     mean?

17     A.      It means that Superior will go to

18     that courthouse, pull that record up which

19     is the official court document, verify the

20     information, complete the information.

21     And there's fields that we look at,

22     obviously, defendant name, data, docket

23     date, dollar amount, et cetera.  And we'll

24     then report back to Trans Union and we

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

137
NANCY CERBUS

1    must be thorough in this whole process and

2    accurate.

3    Q.      Is it Trans Union that imposes

4    this requirement on you or how to do these

5    verifications by going to the courthouse?

6    A.      They do; however, Superior, this

7    is how we do it anyway.  We would go to

8    the court to verify the information.

9              I'm sorry, I'm going to need

10   to take a break.

11   Q.      Sure.  Whenever you would like.

12                    -  -  -

13             (Whereupon a brief recess

14   was taken at 12:58 p.m. and the deposition

15   resumed at 1:04 p.m.)

16                    -  -  -

17   BY MR. SOUMILAS:

18   Q.      Before we took a break,

19   Ms. Cerbus, we were talking about the

20   procedure that Superior employs in

21   verifying information for Trans Union.  I

22   just want to ask you a couple more

23   questions about that before we move on.

24   A.      Okay.

138
NANCY CERBUS

1    Q.    I think you told me that Trans

2    Union requires you, and also as part of

3    its own procedure, Superior chooses to go

4    to the courthouse to check the original

5    records in verifying a dispute from a

6    consumer, correct?

7    A.    Correct.

8    Q.    You also told me that at least in

9    July 2003 in connection with your inquiry

10   of Mr. Palmer that he needed to go and get

11   some archived records.  The case was old,

12   I take it?

13   A.    Yes.

14   Q.    How long did you tell me it takes

15   to retrieve the archived records?

16   A.    Usually a week in Municipal

17   Court.

18   Q.    And to your knowledge, does

19   someone physically need to go to the

20   courthouse to ask for the retrieval and

21   then go back in a week and see the

22   records?

23   A.    Yes.

24   Q.    Do you know how old a case needs

139
NANCY CERBUS

1    to be in order to be archived in the

2    Philadelphia Municipal Court?

3    A.      I don't.

4    Q.      Do you know whether in 2001, for

5    example, when Mr. Palmer verified this

6    information concerning Ms. Lawrence

7    whether he had to get archived records?

8    A.      I don't.

9    Q.      Once you follow the procedures

10   that you told me Trans Union requires you

11   to follow, and you get the information

12   that you need, you type it all out on the

13   CDV right into your computer; is that what

14   happens?

15   A.      At the home office?

16   Q.      Well, you said at some point you

17   type all the information onto the CDV. I'm

18   just wondering where that happens.

19   A.      At the home office.

20   Q.      So someone like Mr. Palmer is

21   here in Philadelphia, his job is to go to

22   the courthouse?

23   A.      Yes.

24   Q.      Is his job to photocopy

140
NANCY CERBUS

1    information or could he just look at it

2    with his eyes?

3    A.        He reviews it with his eyes.

4    Q.        He doesn't have to photocopy the

5    court records every time there's a

6    dispute?

7    A.        No.

8    Q.        Then after he reviews it with his

9    eyes, what does he do according to your

10   procedures?

11   A.        He'll write down the information

12   on a form that Superior provides for him

13   and he'll -- once it's complete, he'll fax

14   it over to the office.

15   Q.        And then will someone at the

16   office essentially transcribe the

17   information from the form into the

18   computer system?

19   A.        Yes.

20   Q.        And respond to Trans Union's CDV

21   or ACDV?

22   A.        Yes.

23   Q.        Does Superior do anything else in

24   terms of its investigation?

141

NANCY CERBUS

1    A.    For that particular

2    investigation, no, but what we will do is

3    we audit all of our contractors and

4    employees that perform verifications and

5    we'll do random audits to make sure that

6    they're performing their obligations

7    accurately.

8    Q.    And I understand that you have

9    records of at least four audits concerning

10   Mr. Palmer?

11   A.    Yes.

12   Q.    Do you have any audits concerning

13   the employee who handled the Philadelphia

14   region prior to Mr. Palmer, a Joy Graypin,

15   I believe you said?

16   A.    Joy Graypin.  I don't know.

17   Q.    Do you know whether any of your

18   audits specifically deal with a dispute of

19   Grace Lawrence?

20   A.    I don't, no.

21   Q.    Do you know whether Mr. Palmer in

22   2001 physically went to the courthouse to

23   check the records concerning Grace

24   Lawrence in connection with that dispute?

142

NANCY CERBUS

1      I'm asking whether you have personal

2      knowledge about that, not whether he

3      should have done it pursuant to your

4      procedures.

5      A.      I'm not sure I understand.

6              MR. LUCKMAN:  Do you mean

7      whether she saw him go do it?

8              MR. SOUMILAS:  No.

9      BY MR. SOUMILAS:

10     Q.      You told me according to your

11     procedures you were supposed to go to the

12     courthouse to check the records?

13     A.      Yes.

14     Q.      And fill out the form that

15     Superior uses?

16     A.      Yes.

17     Q.      Do you know whether he did that?

18     A.      I wouldn't know.

19     Q.      You wouldn't know.  So sitting

20     here today you don't know?

21     A.      I mean, I don't know.

22     Q.      Okay.  The same question with

23     respect to any predecessor of Mr. Palmer

24     that would have checked records in 1997 or

143

NANCY CERBUS

1     1998, such as this Ms. Graypin.  Do you

2     have any personal knowledge of whether she

3     went to the courthouse to check judgment

4     information concerning Ms. Lawrence?

5     A.      Personal knowledge?

6     Q.      Do you know whether she went or

7     not?

8     A.      I'm sorry, I don't understand

9     what you're trying to ask me.

10     Q.      I know your procedures tell these

11     contractors or employees what they're

12     supposed to do.  My question is, do you

13     have any knowledge that they did what they

14     were supposed to do?  Did you speak with

15     someone?  Did you see any records that

16     show that they did it?  Do you have any

17     proof that they physically went to the

18     courthouse?

19                  MR. LUCKMAN:  Object to the

20     form.

21     BY MR. SOUMILAS:

22     Q.      Do you understand the question

23     now?

24     A.      Well, the only way that we would

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

144
NANCY CERBUS

1    be able to get it done is if they went to

2    the courthouse.

3    Q.      I'm sorry, the only way you would

4    be able to get what done?

5    A.      Those verifications.  The

6    reverifying to see if they physically went

7    to the courthouse.

8    Q.      I understand that.  That's your

9    procedure and that's what you're supposed

10    to do.  But my question is a little

11    different.  My question is, sitting here

12    today and based on all the information

13    that you reviewed, documents,

14    conversations with people and so forth, do

15    you know whether they, in fact, did it?

16    A.      I don't know.

17    Q.      How many investigations on the

18    average does Superior conduct for Trans

19    Union concerning public record disputes

20    from consumers?

21    A.      Superior does about 20,000 a

22    month.

23    Q.      Is that how many you do now?

24    A.      Yes.

145
NANCY CERBUS

1    Q.      How many did you do in 2001?

2    A.      I would say about the same, but

3    maybe about five percent less.

4    Q.      About five percent less?

5    A.      Yes.

6    Q.      How about in the 1997 to '98 time

7    frame?

8    A.      We probably did about 12,000 a

9    month.  For Trans Union we do about 8,000

10   a month.

11   Q.      I know you mentioned audits and

12   procedures and forms and so forth about

13   what your company does to make sure they

14   get it right.  My question to you is, do

15   you believe that your company made any

16   error in reporting credit information

17   concerning Grace Lawrence?

18                MR. LUCKMAN:  Object to the

19   form.

20                THE WITNESS:   I don't

21   understand.

22   BY MR. SOUMILAS:

23   Q.      Sitting here today and upon your

24   review of the all the information that

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

146
NANCY CERBUS

1    you've provided to us and testified about,

2    do you know whether Superior made any

3    errors in reporting a judgment against

4    Grace Lawrence?

5    A.        I don't think we did, no.

6    Q.        Are you confident that your

7    company has procedures in place that would

8    catch any type of an error if it was made?

9              MR. LUCKMAN:  Object to the

10   form.

11   BY MR. SOUMILAS:

12   Q.        Do you understand the question,

13   ma'am?  I know you testified about audits

14   and forms and so forth.  And I'm wondering

15   whether as a Vice President of this

16   company you feel that your procedure would

17   catch any errors?

18   A.        Yes, I do.

19   Q.        Do you know whether Ms. Lawrence

20   -- Grace Lawrence ever owed a judgment to

21   a Thomas Frommer?

22   A.        I don't know.

23   Q.        I'll spell it for you,

24   F-R-O-M-M-E-R.

147

NANCY CERBUS

1                And I'm sorry, your answer

2       was you don't know?

3       A.      I don't know.

4       Q.      Do you know whether Ms. Lawrence

5       owed a judgment of $2,951 to anybody?

6       A.      I don't.  I don't know.

7       Q.      Do you know whether Trans Union

8       made any type of a mistake in reporting

9       that Ms. Lawrence had a $2,951 judgment

10      against her?

11                MR. LUCKMAN:  Objection.

12                THE WITNESS:   I don't

13      know.

14      BY MR. SOUMILAS:

15      Q.      Do you know whether the City of

16      Philadelphia made any type of a mistake?

17      A.      I don't know.

18      Q.      You simply don't know whether

19      there was a judgment or if anybody made a

20      mistake; is that what you're saying?

21      A.      That's correct.

22      Q.      I know you testified earlier that

23      you don't recall speaking with Mr. Palmer

24      about whether he has any information that

148
NANCY CERBUS

1    this judgment was against Ms. Lawrence.  I

2    want to ask you a broader question.

3                    Have you spoken with anybody

4    within your company that has information

5    that a $2,951 judgment was entered against

6    Ms. Lawrence?

7    A.        No.

8    Q.        And outside of your company, do

9    you know anyone who has information that,

10   in fact, such a judgment was entered

11   against Ms. Lawrence?

12   A.        Outside of my company?

13   Q.        Yes.  I asked you if you've

14   spoken with anyone within your company

15   that had such information and you said no.

16   Now I'm asking a broader question.

17   Outside of your company, have you spoken

18   with anyone that's told you that or that's

19   given you that type of information that

20   she, in fact, owed a $2,951 judgment?

21   A.        I don't know.

22   Q.        You don't know if you spoke with

23   someone or --

24   A.        I spoke to several people about

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

149
NANCY CERBUS

1    this judgment.

2    Q.      To your best knowledge, has

3    anyone confirmed for you that she owed the

4    money?

5                    MR. LUCKMAN:  Object to the

6    form.

7                    THE WITNESS:   I don't

8    know.

9    BY MR. SOUMILAS:

10   Q.      You don't know whether anyone has

11   confirmed it for you or you don't know

12   whether she owes the money?

13   A.      I don't know if anybody confirmed

14   it with me.

15   Q.      Let me put one last document in

16   front of you.  Let's mark it as Cerbus-3.

17                    -  -  -

18                    (Whereupon, Exhibit

19   Cerbus-3 was marked for identification.)

20                    -  -  -

21   BY MR. SOUMILAS:

22   Q.      Once you have had a chance to

23   review that document, Ms. Cerbus, let me

24   know.

150
NANCY CERBUS

1            Okay?

2       A.      Okay.

3       Q.      Have you ever seen that document

4  before today?

5       A.      Yes.

6       Q.      When did you see it?

7       A.      I saw it when Nick faxed it over

8  to me.

9       Q.      I'm sorry?

10      A.      I saw it when Nick faxed it over

11 to me.

12      Q.      Nick Palmer?

13      A.      Yes.

14      Q.      When did he fax you this

15 document?

16      A.      Between May and July.

17      Q.      Of this year?

18      A.      Yes.

19      Q.      And I'm sorry, I don't mean to be

20 picky but I am a lawyer.  Do you know

21 whether he faxed you this particular

22 document or one that looked just like it?

23 This one, for example, has some

24 handwritten notations and some dates

NANCY CERBUS

1    circled on it.

2    A.       It wasn't this one.

3    Q.       Was it the same type of court

4    docket document from the Philadelphia

5    Municipal Court?

6    A.       Yes.

7    Q.       And to your knowledge, prior to

8    May of 2003 where Mr. Palmer faxed this

9    document over, had you ever seen this

10   document before?

11   A.       Not to my knowledge.

12   Q.       Had Trans Union ever sent this

13   document to Superior?

14   A.       Not to my knowledge.

15   Q.       Is this the computer printout

16   document that you gave testimony about

17   earlier today?

18   A.       Yes.

19   Q.       Were there anymore computer

20   printouts other than this one page that

21   I'm showing you as Cerbus-3?

22   A.       Well, my exhibit -- my computer

23   printout was actually two pages.

24   Q.       It was two pages?

152

NANCY CERBUS

1    A.      Yes.

2    Q.      This was, you believe, one of the

3    pages?

4    A.      Yes.

5    Q.      Could you interpret the judgment

6    information on this page based on your

7    experience as an employee of Superior?

8    A.      I would say that from this

9    information that you would see the

10   plaintiff information, the defendant

11   information and that there was a counter

12   claim filed.

13   Q.      Do you know who the defendant was

14   in this case?

15   A.      Based on this information?

16   Q.      Based on the document in front of

17   you, yes.

18   A.      I would say that Grace Lawrence

19   was the defendant.

20   Q.      And her information is on the top

21   right of this form?

22   A.      Yes.

23   Q.      And was a Thomas, it says here,

24   Froneer or Frommer.  He was the plaintiff?

153

NANCY CERBUS

1       A.      Yes.

2       Q.      Directing your attention to the

3   third entry or the third line of data

4   under court activity.

5       A.      Yes.

6       Q.      Do you see that there are two

7   bits of information underlined on the

8   document that I'm showing you?

9       A.      I do, yes.

10      Q.      You see that says judge for DF,

11  D-F?

12      A.      Yes.

13      Q.      2951?

14      A.      Yes.

15      Q.      Do you interpret that to be a

16  judgment for the defendant?

17      A.      Yes.

18      Q.      Next to it, the other item

19  underlined is judgment for DF/CNT.  What

20  do you interpret that to mean?

21      A.      Judgment for defendant/counter.

22      Q.      On her counter claim?

23              MR. LUCKMAN:  Objection.

24  BY MR. SOUMILAS:


KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

154

NANCY CERBUS

1    Q.    Do you interpret that to mean

2    that it's a judgment on the defense

3    counter claim?

4    A.    Yes; however, the Hearing No. 2

5    which was on 7/31/96, there's a Hearing

6    No. 1 on 7/31/96 that also says that it

7    was withdrawn without prejudice.

8    Q.    I'm sorry, could you show me

9    where you're looking at on the form?

10    A.    We're looking at Hearing No. 2.

11    Q.    Yes.

12    A.    Right above it it says, Hearing

13    No. 1.  The disposition is withdrawn

14    without prejudice.

15    Q.    Okay.

16    A.    So I would interpret this as

17    meaning that on this date, 7/31/96

18    something is unique about this case

19    because it doesn't make sense, because it

20    says that the case has been withdrawn and

21    then also it says that there is a judgment

22    for defendant.

23    Q.    I understand that.  Based on the

24    training that you give to employees and

155
NANCY CERBUS

1    independent contractors, how would this

2    type of information from the Philadelphia

3    Municipal Court be coded as a judgment?

4                    MR. LUCKMAN:  Object to the

5    form.

6    BY MR. SOUMILAS:

7    Q.        Do you understand the question,

8    ma'am?

9    A.        I do hear your question.  Now,

10    what you'll need to remember is that when

11    Nicholas goes to the court, he pulls the

12    original copies, so he's not looking at

13    this.  This is what the people at the

14    court -- they're terminal looks like.

15    Q.        Okay.

16    A.        So he wouldn't be looking at this

17    sheet anyway.

18    Q.        I understand that.  So to answer

19    my question, your employees typically

20    would not be entering data into your

21    system based on this sheet?

22    A.        No.

23    Q.        They would be looking at the

24    court certified records to enter the data?

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

156
NANCY CERBUS

1    A.      Yes.

2    Q.      Have you seen the court certified

3    records in this case?

4    A.      Yes.

5    Q.      And this is what Nick Palmer sent

6    to you in July of 2003?

7    A.      Yes.

8    Q.      And to your knowledge -- I'm

9    sorry, I think you've testified you still

10   don't know what those records -- you don't

11   recall, sitting here today, what those

12   records say?

13   A.      That's correct.

14   Q.      And would you interpret this

15   particular record to say that there is a

16   judgment against Ms. Lawrence?

17              MR. LUCKMAN:  Objection.

18              THE WITNESS:   I don't

19   think you can interpret that.

20   BY MR. SOUMILAS:

21   Q.      But you said you were concerned

22   that it says withdrawn without prejudice,

23   correct?

24   A.      Right.

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

157
NANCY CERBUS

1   Q.      And you also saw that it's a

2   judgment for the defendant?

3   A.      That's correct.

4   Q.      So would you agree with me that

5   you cannot reasonably interpret this

6   record to be a judgment against

7   Ms. Lawrence?

8                MR. LUCKMAN:  Objection to

9   the form.

10  BY MR. SOUMILAS:

11  Q.      I think you testified to that

12  earlier, but if I'm mistaken, let me know.

13  A.      Sorry, what is your question?

14  Q.      Could you reasonably interpret

15  this -- I understand your concern about

16  its ambiguity, but regardless of how you

17  interpret the ambiguity, could it possibly

18  under any reasonable reading be a judgment

19  against Ms. Lawrence?

20                MR. LUCKMAN:  Object to the

21  form.

22  BY MR. SOUMILAS:

23  Q.      You can answer the question.

24  A.      Could it be a judgment against

NANCY CERBUS

1    Grace Lawrence?

2    Q.    This document in front of you,

3    yes.

4    A.    Sure, it could be.

5    Q.    It could be.  Could you explain

6    to me how you would interpret this

7    document to mean that it's a judgment

8    against Ms. Lawrence?

9    A.    Because she's listed as a

10   defendant and there is a dollar amount.

11   Q.    Would you agree with me though

12   that under Hearing 2 it says judgment for

13   the defendant?  You've already testified

14   about that.

15   A.    Right.

16   Q.    And it also says next to that,

17   judgment for defendant on what you've

18   interpreted to be the counter claim and

19   it's abbreviated CNT?

20   A.    Right.

21   Q.    If it's a judgment for the

22   defendant on the counter claim, how could

23   it be against her?

24            MR. LUCKMAN:  Objection.

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

159
NANCY CERBUS

1                    THE WITNESS:  Because she's

2          listed as the defendant still.

3          BY MR. SOUMILAS:

4          Q.      So because she's listed as the

5          defendant, you believe that the judgment

6          could be against her?

7          A.      No.

8          Q.      Could you explain to me why you

9          believe the judgement could be against

10         her?

11                   MR. LUCKMAN:  Could you

12         explain again?

13                   MR. SOUMILAS:  Yes, because

14         I apparently haven't understood it yet.

15                   THE WITNESS:  You asked

16         me -- why don't you ask me again.

17         BY MR. SOUMILAS:

18         Q.      My question is, looking at this

19         document, would you agree with me that you

20         cannot reasonably conclude that this is a

21         judgment against Ms. Lawrence?

22                   MR. LUCKMAN:  Object to the

23         form.

24                   THE WITNESS:   If I look at

160

NANCY CERBUS

1        this document, I would, and our employees

2        or contractors would probably state that

3        there's something odd about this case.

4        You cannot determine who the judgment is

5        against or if the case is open or if it's

6        been dismissed or withdrawn.

7        BY MR. SOUMILAS:

8        Q.       Why is there something odd about

9        the case?

10       A.       Because one, there's a counter

11       claim filed.  Two, there's a Hearing 1, a

12       Hearing 2 and then there's also an appeal.

13       Q.       So you're saying that there's

14       something unusual or odd, to use your

15       word, about this case because there was a

16       counter claim, number one, and number two,

17       it's the procedural history that you just

18       summarized, a first hearing, a second

19       hearing and then an appeal?

20       A.       Yes.

21       Q.       So those things make it unusual?

22       A.       Yes.  And there's something else,

23       Hearing No. 3, which I wouldn't even know

24       what unusual something see transcription

161
NANCY CERBUS

1    or whatever.

2    Q.    Okay.  Is there anything else

3    that in your opinion makes this case as

4    it's summarized in this Municipal Court

5    docket unusual or odd?

6              MR. LUCKMAN:  Object to the

7    form.

8              THE WITNESS:   I'm sorry,

9    what was your question?

10   BY MR. SOUMILAS:

11   Q.    You've explained to me a couple

12   of reasons why you think the disposition

13   of this case is odd.  I'm wondering

14   whether there are any other reasons as you

15   look at this document that would lead you

16   to that conclusion that it's an odd or

17   unusual case?

18   A.    I would say yes, because it says

19   that on the top that it's disposed and it

20   doesn't really say anything where it was

21   disposed or -- it's just very odd.

22   Q.    I'm sorry, where are you looking

23   at?

24              MR. LUCKMAN:  The top line.

162

NANCY CERBUS

1                THE WITNESS:  The top line.

2        It says disposed.

3        BY MR. SOUMILAS:

4        Q.        It says, The case has been

5        disposed?

6        A.        Right.

7        Q.        Okay.

8        A.        And then if you look at the

9        docket entries or the court activities as

10       it's listed, it doesn't really look like

11       it's closed other than the appeal that was

12       filed.

13       Q.        Okay.  Any other reason?

14       A.        Probably not.

15       Q.        Now, I understand all of the

16       reasons why you told me why you think the

17       case is unusual or odd.  My question

18       nevertheless is, given all of those

19       reasons, do you think it's reasonable for

20       someone to conclude that this is a

21       judgment against Ms. Lawrence?

22                MR. LUCKMAN:  Object to the

23       form.

24                THE WITNESS:   I don't know

NANCY CERBUS

1      if it's reasonable to conclude that.

2      BY MR. SOUMILAS:

3      Q.      Would you agree with me that

4      nowhere on this form does it says that

5      it's a judgment for the plaintiff,

6      Mr. Frommer or Froneer?

7                    MR. LUCKMAN:  Objection.

8                    THE WITNESS:   It doesn't

9      say that it's a judgment for him, no.

10     BY MR. SOUMILAS:

11     Q.      You told me that Trans Union

12     never forwarded this document to you or to

13     your company directly; is that correct?

14     A.      You asked me if I saw this before

15     and I said yes.  The detail that I saw was

16     on two pages.

17     Q.      And I remember that.  I just

18     wanted to confirm because my memory is not

19     always perfect.  Based on your review of

20     all of the information that you've

21     gathered concerning this case, do you know

22     whether during the dispute process Trans

23     Union forwarded this form to you?

24     A.      No, they wouldn't have.


KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

                                                    164
                              NANCY CERBUS


     1      Q.      You said your document, the one

     2    that you saw from Mr. Palmer in May of

     3    2003 had a second page?

     4      A.      Yes.

     5      Q.      Do you remember anything about

     6    that second page?

     7      A.      I don't.

     8      Q.      Do you think you still have a

     9    copy of that second page?

    10      A.      I'm sure I do, yes.

    11      Q.      Just a final line of questions

    12    that I want to ask you has to do with your

    13    business relationship with Trans Union,

    14    okay?

    15              As a Vice President of your

    16    company, are you aware of any agreements

    17    between your company and Trans Union that

    18    say or that provide that Trans Union can't

    19    sue you for money if they're found liable

    20    in this case?

    21              MR. LUCKMAN:   Objection.

    22              THE WITNESS:   I don't

    23    know.

    24    BY MR. SOUMILAS:


                        KAPLAN, LEAMAN AND WOLFE
                             (215) 922-7112

NANCY CERBUS

1    Q.       Do you know whether if, let's say

2    Ms. Lawrence wins her case and Trans Union

3    is liable, they can turn around and sue

4    you for making a mistake?

5                 MR. LUCKMAN:  Objection.

6                 THE WITNESS:   I don't

7    know.  And . . .

8    BY MR. SOUMILAS:

9    Q.       And what?  You don't want to find

10   out.

11               Would you know who within

12   your company would be familiar with such

13   an indemnity contribution agreement?

14   A.       I do, yes.

15   Q.       Who would that be?

16   A.       It would be Steven Craig.

17   Q.       The president?

18   A.       Yes.

19   Q.       Based on all of the information

20   we reviewed here today and the information

21   that you've reviewed in your files that we

22   still haven't seen, do you know how it

23   came about that Trans Union reported a

24   $2,951 judgment against Ms. Lawrence on

                       NANCY CERBUS


1    her credit report?

2    A.      Yes.

3    Q.      You do know?

4    A.      Yes.

5    Q.      How did it come about?

6    A.      Superior collects the information

7    and provides it to the credit companies.

8    Q.      Okay.

9    A.      So the credit companies would

10   then append it to the consumer credit

11   report based on the information that

12   Superior provides.

13   Q.      Okay.  So are you saying that if

14   there was any type of a mistake made or if

15   anybody is at fault, it would be Superior?

16              MR. LUCKMAN:  Object to the

17   form.

18   BY MR. SOUMILAS:

19   Q.      I'm sorry, I want to make the

20   question clear because I wasn't asking you

21   a question about procedure.  I wasn't

22   asking you a question about how

23   procedurally does the information get from

24   A to B.  I'm asking you if you take my

167

NANCY CERBUS


1    client at her word that she doesn't owe

2    this $2,951 judgment, do you know who

3    screwed up along the way in having Trans

4    Union report it against her?

5                   MR. LUCKMAN:  Object to the

6    form.

7                   MR. SOUMILAS:  Fair enough.

8    BY MR. SOUMILAS:

9    Q.      You could answer it if you

10   understand it.

11   A.      I'm sorry, what was the question?

12   Q.      If you give me the benefit of the

13   doubt that Ms. Lawrence does not owe the

14   judgment of $2,951, let's assume that for

15   the sake of this question, do you know

16   what errors or who's at fault along the

17   way in having Trans Union at the end of

18   the day report it as being a judgment

19   against her?

20                   MR. LUCKMAN:  Object to the

21   form.

22   BY MR. SOUMILAS:

23   Q.      Based on all of the information

24   that you reviewed, do you know how that

168

NANCY CERBUS

1    happened?

2    A.       Other than a blanket statement

3    which I can tell you.

4    Q.       Okay.

5                  MR. LUCKMAN:  I think she's

6    answered the question.

7    BY MR. SOUMILAS:

8    Q.       What is the blanket statement?

9    A.       What is your question, again?

10                 MR. SOUMILAS:  I'm afraid

11   I'm confusing her.

12                 MR. LUCKMAN:  Just for my

13   benefit, it sounds like she's answered

14   what happened and you're asking it again.

15   I think maybe it's confusing.

16                 MR. SOUMILAS:  Yeah, I

17   think I'm also confused by it because my

18   question has to do with, not the

19   procedure, not how does it come about that

20   Trans Union publishes information about a

21   person.  We went through all that and you

22   told me step-by-step how that happens, so

23   I understand all that.

24                 But what I'm asking you now

169

NANCY CERBUS

1    is that if that information was false or

2    inaccurate, take that as a given for now

3    for the sake of my question, that if that

4    information that Trans Union published

5    about Grace Lawrence owing $2,951 judgment

6    was just wrong, do you know how it came

7    about that the mistake was made?

8                MR. LUCKMAN:  Object to the

9    form; asked and answered.

10                THE WITNESS:  So you're

11   asking me to speculate?

12   BY MR. SOUMILAS:

13   Q.       No, no.  I'm not asking you to

14   speculate.  If the answer is you don't

15   know, the answer is you don't know.  But

16   if you do know based on all the documents

17   that you reviewed as to what happened, you

18   let me know.  If you disagree with me and

19   you tell me that the judgment is against

20   her, that's fine also, but I want to know

21   based on everything you reviewed what do

22   you think happened?

23   A.       What do I think happened?

24   Q.       Yes.

170

NANCY CERBUS

1                MR. LUCKMAN:  I'll object.

2                THE WITNESS:  I don't know

3        because I would have to look at everything

4        procedurally based upon --

5        BY MR. SOUMILAS:

6        Q.      But based on everything that

7        we've reviewed here today and nothing

8        more, could you give an opinion one way or

9        the other as to whether an error was made

10       along the way?

11               MR. LUCKMAN:  Object to the

12       form.

13               THE WITNESS:  I wouldn't be

14       able to.

15       BY MR. SOUMILAS:

16       Q.      I'm not going to press you any

17       longer because that's a fair answer.  If

18       you don't know, you don't know, okay.

19               The only final thing I want

20       to say is, I want to thank you for your

21       time.  It look longer than I told you it

22       would take, but in measure it was because

23       this deposition revealed that you have in

24       your possession an awful lot of documents

171

NANCY CERBUS

1      that we don't have in this case and this

2      case is fairly far along in the litigation

3      process, so I would again make a request

4      of you that you take a look at my

5      subpoena, determine whether you think

6      those files that you have fit my request

7      and give us copies of those files by

8      mailing them or sending them to me

9      directly.  I will send you a follow-up

10     letter asking you for that.  You don't

11     have to turn them over now if you don't

12     feel that that's appropriate, but I'll

13     tell you that if we don't get them, our

14     only recourse is to go to the Federal

15     court and ask for help, okay?

16     A.      Yeah.

17     Q.      Do you understand that?

18     A.      Yes, I do.

19            MR. SOUMILAS:  Thank you,

20     Ms. Cerbus.

21            Any questions?

22            MR. LUCKMAN:  No questions.

23            - - -

24            (Whereupon, the deposition

KAPLAN, LEAMAN AND WOLFE
(215) 922-7112

172
NANCY CERBUS

1      of NANCY CERBUS was concluded at

2      1:38 p.m.)

3                         -   -   -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

173

```
 1              C E R T I F I C A T I O N

 2

 3

 4

 5          I hereby certify that the

 6      proceedings and evidence noted are

 7      contained fully and accurately in the

 8      stenographic notes taken by me upon the

 9      foregoing matter on Friday, October 24,

10      2003, and that this is a correct

11      transcript of the same.

12

13

14

15

                Nicolle J. D'Amico
16              Court Reporter and Notary Public

17

18          (The foregoing certification of this

19      transcript does not apply to any

20      reproduction of the same by any means,

21      unless under the direct control and/or

22      supervision of the certifying reporter.)

23

24
```